Fred W. Schwinn (SBN 225575)
CONSUMER LAW CENTER, INC.
12 South First Street, Suite 1014
San Jose, California  95113-2418
Telephone Number: (408) 296-6100
Facsimile Number: (408) 294-6100
Email Address: fred.schwinn@sjconsumerlaw.com

Balám O. Letona (SBN 229642)
LAW OFFICE OF BALÁM O. LETONA, INC.
1347 Pacific Avenue, Suite 203
Santa Cruz, California  95060-3940
Telephone Number: (831) 421-0200
Facsimile Number: (831) 621-9659
Email: letonalaw@gmail.com

Attorneys for Plaintiff
CARLOS H. PEREZ

**ORIGINAL FILED**

APR 1 5 2008

Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose

ADR

E-FILING

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

**C08    01972**

HRL

CARLOS H. PEREZ, individually and on behalf of the general public,

                              Plaintiff,

        v.

GMAC MORTGAGE USA CORPORATION, A/K/A GMAC MORTGAGE, LLC, a Delaware corporation;  MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware corporation;  EXECUTIVE TRUSTEE SERVICES, LLC, a Delaware limited liability company;  GREENPOINT MORTGAGE FUNDING, INC., a New York corporation;  ANDRUS & ASSOCIATES, INC., a California corporation;   PAUL RAY ANDRUS, individually and in his official capacity; HOMECOMINGS FINANCIAL, LLC, a Delaware limited liability company; COUNTRYWIDE HOME LOANS, INC., a New York corporation;  SOUTH PACIFIC FINANCIAL CORPORATION, a California corporation;  RESIDENTIAL MORTGAGE CAPITAL, D/B/A FIRST

Case No.

**COMPLAINT FOR DAMAGES, INJUNCTIVE AND DECLARATORY RELIEF**

**JURY TRIAL DEMANDED**

1  SECURITY LOAN; a California
2  corporation;  JAMES JOHN CHAPMAN,
   individually and in his official capacity;
3  LUIS G. BARRIOS, individually and in his
   official capacity;  ELIZABETH P.
4  CAMPOS, individually and in her official
   capacity; and DOES 1 through 20,
5  inclusive,

6                                    Defendants.

7

8                          **INTRODUCTION**

9        1.    Predatory and abusive lending practices inflict wide-ranging damage on society:

10  borrowers and their families can be devastated by these practices, which often result in nonjudicial

11
12  foreclosure of the borrowers' homes.  Defendants in this action preyed upon Plaintiff through a series of

13  predatory and abusive lending practices.  Plaintiff seeks rescission of the predatory loans in which he is

14  trapped, equitable relief and monetary damages.

15        2.    Plaintiff institutes this action to enforce his right to rescind four (4) consumer credit

16
17  transactions, to void Defendants' security interest in Plaintiff's home and to recover actual damages,

18  statutory damages, attorney fees, and the costs of this action against Defendants for multiple violations

19  of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*., ("TILA"), and Federal Reserve Board Regulation

20  Z, 12 C.F.R. § 226, promulgated pursuant thereto.  Plaintiff also institutes this action for violations of

21  the Real Estate and Settlement Procedures Act, 12 U.S.C. § 2601 *et seq*., and Federal Reserve Board

22
23  Regulation X, 24 C.F.R. § 3500 *et seq*., Elder Abuse and Dependent Adult Civil Protection Act, Cal.

24  Welf. & Inst. Code § 15610 *et seq*., and Cal. Civ. Code § 1632.

25                          **JURISDICTION**

26        3.    Jurisdiction is conferred upon this Court pursuant to 15 U.S.C. § 1640(e) and 28

27  U.S.C. §§ 1331 and 1337 in that the claims alleged herein arise under the laws of the United States.

28

- 2 -
COMPLAINT

This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiff's state law claims because those claims are related to Plaintiff's federal claims and arise out of a common nucleus of related facts and form part of the same case or controversy under Article III of the United States Constitution.

4. The Court has jurisdiction over Plaintiff's action for declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by 28 U.S.C. § 2203 and Rule 65 of the Federal Rules of Civil Procedure.

5. This action arises out of Defendants' violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. ("TILA").

## VENUE

6. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Venue is also proper in this judicial district in that Defendants transact business in this judicial district and the violations of the TILA complained of occurred in this judicial district.

## INTRADISTRICT ASSIGNMENT

7. This lawsuit should be assigned to the San Jose Division of this Court because a substantial part of the events or omissions which gave rise to this lawsuit occurred in Santa Clara County.

## PARTIES

8. Plaintiff, CARLOS H. PEREZ (hereinafter "Plaintiff"), is a 71 year old frail elderly man, widowed, who owns his home and resided at 551 Loumena Lane, San Jose, California for the past 28 years. Plaintiff suffers from health problems and conditions associated with aging and has difficulties with his hearing and vision. It is believed that Plaintiff also suffers from a mild form of

dementia.  Plaintiff is a natural Hispanic who traces his national origin to Guatemala.  At all relevant times alleged in this Complaint, Plaintiff spoke broken English and was not fluent in reading or writing in the English language.  Accordingly, all oral communications alleged in this Complaint occurred in the Spanish language, except where specifically alleged otherwise.  Plaintiff is on a fixed income of approximately $800 per month, supplemented by the Social Security Disability benefits received by his mentally disabled adult son for whom Plaintiff is the primary caregiver, and by periodic donations he receives from his family members.  Plaintiff is a natural person and a "consumer" within the meaning of 15 U.S.C. § 1602(h) and Regulation Z § 226.2(a)(11).  Plaintiff is a "senior citizen" within the meaning of Cal. Civil Code § 1761(f).

9.    Defendant, GMAC MORTGAGE USA CORPORATION, A/K/A GMAC MORTGAGE, LLC (hereinafter "GMAC"), is a Delaware corporation engaged in the business of consumer mortgage lending in this state with its principal place of business located at: 100 Witmer Road, Horsham, Pennsylvania 19044-0963.  GMAC may be served as follows: GMAC Mortgage USA Corporation, c/o Corporation Service Company, 2730 Gateway Oaks Drive, Suite 100, Sacramento, California  95833-3503.  At all relevant times alleged in this Complaint GMAC regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed.  Plaintiff is informed, believes and thereon alleges, that GMAC is a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).  At all relevant times alleged in this Complaint, GMAC was engaged in the business of "mortgage lending" as defined by Cal. Finance Code § 50003(n) and was licensed by the California Department of Corporations (Lic. No. 4130026).  At all relevant times alleged in this Complaint, GMAC was a "finance lender" as defined by Cal. Finance Code § 22009 and was licensed by the California Department of Corporations (Lic. No. 603A285).  At all relevant times alleged in this Complaint, GMAC was licensed by the

California Department of Real Estate ("DRE") (Lic. No. 01776965) and was a "licensee" as defined by Cal. Finance Code § 22007. Plaintiff is informed, believes and thereon alleges, that HOMECOMINGS is and was at all relevant times alleged in this Complaint, a wholly owned subsidiary of GMAC.

10. Defendant, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (hereinafter "MERS"), is a Delaware corporation engage in the residential mortgage business in this state with its principal place of business located at: 1595 Spring Hill Road, Suite 310, Vienna, Virginia 22182. MERS may be served as follows: Mortgage Electronic Registration Systems, Inc., c/o The Prentice-Hall Corporation System, Inc., 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808-1645. Plaintiff is informed, believes and thereon alleges, that MERS has no beneficial or financial interest in the subject property or deeds of trust, but holds legal title as nominee for other Defendants named in this action. MERS has been named in this action solely for the purpose of clearing title to the subject property.

11. Defendant, EXECUTIVE TRUSTEE SERVICES, LLC ("EXECUTIVE"), is a Delaware limited liability company engage in the residential mortgage business in this state with its principal place of business located at: 2255 North Ontario Street, Suite 400, Burbank, California 91504-3120. EXECUTIVE may be served as follows: Executive Trustee Services, LLC, c/o Corporation Service Company, Agent for Service for Service of Process, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808-1645. Plaintiff is informed, believes and thereon alleges, that EXECUTIVE is an instrumentality of GMAC and other Defendants named in this action. EXECUTIVE has been named in this action solely for the purpose of clearing title to the subject property.

12. Defendant, GREENPOINT MORTGAGE FUNDING, INC. (hereinafter "GREENPOINT") is a New York corporation engaged in the business of extending credit to persons in residential real estate transactions in this state with its principal place of business located at: 100 Wood

Hollow Drive, Novato, California 94945-1424. GREENPOINT may be served as follows: Greenpoint Mortgage Funding, Inc., c/o Corporation Service Company, 2730 Gateway Oaks Drive, Suite 100, Sacramento, California 95833-3503. At all relevant times alleged in this Complaint GREENPOINT regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed. Plaintiff is informed, believes and thereon alleges, that GREENPOINT is a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17). At all relevant times alleged in this Complaint, GREENPOINT was a "finance lender" as defined by Cal. Finance Code § 22009 and was licensed by the California Department of Corporations (Lic. No. 6052183). At all relevant times alleged in this Complaint, GREENPOINT was engaged in the business of "mortgage lending" as defined by Cal. Finance Code § 50003(n) and was licensed by the California Department of Corporations (Lic. No. 4150022). At all relevant times alleged in this Complaint, GREENPOINT was licensed by the California Department of Real Estate ("DRE") (Lic. No. 01263629) and was a "licensee" as defined by Cal. Finance Code § 22007.

13. Defendant, ANDRUS & ASSOCIATES, INC. (hereinafter "ANDRUS & ASSOCIATES"), is an California corporation engaged in the business of brokering consumer mortgage loans in this state with its principal place of business located at: 39650 Liberty Street, Suite 410, Fremont, California 94538-2261. ANDRUS & ASSOCIATES may be served as follows: Andrus & Associates, Inc., c/o Paul Andrus, Agent for Service of Process, 39650 Liberty Street, Suite 410, Fremont, California 94538-2261. Plaintiff is informed, believes and thereon alleges, that ANDRUS & ASSOCIATES was and is licensed by the California Department of Real Estate as a real estate broker by designating an officer who held a valid real estate broker license. Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, ANDRUS & ASSOCIATES' only designated officer licensed by the California Department of Real Estate was Defendant, PAUL RAY

ANDRUS. Plaintiff is informed and believes that ANDRUS & ASSOCIATES' business activity within Santa Clara County included the brokerage of real estate and representation of parties in residential real estate transactions.  At all relevant times alleged in this Complaint, ANDRUS & ASSOCIATES was licensed by the California Department of Real Estate ("DRE") (Lic. No. 01316911) and was a "licensee" as defined by Cal. Finance Code § 22007.

14.    Defendant, PAUL RAY ANDRUS (hereinafter "ANDRUS"), is a natural person and is, or was at all relevant times alleged in this Complaint, an agent, employee, officer or director of ANDRUS & ASSOCIATES.  ANDRUS may be served at his business address at:  Paul Ray Andrus, Andrus & Associates, Inc., 39650 Liberty Street, Suite 410, Fremont, California  94538-2261 and at his residence address at:  Paul Ray Andrus, 38669 Spetti Court, Fremont, California  94536-4344.  Plaintiff is informed, believes and thereon alleges, that ANDRUS, as the designated officer of ANDRUS & ASSOCIATES, was responsible for the training, supervision and control of such activities requiring a DRE license and which were conducted on behalf of ANDRUS & ASSOCIATES by its officers and employees.  At all relevant times alleged in this Complaint, ANDRUS was acting as a "broker" as defined by Cal. Finance Code § 22004.  At all relevant times alleged in this Complaint, ANDRUS was licensed by the California Department of Real Estate ("DRE") (Lic. No. 01202245) and was a "licensee" as defined by Cal. Finance Code § 22007.

15.    Defendant,    HOMECOMINGS    FINANCIAL,    LLC    (hereinafter "HOMECOMINGS"), is a Delaware limited liability company engaged in the business of consumer mortgage lending in this state with its principal place of business located at: 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota  55437-1059.  HOMECOMINGS may be served as follows: Homecomings Financial, LLC, c/o Corporation Service Company, 2730 Gateway Oaks Drive, Suite 100, Sacramento, California  95833-3503.  At all relevant times alleged in this Complaint

HOMECOMINGS regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed. Plaintiff is informed, believes and thereon alleges, that HOMECOMINGS is a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17). At all relevant times alleged in this Complaint, HOMECOMINGS was engaged in the business of "mortgage lending" as defined by Cal. Finance Code § 50003(n) and was licensed by the California Department of Corporations (Lic. No. 413007). At all relevant times alleged in this Complaint, HOMECOMINGS was a "finance lender" as defined by Cal. Finance Code § 22009 and was licensed by the California Department of Corporations (Lic. No. 6035717). Plaintiff is informed, believes and thereon alleges, that HOMECOMINGS is and was at all relevant times alleged in this Complaint, a wholly owned subsidiary of GMAC.

16. Defendant, COUNTRYWIDE HOME LOANS, INC. (hereinafter "COUNTRYWIDE"), is a New York corporation corporation engaged in the business of consumer mortgage lending in this state with its principal place of business located at: 4500 Park Granada, Calabasas, California 91302-1613. COUNTRYWIDE may be served as follows: Countrywide Home Loans, Inc., c/o The Prentice-Hall Corporation System, Inc., 2730 Gateway Oaks Drive, Suite 100, Sacramento, California 95833-3503. At all relevant times alleged in this Complaint COUNTRYWIDE regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed. Plaintiff is informed, believes and thereon alleges, that HOMECOMINGS is a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17). At all relevant times alleged in this Complaint, COUNTRYWIDE was engaged in the business of "mortgage lending" as defined by Cal. Finance Code § 50003(n) and was licensed by the California Department of Corporations (Lic. No. 4130020). At all relevant times alleged in this Complaint, COUNTRYWIDE was licensed by the California Department of Real Estate ("DRE") (Lic.

No. 00351782) and was a "licensee" as defined by Cal. Finance Code § 22007.

17.    Defendant, SOUTH PACIFIC FINANCIAL CORPORATION (hereinafter "SOUTH PACIFIC") is a California corporation engaged in the business of extending credit to persons in residential real estate transactions in this state with its principal place of business located at: 10737 Laurel Street, Suite 200, Rancho Cucamonga, California 91730-3837. SOUTH PACIFIC may be served as follows: South Pacific Financial Corporation, c/o Timothy Cahill, Agent for Service of Process, 2548 Brennen Way, Fullerton, California 92835-4217. At all relevant times alleged in this Complaint SOUTH PACIFIC regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed. Plaintiff is informed, believes and thereon alleges, that SOUTH PACIFIC is a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17). At all relevant times alleged in this Complaint, SOUTH PACIFIC was a "finance lender" as defined by Cal. Finance Code § 22009 and was licensed by the California Department of Corporations (Lic. No. 6032415). At all relevant times alleged in this Complaint, SOUTH PACIFIC was engaged in the business of "mortgage lending" as defined by Cal. Finance Code § 50003(n) and was licensed by the California Department of Corporations (Lic. No. 4130023). At all relevant times alleged in this Complaint, SOUTH PACIFIC was licensed by the California Department of Real Estate ("DRE") (Lic. No. 00858497) and was a "licensee" as defined by Cal. Finance Code § 22007.

18.    Defendant, RESIDENTIAL MORTGAGE CAPITAL, D/B/A FIRST SECURITY LOAN (hereinafter "RESIDENTIAL"), is an California corporation engaged in the business of brokering consumer mortgage loans in this state with its principal place of business located at: 900 Mission Avenue, San Rafael, California 94901-2971. RESIDENTIAL may be served as follows: Residential Mortgage Capital, c/o James J. Chapman, Agent for Service of Process, 900 Mission

Avenue, San Rafael, California 94901-2971. Plaintiff is informed, believes and thereon alleges, that RESIDENTIAL was and is licensed by the California Department of Real Estate as a real estate broker by designating an officer who held a valid real estate broker license. Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, RESIDENTIAL's only designated officer licensed by the California Department of Real Estate was Defendant, JAMES JOHN CHAPMAN. Plaintiff is informed and believes that RESIDENTIAL's business activity within Santa Clara County included the brokerage of real estate and representation of parties in residential real estate transactions. At all relevant times alleged in this Complaint, RESIDENTIAL was licensed by the California Department of Real Estate ("DRE") (Lic. No. 01198426) and was a "licensee" as defined by Cal. Finance Code § 22007.

19.     Defendant, JAMES JOHN CHAPMAN (hereinafter "CHAPMAN"), is a natural person and is, or was at all relevant times alleged in this Complaint, an agent, employee, officer or director of RESIDENTIAL. CHAPMAN may be served at his business address at: James John Chapman, Residential Mortgage Capital, 900 Mission Avenue, San Rafael, California 94901-2971 and at his residence address at: James John Chapman, 42 Cypress Road, Point Reyes Station, California 94956. Plaintiff is informed, believes and thereon alleges, that CHAPMAN, as the designated officer of RESIDENTIAL, was responsible for the training, supervision and control of such activities requiring a DRE license and which were conducted on behalf of RESIDENTIAL by its officers and employees. At all relevant times alleged in this Complaint, CHAPMAN was acting as a "broker" as defined by Cal. Finance Code § 22004. At all relevant times alleged in this Complaint, CHAPMAN was licensed by the California Department of Real Estate ("DRE") (Lic. No. 00442386) and was a "licensee" as defined by Cal. Finance Code § 22007.

20.     Defendant, LUIS G. BARRIOS (hereinafter "BARRIOS"), is a natural person and

is, or was at all relevant times alleged in this Complaint, an agent, employee, officer or director of ANDRUS & ASSOCIATES.  BARRIOS may be served at his business address at:  Luis G. Barrios, Andrus & Associates, Inc., 39650 Liberty Street, Suite 410, Fremont, California  94538-2261 and at his residence address at:  Luis G. Barrios, 235 Reflections Drive, #16, San Ramon, California  94583-4734.  Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, BARRIOS was employed by and acting as an agent of ANDRUS.  Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, BARRIOS also was employed by and acting as an agent of CHAPMAN. Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, BARRIOS was not licensed by the California Department of Real Estate ("DRE") but was acting as a residential mortgage loan broker.

21.    Defendant, ELIZABETH P. CAMPOS (hereinafter "CAMPOS"), is a natural person and is, or was at all relevant times alleged in this Complaint, an agent, employee, officer or director of ANDRUS & ASSOCIATES.  CAMPOS may be served at her business address at: Elizabeth P. Campos, Andrus & Associates, Inc., 39650 Liberty Street, Suite 410, Fremont, California 94538-2261 and at her residence address at:  Elizabeth P. Campos, 1386 Kubicek Way, Brentwood, California  94513-2270.  Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, CAMPOS was employed by and acting as an agent of ANDRUS.  Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, CAMPOS was also employed by and acting as an agent of CHAPMAN. At all relevant times alleged in this Complaint, CAMPOS was commissioned as a notary in the State of California.

22.    The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, and each of them, are unknown to Plaintiff at this time, and Plaintiff therefore sues said Defendants by such fictitious names.  Plaintiff is informed,

believes and thereon alleges, that at all relevant times alleged in this Complaint, Defendants DOES 1 through 10, inclusive, are natural persons, limited liability companies, corporations or business entities of unknown form that have or are doing business in the state of California.  Plaintiff will seek leave of the Court to replace the fictitious names of these Doe Defendants with their true names when they are discovered by Plaintiff.

23.    Plaintiff is informed, believes and thereon alleges, that DOES 11 through 20, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and/or are assignees to the predatory loans which are the subject of this action.  Plaintiff will seek leave of the Court to replace the fictitious names of these entities with their true names when they are discovered by Plaintiff.

24.    At all relevant times alleged in this Complaint, Defendants, and each of them, were engaged in the business of promoting, marketing, distributing and selling the predatory loans that are the subject of this Complaint, throughout the state of California, including Santa Clara County.

25.    Plaintiff is informed, believes and thereon alleges, that each and all of the aforementioned Defendants are responsible in some manner, either by act or omission, strict liability, fraud, deceit, fraudulent concealment, negligence, respondeat superior, breach of contract or otherwise, for the occurrences herein alleged, and that Plaintiff's injuries, as herein alleged, were proximately caused by the conduct of Defendants.

26.    Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, each of the Defendants sued herein were the agent, servant, employer, joint venturer, partner, division, owner, subsidiary, alias, assignee and/or alter-ego of each of the remaining Defendants and were at all times acting within the purpose and scope of such agency, servitude, joint

venture, division, ownership, subsidiary, alias, alter-ego, partnership or employment and with the authority, consent, approval and ratification of each remaining Defendant.

27.    Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint, each Defendant was the co-conspirator, agent, servant, employee, assignee and/or joint venturer of each of the other Defendants and was acting within the course and scope of said conspiracy, agency, employment, assignment and/or joint venture and with the permission and consent of each of the other Defendants.

28.    Whenever reference is made in this Complaint to any act of any corporate or other business Defendant, that reference shall mean that the corporation or other business did the acts alleged in this Complaint through its officers, directors, employees, agents and/or representatives while they were acting within the actual or ostensible scope of their authority.

29.    At all relevant times alleged in this Complaint, each Defendant has committed the acts, caused others to commit the acts, ratified the commission of the acts, or permitted others to commit the acts alleged in this Complaint and has made, caused, ratified, or permitted others to make, the untrue or misleading statements alleged in this Complaint.  Whenever reference is made in this Complaint to any act of Defendants, such allegation shall mean that each Defendant acted individually and jointly with the other Defendants.  HOMECOMINGS, COUNTRYWIDE, SOUTH PACIFIC, RESIDENTIAL, CHAPMAN, BARRIOS and CAMPOS shall be referred to collectively as "the SOUTH PACIFIC Parties."    GMAC, MERS, EXECUTIVE, GREENPOINT, ANDRUS & ASSOCIATES, ANDRUS, BARRIOS and CAMPOS shall be referred to collectively as "the GREENPOINT Parties."    The term "Defendants" wherever used in this Complaint shall mean all named defendants.

/ / /

**PREDATORY LENDING**

30.    There is no uniformly accepted definition of "predatory lending."  However, the United States Department of Housing and Urban Development ("HUD") has defined predatory lending as lending "involving deception or fraud, manipulation of borrowers through aggressive sales tactics, or taking unfair advantage of a borrower's lack of understanding about loan terms."[1] According to HUD, "[t]hese practices are often combined with loan terms that, alone or in combination, are abusive or make the borrower more vulnerable to abusive practices." *Id*.

31.    HUD and the United States General Accounting Office ("GAO") have identified various lending practices as predatory.   Since predatory lenders are constantly developing new techniques to take advantage of borrowers, any enumeration of predatory practices necessarily will be incomplete.   Nevertheless, it is generally accepted by the lending industry and government agencies that monitor that industry that predatory lending practices include: (a) engaging in aggressive, high-pressure and/or misleading sales tactics; (b) lending without regard to the borrower's ability to repay; (c) imposing excessive prepayment penalties that trap borrowers into predatory loans; (d) making misrepresentations or otherwise misleading borrowers about loan terms; (e) falsifying loan documents; (f) targeting low-income, elderly and minority borrowers for predatory lending campaigns; (g) charging excessive fees, points and interest rates unrelated to the borrower's credit/risk profile; (h) misleading borrowers about the borrower's credit/risk profile to steer borrowers to a higher-cost loan that is not justified by the borrower's true profile; and (i) causing borrowers to refinance loans multiple times over a short period of time without any economic gain to the borrowers.[2]   These and similar practices, individually and collectively, are referred to herein as "predatory lending" practices.

---

[1]    Curbing Predatory Home Mortgage Lending (June 2000), a joint report of the Department of Housing and Urban Development and the Treasury Task Force on Predatory Lending ("HUD Report") at 1. (Available online at: http://www.huduser.org/Publications/pdf/treasrpt.pdf)
[2]    HUD Report at 2; Federal and State Agencies Face Challenges in Combating Predatory Lending (January 2004), a report by the United States General Accounting Office ("GAO Report") at 3-4, 18-19.   (Available online at: http://www.gao.gov/new.items/d04280.pdf)

32.    Predatory lenders use prepayment penalties as a means to trap borrowers into loans with onerous terms.[3]   Borrowers cannot refinance and escape those onerous terms without incurring thousands of dollars in new fees or paying prepayment penalties, further stripping the equity from their homes.

33.    The practice of specifically targeting and aggressively soliciting protected class members, such as racial/ethnic minority populations, for predatory loan products is known as "reverse redlining."[4]

34.    Predatory lenders frequently deceive borrowers and engage in outright fraud through practices such as falsifying loan applications and settlement documents and forging signatures.[5] They also promise borrowers that if they accept a loan with a high interest rate, they can refinance for a lower interest rate after a short period at no cost.

35.    Another common predatory lending practice involves inflating property appraisals. When predatory lenders arrange or accept inflated appraisals, they induce borrowers to enter loans that exceed the value of their homes.  This traps the borrower into predatory loans and prevents them from selling their homes to pay off the mortgage loans because they cannot afford the large cash payment required to satisfy the deficiency between the sale price and the principal balance.   This practice benefits predatory lenders who collect closing costs on the loan(s) that otherwise should not have been made and by trapping borrowers into high rate loans that cannot be refinanced due to the lack of equity.

36.    Low-income minorities and the elderly are the primary victims of predatory lending practices.  Predatory lenders prey on low-income minority borrowers, particularly those who may not speak or read English, have little education, are financially unsophisticated and/or lack access to mainstream financial outlets.[6]

---

[3]  GAO Report at 19.
[4]  HUD Report at 72.
[5]  GAO Report at 19.
[6]  HUD Report at 22; GAO Report at 25.

37.    Predatory lending practices often lead homeowners into a cycle of refinancing, foreclosure, economic ruination and segregation from conventional credit sources.[7]   On a larger scale, when predatory lending practices are concentrated in specific areas -- as they frequently are -- communities suffer from destabilization through the loss of equity, distressed and vacant properties, and stifled economic development.[8]   This causes a depression in property values and requires entire neighborhoods to pay the price for the wrongful practices of unscrupulous lenders.

## FACTUAL ALLEGATIONS

38.    Plaintiff was born on April 17, 1936, in Guatemala.

39.    Plaintiff and his now deceased wife purchased the property located at 551 Loumena Lane, San Jose, California (hereinafter "the home") in 1980 for approximately $80,000.

40.    At all relevant times alleged in this Complaint, Plaintiff has resided in the home with his mentally disabled son.

41.    Plaintiff, as a senior citizen with limited education and income, but substantial equity in his home, was a prime target for predatory mortgage lenders and brokers.

42.    Because of his age, deteriorating mental faculties and inability to read and comprehend financial transactions written in the English language, Plaintiff has been a victim of a predatory lending practice known as "flipping."   Unscrupulous mortgage brokers and lenders induced Plaintiff to repeatedly refinance loans on his home with interest-only loans, charging high points and fees each time.   As a result of these predatory lending practices, over the course of a few short years, Plaintiff's house payments have increased substantially to the point where he can no longer make them, and the total debt owed on his home exploded to over $600,000 and the equity in his home was reduced as a result.

---

[7]  HUD Report at 74.
[8]  GAO Report at 20.

<u>The South Pacific Loans</u>

43.    Sometime in or about March of 2005, Plaintiff was solicited by BARRIOS to refinance his home loans.  BARRIOS explained that he could arrange a new home loan for Plaintiff and thereby reduce his interest rate to a "fixed 1%" and reduce his monthly mortgage payments by "at least $500."   Based on these representations, Plaintiff agreed to refinance his home with the SOUTH PACIFIC Parties (hereinafter the "South Pacific loans").

44.    Plaintiff and his wife were unsophisticated and unable to consummate real estate transactions without the assistance of real estate professionals.  Accordingly, Plaintiff and his wife relied on BARRIOS and the other SOUTH PACIFIC Parties when entering into the South Pacific loans.

45.    BARRIOS and the other SOUTH PACIFIC Parties knew or should have known that their conduct was directed towards a senior citizen.

46.    Plaintiff is informed, believes and thereon alleges that all of the documents related in any way to the South Pacific loans, including written contracts and all mandated disclosures that are intended for the protection of consumers and borrowers such as Plaintiff, were written in the English language even though all aspects of the transaction were discussed or negotiated in the Spanish language.

47.    On or about April 15, 2005, Plaintiff entered into two consumer credit transactions with the SOUTH PACIFIC Parties in which the extended consumer credit was subject to a finance charge and which was initially payable to SOUTH PACIFIC.

48.    A true and accurate copy of the <u>Adjustable Rate Note</u> evidencing the senior loan transaction (hereinafter the "ARM loan") is attached hereto, marked Exhibit "A", and by this reference is incorporated herein.

49.    Plaintiff is informed, believes and thereon alleges, that the <u>Adjustable Rate Note</u>

- 17 -
COMPLAINT

(Exhibit "A") was thereafter sold, assigned or otherwise transferred to HOMECOMINGS.

50.    A true and accurate copy of the <u>Home Equity Credit Line Agreement and Disclosure Statement</u> evidencing the junior loan transaction is attached hereto, marked Exhibit "B", and by this reference is incorporated herein.

51.    Plaintiff is informed, believes and thereon alleges, that the <u>Home Equity Credit Line Agreement and Disclosure Statement</u> (Exhibit "B") was thereafter sold, assigned or otherwise transferred to COUNTRYWIDE.

52.    As part of the South Pacific loans, SOUTH PACIFIC obtained two security interests in the form of Deeds of Trust in the property commonly known as 551 Loumena Lane, San Jose, California  95111 which is used as Plaintiff's principal dwelling.

53.    Said Deeds of Trust are recorded in the office of the Santa Clara County Recorder and can be found as documents numbered 18336175 and 18336176.

54.    A true and accurate copy of the <u>Deed of Trust</u> evidencing the senior security interest is attached hereto, marked Exhibit "C", and by this reference is incorporated herein.

55.    A true and accurate copy of the <u>Deed of Trust and Assignment of Rents</u> evidencing the junior security interest is attached hereto, marked Exhibit "D", and by this reference is incorporated herein.

56.    A true and correct copy of the <u>Federal Truth-in-Lending Disclosure Statement</u> given by the SOUTH PACIFIC Parties to Plaintiff for the senior loan transaction is attached hereto, marked Exhibit "E", and by this reference is incorporated herein.

57.    A true and correct copy of the <u>Notice of Right to Cancel</u> disclosures given by the SOUTH PACIFIC Parties to Plaintiff for the senior loan transaction are attached hereto, marked Exhibit "F", and by this reference is incorporated herein.

58. A true and correct copy of the <u>Notice of Right to Cancel</u> disclosure given by the SOUTH PACIFIC Parties to Plaintiff for the junior loan transaction is attached hereto, marked Exhibit "G", and by this reference is incorporated herein.

59. The SOUTH PACIFIC Parties provided copies of Exhibits "E," "F" and "G" to Plaintiff on or about April 15, 2005.

60. Financial Title Company located at 1333 Willow Pass Road, #106, Concord, California  94520, acted as the SOUTH PACIFIC Parties' settlement agent in connection with the closure of the escrow for the South Pacific loans.

61. According to the final HUD-1 Settlement Statement, the total borrowed under the South Pacific loans was 508,500.00.

62. Plaintiff is informed, believes and thereon alleges, that in connection with the South Pacific loans, RESIDENTIAL and CHAPMAN received at least $5,776 in fees and costs.

63. In addition to the fees and costs they received, Plaintiff is informed, believes and thereon alleges, that RESIDENTIAL and CHAPMAN received a yield spread premium of at least $10,170.00 that was not clearly disclosed as such to Plaintiff.

64. According to the final HUD-1 Settlement Statement, CAMPOS received $150.00 for notary fees.

65. The maximum fees a notary may charge for notarizations are prescribed by Cal. Gov. Code § 8211.

66. The notary fees Plaintiff was charged in connection with the South Pacific loans exceeded the maximum notary fees prescribed by California law.

67. According to the final HUD-1 Settlement Statement, Plaintiff was required to pay $12,830.97 in prepayment penalties to his previous home lenders in order to obtain the South Pacific

- 19 -
COMPLAINT

loans. Of these prepayment penalties, $9,241.59 was paid to COUNTYWIDE.

68.    At no time did the SOUTH PACIFIC Parties inform Plaintiff that he would be required to pay a prepayment penalty if he entered into the South Pacific loans.

69.    Plaintiff would not have agreed to enter into the South Pacific loans had the SOUTH PACIFIC Parties informed Plaintiff that he would be required to pay a prepayment penalty.

70.    The SOUTH PACIFIC Parties promoted their ARM loan product to Plaintiff in a false and deceptive manner. BARRIOS orally represented to Plaintiff that the ARM loan would remain at a fixed 1% rate of interest for a period of 5 years. BARRIOS and the other SOUTH PACIFIC Parties used this "teaser" rate to lure Plaintiff into purchasing the ARM loan product. However, the low fixed rate was illusory, a false promise. Plaintiff did not receive the benefit of the low rate promised to him. Once signed on to the ARM loan product, the interest rate applied to Plaintiff's loan was immediately and significantly increased. BARRIOS and the other SOUTH PACIFIC Parties initiated this scheme in order to maximize their profits.

71.    Based on the representation made by BARRIOS and the other SOUTH PACIFIC Parties, and the conduct alleged herein, Plaintiff agreed to finance his primary residence through the South Pacific loans. Plaintiff was told he was being sold a senior home loan with a low interest rate of 1% (the "teaser" rate) and that the interest rate was fixed for the first five (5) years of the loan. BARRIOS and the other SOUTH PACIFIC Parties also informed Plaintiff, and Plaintiff was led to believe, that if he made payments based on the promised low interest rate, which were the payments reflected in the written payment schedule provided to him by the SOUTH PACIFIC Parties, the ARM loan was a no negative amortization home loan. Plaintiff's payments were to be applied to the principal loan balance as well as to interest.

72.    In fact, the ARM loan possessed a low, fixed, *payment* but not a low, fixed,

interest rate.  Unbeknownst to Plaintiff, the actual interest rate he was charged on the ARM loan was not fixed, was not the low teaser rate promised by BARRIOS or stated in the loan documentation, and was in fact, considerably higher than going market rates.  After purchasing the ARM loan product, Plaintiff did not actually receive the benefit of the low, teaser rate at all, or received that rate for only a single month.  Immediately thereafter, the SOUTH PACIFIC Parties increased the interest rate they charged Plaintiff.  The now-increased interest charges incurred by Plaintiff over and above the fixed interest payment rate were added to the principal balance on his home loan in ever increasing increments, substantially reducing the equity in Plaintiff's home.

73.    In stark contrast to this reality, the SOUTH PACIFIC Parties, through the standardized loan contracts they created and supplied to Plaintiff,  stated that negative amortization was only a possibility and would occur only if the payments were not sufficient.  BARRIOS and the SOUTH PACIFIC Parties concealed and failed to disclose the fact that the way the ARM loan product was presented and designed, in fact, *guaranteed* negative amortization.  BARRIOS and the SOUTH PACIFIC Parties failed to disclose and omitted the objectively material fact that negative amortization would occur if Plaintiff followed the payment schedule set forth in the loan documents. This information was objectively material and necessary for Plaintiff to make an informed decision because this would have revealed that the ARM loan's principal balance would increase if the payment schedule was followed, thereby rendering it more difficult, if not impossible, to refinance the loan by the time the interest and payment rates reset.  In this respect, the SOUTH PACIFIC Parties utterly failed to place any warning on the Truth In Lending disclosure form about negative amortization.

74.    The SOUTH PACIFIC Parties failed to disclose and by omission failed to inform Plaintiff in a clear and conspicuous manner that the fixed "teaser" rate offered by the SOUTH PACIFIC Parties was actually never applied to Plaintiff's loan, or, at best, was only applied for thirty (30) days.

Thereafter, the true interest charged on the ARM loan was significantly higher than the promised, advertised rate.

75.    The SOUTH PACIFIC Parties failed to disclose and by omission failed to inform Plaintiff that the payments set forth in the schedule of payments were insufficient to cover the actual charges and that this was, in fact, a loan that would cause Plaintiff to lose the equity that he had in his home.

76.    The SOUTH PACIFIC Parties failed to disclose and by omission failed to inform Plaintiff that when the principal balance increased to a certain level, Plaintiff would no longer have the option of making the fixed interest payment amount.

77.    Disclosing whether a payment will result in negative amortization is of critical importance to consumers.   If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences of negative amortization is the loss of equity.   The SOUTH PACIFIC Parties are, and at all times relevant hereto, have been aware that clear and conspicuous disclosure of the actual interest rate and the payment rate sufficient to avoid negative amortization and the concomitant loss of equity is extremely important material information.

78.    At all relevant times, the SOUTH PACIFIC Parties knew or should have known, or were reckless in not knowing, that: (i) the payment rate provided to Plaintiff was insufficient to pay both interest and principal; (ii) that negative amortization was substantially certain to occur if Plaintiff made payments according to the payment schedule provided by the SOUTH PACIFIC Parties; and (iii) that loss of equity and/or loss of Plaintiff's residence was substantially certain to occur if Plaintiff made payments according to the payment schedule provided by the SOUTH PACIFIC Parties.

79.    In spite of their knowledge, BARRIOS and the other SOUTH PACIFIC Parties marketed the ARM loan product as a product that would provide Plaintiff with a low interest rate for

the first five (5) years of the loan, and at all relevant times, failed to disclose and/or concealed by making partial representations of material fact when the SOUTH PACIFIC Parties had exclusive knowledge of material facts that negative amortization was certain to occur.  This concealed and omitted information was not known to Plaintiff and which, at all relevant times, the SOUTH PACIFIC Parties failed to disclose and/or actively concealed by making such statements and partial, misleading representations to Plaintiff.  Because the ARM loan product did not provide a low interest rate for the first five (5) years and the payment rate disclosed by the SOUTH PACIFIC Parties was insufficient to pay both principal and interest, negative amortization occurred.

80.    The true facts about the SOUTH PACIFIC Parties ARM loan product are that it does not provide the low interest rate promised and is certain to result in negative amortization.

81.    Disclosure of a payment rate that is sufficient to pay both principal and interest on a home loan is of critical importance to consumers.  If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences is that negative amortization or loss of equity will occur.  The SOUTH PACIFIC Parties are, and at all relevant times hereto have been aware, that the ability of the disclosed payment rate to pay both principal and interest so as to avoid negative amortization is one of the most important terms of a home loan.

82.    Knowing the truth and motivated by profit and market share, the SOUTH PACIFIC Parties have knowingly and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiff.

83.    The ARM loan product has resulted in significant loss and damage to Plaintiff, including but not limited to the loss of equity Plaintiff has or had in his home.

84.    The facts which BARRIOS and the other SOUTH PACIFIC Parties misrepresented and concealed, as alleged in the preceding paragraphs, were material to the decision

about whether to purchase the ARM loan product in that Plaintiff would not have purchased this loan product but for BARRIOS and the other SOUTH PACIFIC Parties' unlawful, unfair, fraudulent and/or deceptive acts and/or practices as alleged herein.

85.    BARRIOS and the other SOUTH PACIFIC Parties engaged in the unlawful, unfair, fraudulent, untrue and/or deceptive marketing scheme to induce Plaintiff to purchase the ARM loan product.

86.    BARRIOS and the other SOUTH PACIFIC Parties' unlawful, unfair, fraudulent, untrue and/or deceptive acts and/or practices were committed with willful and wanton disregard for whether of not Plaintiff would, in fact, receive a home loan that would actually provide the low interest and payment rate, as promised, for the first five (5) years of the loan that is sufficient to pay both principal and interest.

87.    Plaintiff is informed and believes, and thereon alleges that at all relevant times, the SOUTH PACIFIC Parties possessed full knowledge and information concerning the above facts about the ARM loan product, and otherwise marketed and sold these loan products throughout the United States, including the State of California.

88.    On or about March 22, 2008, Plaintiff, through his attorney, notified the SOUTH PACIFIC Parties that Plaintiff had exercised his right to rescind the senior loan transaction pursuant to the TILA and Regulation Z.

89.    A true and accurate copy of the letter by which Plaintiff informed the SOUTH PACIFIC Parties that he had exercised his rescission rights in the senior loan transaction is attached hereto, marked Exhibit "H" and by this reference is incorporated herein.

90.    On or about March 31, 2008, Plaintiff, through his attorney, notified the SOUTH PACIFIC Parties that Plaintiffs had exercised his right to rescind the junior loan transaction pursuant to

the TILA and Regulation Z.

91.    A true and accurate copy of the letter by which Plaintiff informed the SOUTH PACIFIC Parties that he had exercised his rescission rights in the junior loan transaction is attached hereto, marked Exhibit "I" and by this reference is incorporated herein.

92.    The SOUTH PACIFIC Parties received the letter by which Plaintiff informed them that he had exercised his rescission rights in the senior loan transaction on or about March 24, 2008.  A true and accurate copy of the Certified Mail Return Receipts are attached hereto, marked Exhibit "J" and by this reference are incorporated herein.

93.    More than 20 calendar days have passed since the SOUTH PACIFIC Parties received notice of Plaintiff's intent to rescind the senior loan transaction.

94.    The SOUTH PACIFIC Parties received the letter by which Plaintiff informed them that he had exercised his rescission rights in the junior loan transaction on or about April 1, 2008. A true and accurate copy of the Certified Mail Return Receipts are attached hereto, marked Exhibit "K" and by this reference are incorporated herein.

95.    The SOUTH PACIFIC Parties have failed to return to Plaintiff any money or property given by Plaintiff to anyone in connection with the senior loan transaction, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

96.    The SOUTH PACIFIC Parties have failed to return to Plaintiff any money or property given by Plaintiff to anyone in connection with the junior loan transaction, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.15(d)(2).

97.    As a senior citizen subjected to the SOUTH PACIFIC Parties' abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

/ / /

The GreenPoint Loans

98.    Within a few months after entering into the South Pacific loans, and in any event no later than November of 2005, BARRIOS began using aggressive marketing practices and sales tactics by calling Plaintiff and visiting him at his home in an attempt to convince Plaintiff to again refinance his home loans.  Between November 2005 and February 2006, BARRIOS would either call or visit Plaintiff at his home 2-3 times per week and attempt to convince Plaintiff to refinance his home loans.  Each time BARRIOS would call or visit, Plaintiff would tell BARRIOS that he did not want to refinance his home loans.  During this period, BARRIOS repeatedly told Plaintiff that he could arrange new home loans for Plaintiff whereby Plaintiff could payoff his credit card debt and thereby reduce his total monthly debt payments.  BARRIOS also told Plaintiff that he could still obtain an interest rate of 1% that would be fixed for five (5) years.

99.    Sometime in approximately January 2006, Plaintiff completed a loan application at the insistence of BARRIOS.  Approximately one week later, BARRIOS contacted Plaintiff and told him that his credit score had fallen because of late payments on his credit card debts.  BARRIOS explained that because of Plaintiff's lower credit score, Plaintiff would not qualify for the 1% fixed interest rate.  BARRIOS then told Plaintiff that BARRIOS knew some people who could improve Plaintiff's credit score for a fee of $100.00.  BARRIOS told Plaintiff that the credit scoring people would need Plaintiff's credit card number so that they could charge the $100.00 fee to Plaintiff's credit card account.  Based on this representation, Plaintiff provided BARRIOS with his credit card account number.

100.    BARRIOS had originally told Plaintiff that the appraisal fee of $350.00 for the new loans would be paid through the closing of the transaction.  Sometime later, BARRIOS contacted Plaintiff and told him that the appraisal fee would need to be paid in advance of closing.  When Plaintiff

protested, BARRIOS told Plaintiff that BARRIOS had Plaintiff's credit card account number and that BARRIOS could use that account for payment of the appraisal fee. Plaintiff refused, but some months later received his credit card billing statement and noticed that a $350.00 charge had been placed on the account for the appraisal fee. In fact, Plaintiff would later pay an additional $350.00 to ANDRUS & ASSOCIATES at closing for the appraisal fee and, therefore, paid for the appraisal fee twice.

101.   In early February 2006, BARRIOS and CAMPOS came to Plaintiff's home with a large number of loan documents for Plaintiff and his wife to sign. After discussing with BARRIOS the amount of cash Plaintiffs would be receiving from the loan proceeds, Plaintiff and his wife told BARRIOS that they did not want to complete the loan transactions because they were not going to be able to payoff all their credit card debts with the loan proceeds. BARRIOS insisted that Plaintiff and his wife sign the loan documents and they eventually did. Once all the loan documents were signed and BARRIOS and CAMPOS had left Plaintiff's home, Plaintiff called a friend to get his advice regarding the loan transactions. Thereafter, Plaintiff telephoned Financial Title Company and spoke to a Spanish speaking woman. Plaintiff told the woman at the title company that they wanted to cancel the transaction.

102.   Thereafter, Plaintiff received a telephone call from ANDRUS. ANDRUS told Plaintiff that he was BARRIOS' manager. ANDRUS yelled at Plaintiff and demanded to know why Plaintiff had not made a decision regarding the refinancing loans. ANDRUS was very upset because they had done a lot of work on the file – sending documents back and forth – and Plaintiff would not agree to the loans. Plaintiff told ANDRUS that he would call back when he was ready to complete the loan transactions.

103.   Thereafter, BARRIOS continued to call and visit Plaintiff at his home, each time pressuring him to sign the loan documents. After BARRIOS told Plaintiff that he had personally called

and spoken with the bank regarding the loans and that the bank had agreed to change the loan terms to an interest rate of 1.5% that would be fixed for five (5) years, Plaintiff and his wife agreed to sign the loan documents again (hereinafter the "GreenPoint loans").

104.    Plaintiff and his wife were unsophisticated and unable to consummate real estate transactions without the assistance of real estate professionals.  Accordingly, Plaintiff and his wife relied on BARRIOS and the other GREENPOINT Parties when entering into the GreenPoint loans.

105.    BARRIOS and the other GREENPOINT Parties knew or should have known that their conduct was directed towards a senior citizen.

106.    Plaintiff is informed, believes and thereon alleges that all of the documents related in any way to the GreenPoint loans, including written contracts and all mandated disclosures that are intended for the protection of consumers and borrowers such as Plaintiff, were written in the English language even though all aspects of the transaction were discussed or negotiated in the Spanish language.

107.    On or about March 2, 2006, Plaintiff entered into two consumer credit transactions with the GREENPOINT Parties in which the extended consumer credit was subject to a finance charge and which was initially payable to GREENPOINT.

108.    A true and accurate unsigned copy of the Adjustable Rate Note evidencing the senior loan transaction (hereinafter the "ARM loan") is attached hereto, marked Exhibit "L", and by this reference is incorporated herein.

109.    Plaintiff is informed, believes and thereon alleges, that the Adjustable Rate Note (Exhibit "L") was thereafter sold, assigned or otherwise transferred to GMAC.

110.    A true and accurate unsigned copy of the Home Equity Line of Credit Agreement and Promissory Note evidencing the junior loan transaction is attached hereto, marked Exhibit "M",

and by this reference is incorporated herein.

111.    Plaintiff is informed, believes and thereon alleges, that the <u>Home Equity Line of Credit Agreement and Promissory Note</u> (Exhibit "M") was thereafter sold, assigned or otherwise transferred to GMAC.

112.    As part of the GreenPoint loans, GREENPOINT obtained two security interests in the form of Deeds of Trust in the property commonly known as 551 Loumena Lane, San Jose, California  95111 which is used as Plaintiff's principal dwelling.

113.    Said Deeds of Trust are recorded in the office of the Santa Clara County Recorder and can be found as documents numbered 18838195 and 18838196.

114.    A true and accurate copy of the <u>Deed of Trust</u> evidencing the senior security interest is attached hereto, marked Exhibit "N", and by this reference is incorporated herein.

115.    A true and accurate copy of the <u>Home Equity Line of Credit Deed of Trust</u> evidencing the junior security interest is attached hereto, marked Exhibit "O", and by this reference is incorporated herein.

116.    A true and correct copy of the <u>Truth In Lending Disclosure Statement</u> given by the GREENPOINT Parties to Plaintiff for the senior loan transaction is attached hereto, marked Exhibit "P", and by this reference is incorporated herein.

117.    A true and correct copy of the <u>Notice of Right to Cancel</u> disclosures given by the GREENPOINT Parties to Plaintiff for the senior loan transaction are attached hereto, marked Exhibit "Q", and by this reference is incorporated herein.

118.    A true and correct copy of the <u>Notice of Right to Cancel</u> disclosure given by the GREENPOINT Parties to Plaintiff for the junior loan transaction is attached hereto, marked Exhibit "R", and by this reference is incorporated herein.

119.    The GREENPOINT Parties provided copies of Exhibits "P", "Q" and "R" to Plaintiff on or about March 2, 2006.

120.    Financial Title Company located at 1333 Willow Pass Road, #106, Concord, California 94520, acted as the GREENPOINT Parties' settlement agent in connection with the closure of the escrow for the South Pacific loans.

121.    According to the final HUD-1 Settlement Statement, the total borrowed under the GreenPoint loans was $594,000.00.

122.    Plaintiff is informed, believes and thereon alleges, that in connection with the GreenPoint loans, ANDRUS & ASSOCIATES and ANDRUS received at least $4,395 in fees and costs.

123.    In addition to the fees and costs they received, Plaintiff is informed, believes and thereon alleges, that ANDRUS & ASSOCIATES and ANDRUS received a yield spread premium of at least $11,055.00 that was not clearly disclosed as such to Plaintiff.

124.    According to the final HUD-1 Settlement Statement, CAMPOS received $250.00 for notary fees.

125.    The maximum fees a notary may charge for notarizations are prescribed by Cal. Gov. Code § 8211.

126.    The notary fees Plaintiff was charged in connection with the GreenPoint loans exceeded the maximum notary fees prescribed by California law.

127.    According to the final HUD-1 Settlement Statement, Plaintiff was required to pay $12,204.00 in prepayment penalties to HOMECOMINGS in order to obtain the GreenPoint loans.

128.    At no time did the GREENPOINT Parties inform Plaintiff that he would be required to pay a prepayment penalty if he entered into the GreenPoint loans.

129.    Plaintiff would not have agreed to enter into the GreenPoint loans had the

GREENPOINT Parties informed Plaintiff that he would be required to pay a prepayment penalty.

130.   During the loan application process, Plaintiff and his wife had advised BARRIOS that their total monthly household income was approximately $2,775.  Plaintiff has learned that the loan application prepared by BARRIOS for the GreenPoint loans contained many false or misleading representations concerning, *inter alia*, Plaintiff's assets, income and employment history, including the following:

      a.   That Plaintiff's total monthly income was $12,150.00;

      b.   That Plaintiff was currently employed as a lead singer in a band with a base salary of $8,600.00 per month from that employment alone;

      c.   That Plaintiff received $1,800.00 per month in Social Security benefits;

      d.   That Plaintiff's wife received $1,750.00 per month in Social Security benefits; and

      e.   That Plaintiff owned a Ford van valued at $25,000.00.

131.   The GREENPOINT Parties promoted their ARM loan product to Plaintiff in a false and deceptive manner.  BARRIOS orally represented to Plaintiff that the ARM loan would remain at a fixed 1.5% rate of interest for a period of 5 years.  BARRIOS and the other GREENPOINT Parties used this "teaser" rate to lure Plaintiff into purchasing the ARM loan product.  However, the low fixed rate was illusory, a false promise.  Plaintiff did not receive the benefit of the low rate promised to him.  Once signed on to the ARM loan product, the interest rate applied to Plaintiff's loan was immediately and significantly increased.  BARRIOS and the other GREENPOINT Parties initiated this scheme in order to maximize their profits.

132.   Based on the representation made by BARRIOS and the other GREENPOINT Parties, and the conduct alleged herein, Plaintiff agreed to finance his primary residence through the

GreenPoint loans. Plaintiff was told he was being sold a senior home loan with a low interest rate of 1.5% (the "teaser" rate) and that the interest rate was fixed for the first five (5) years of the loan. BARRIOS and the other GREENPOINT Parties also informed Plaintiff, and Plaintiff was led to believe, that if he made payments based on the promised low interest rate, which were the payments reflected in the written payment schedule provided to him by the GREENPOINT Parties, the ARM loan was a no negative amortization home loan. Plaintiff's payments were to be applied to the principal loan balance as well as to interest.

133.    In fact, the ARM loan possessed a low, fixed, *payment* but not a low, fixed, interest rate. Unbeknownst to Plaintiff, the actual interest rate he was charged on the ARM loan was not fixed, was not the low teaser rate promised by BARRIOS or stated in the loan documentation, and was in fact, considerably higher than going market rates. After purchasing the ARM loan product, Plaintiff did not actually receive the benefit of the low, teaser rate at all, or received that rate for only a single month. Immediately thereafter, the GREENPOINT Parties increased the interest rate they charged Plaintiff. The now-increased interest charges incurred by Plaintiff over and above the fixed interest payment rate were added to the principal balance on his home loan in ever increasing increments, substantially reducing the equity in Plaintiff's home.

134.    In stark contrast to this reality, the GREENPOINT Parties, through the standardized loan contracts they created and supplied to Plaintiff, stated that negative amortization was only a possibility and would occur only if the payments were not sufficient. BARRIOS and the other GREENPOINT Parties concealed and failed to disclose the fact that the way the ARM loan product was presented and designed, in fact, *guaranteed* negative amortization. BARRIOS and the other GREENPOINT Parties failed to disclose and omitted the objectively material fact that negative amortization would occur if Plaintiff followed the payment schedule set forth in the loan documents.

This information was objectively material and necessary for Plaintiff to make an informed decision because this would have revealed that the ARM loan's principal balance would increase if the payment schedule was followed, thereby rendering it more difficult, if not impossible, to refinance the loan by the time the interest and payment rates reset. In this respect, the GREENPOINT Parties utterly failed to place any warning on the Truth In Lending disclosure form about negative amortization.

135.    The GREENPOINT Parties failed to disclose and by omission failed to inform Plaintiff in a clear and conspicuous manner that the fixed "teaser" rate offered by the GREENPOINT Parties was actually never applied to Plaintiff's loan, or, at best, was only applied for thirty (30) days. Thereafter, the true interest charged on the ARM loan was significantly higher than the promised, advertised rate.

136.    The GREENPOINT Parties failed to disclose and by omission failed to inform Plaintiff that the payments set forth in the schedule of payments were insufficient to cover the actual charges and that this was, in fact, a loan that would cause Plaintiff to lose the equity that he had in his home.

137.    The GREENPOINT Parties failed to disclose and by omission failed to inform Plaintiff that when the principal balance increased to a certain level, Plaintiff would no longer have the option of making the fixed interest payment amount.

138.    Disclosing whether a payment will result in negative amortization is of critical importance to consumers. If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences of negative amortization is the loss of equity. The GREENPOINT Parties are, and at all times relevant hereto, have been aware that clear and conspicuous disclosure of the actual interest rate and the payment rate sufficient to avoid negative amortization and the concomitant loss of equity is extremely important material information.

139.    At all relevant times, the GREENPOINT Parties knew or should have known, or were reckless in not knowing, that: (i) the payment rate provided to Plaintiff was insufficient to pay both interest and principal; (ii) that negative amortization was substantially certain to occur if Plaintiff made payments according to the payment schedule provided by the GREENPOINT Parties; and (iii) that loss of equity and/or loss of Plaintiff's residence was substantially certain to occur if Plaintiff made payments according to the payment schedule provided by the GREENPOINT Parties.

140.    In spite of their knowledge, BARRIOS and the other GREENPOINT Parties marketed the ARM loan product as a product that would provide Plaintiff with a low interest rate for the first five (5) years of the loan, and at all relevant times, failed to disclose and/or concealed by making partial representations of material fact when the GREENPOINT Parties had exclusive knowledge of material facts that negative amortization was certain to occur. This concealed and omitted information was not known to Plaintiff and which, at all relevant times, the GREENPOINT Parties failed to disclose and/or actively concealed by making such statements and partial, misleading representations to Plaintiff. Because the ARM loan product did not provide a low interest rate for the first five (5) years and the payment rate disclosed by the GREENPOINT Parties was insufficient to pay both principal and interest, negative amortization occurred.

141.    The true facts about the GREENPOINT Parties ARM loan product are that it does not provide the low interest rate promised and is certain to result in negative amortization.

142.    Disclosure of a payment rate that is sufficient to pay both principal and interest on a home loan is of critical importance to consumers. If the disclosed payment rate is insufficient to pay both principal and interest, one of the consequences is that negative amortization or loss of equity will occur. The GREENPOINT Parties are, and at all relevant times hereto have been aware, that the ability of the disclosed payment rate to pay both principal and interest so as to avoid negative

amortization is one of the most important terms of a home loan.

143.    Knowing the truth and motivated by profit and market share, the GREENPOINT Parties have knowingly and willfully engaged in the acts and/or omissions to mislead and/or deceive Plaintiff.

144.    The ARM loan product has resulted in significant loss and damage to Plaintiff, including but not limited to the loss of equity Plaintiff has or had in his home.

145.    The facts which BARRIOS and the other GREENPOINT Parties misrepresented and concealed, as alleged in the preceding paragraphs, were material to the decision about whether to purchase the ARM loan product in that Plaintiff would not have purchased this loan product but for BARRIOS and the other GREENPOINT Parties' unlawful, unfair, fraudulent and/or deceptive acts and/or practices as alleged herein.

146.    BARRIOS and the other GREENPOINT Parties engaged in the unlawful, unfair, fraudulent, untrue and/or deceptive marketing scheme to induce Plaintiff to purchase the ARM loan product.

147.    BARRIOS and the other GREENPOINT Parties' unlawful, unfair, fraudulent, untrue and/or deceptive acts and/or practices were committed with willful and wanton disregard for whether or not Plaintiff would, in fact, receive a home loan that would actually provide the low interest and payment rate, as promised, for the first five (5) years of the loan that is sufficient to pay both principal and interest.

148.    Plaintiff is informed and believes, and thereon alleges that at all relevant times, the GREENPOINT Parties possessed full knowledge and information concerning the above facts about the ARM loan product, and otherwise marketed and sold these loan products throughout the United States, including the State of California.

149.    On or about March 24, 2008, Plaintiff, through his attorney, notified the GREENPOINT Parties that Plaintiff had exercised his right to rescind the senior loan transaction pursuant to the TILA and Regulation Z.

150.    A true and accurate copy of the letter by which Plaintiff informed the GREENPOINT Parties that he had exercised his rescission rights in the senior loan transaction is attached hereto, marked Exhibit "S" and by this reference is incorporated herein.

151.    On or about March 24, 2008, Plaintiff, through his attorney, notified the GREENPOINT Parties that Plaintiffs had exercised his right to rescind the junior loan transaction pursuant to the TILA and Regulation Z.

152.    A true and accurate copy of the letter by which Plaintiff informed the GREENPOINT Parties that he had exercised his rescission rights in the junior loan transaction is attached hereto, marked Exhibit "T" and by this reference is incorporated herein.

153.    The GREENPOINT Parties received the letter by which Plaintiff informed them that he had exercised his rescission rights in the senior loan transaction on or about March 26, 2008.  A true and accurate copy of the Certified Mail Return Receipts are attached hereto, marked Exhibit "U" and by this reference are incorporated herein.

154.    More than 20 calendar days have passed since the GREENPOINT Parties received notice of Plaintiff's intent to rescind the senior loan transaction.

155.    The GREENPOINT Parties received the letter by which Plaintiff informed them that he had exercised his rescission rights in the junior loan transaction on or about March 26, 2008.  A true and accurate copy of the Certified Mail Return Receipts are attached hereto, marked Exhibit "V" and by this reference are incorporated herein.

156.    More than 20 calendar days have passed since the GREENPOINT Parties

received notice of Plaintiff's intent to rescind the junior loan transaction.

157.    The GREENPOINT Parties have failed, refused and neglected to take any action necessary or appropriate to reflect the termination of any security interest created under the senior loan transaction, including the security interest described in Paragraph 114, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

158.    The GREENPOINT Parties have failed, refused and neglected to take any action necessary or appropriate to reflect the termination of any security interest created under the junior loan transaction, including the security interest described in Paragraph 115, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.15(d)(2).

159.    The GREENPOINT Parties have failed to return to Plaintiff any money or property given by Plaintiff to anyone in connection with the senior loan transaction, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.23(d)(2).

160.    The GREENPOINT Parties have failed to return to Plaintiff any money or property given by Plaintiff to anyone in connection with the junior loan transaction, as required by 15 U.S.C. § 1635(b) and Regulation Z § 226.15(d)(2).

161.    As a senior citizen subjected to the GREENPOINT Parties' abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

## CLAIMS

## FIRST CLAIM FOR RELIEF

### Violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and Federal Reserve Board Regulation Z, 12 C.F.R. § 226 et seq. (Against SOUTH PACIFIC Parties)

162.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

163.    At all relevant times alleged in this Complaint, Defendant, SOUTH PACIFIC, was a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

164.    At all relevant times alleged in this Complaint, Defendant, HOMECOMINGS, was a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

165.    At all relevant times alleged in this Complaint, Defendant, COUNTRYWIDE, was a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

166.    Plaintiff's transactions with the SOUTH PACIFIC Parties was a "consumer" "credit" transaction within the meaning of the TILA, 15 U.S.C. §§ 1602(h) and 1602(e) and Regulation Z §§ 226.2(a)(11) and 226.2(a)(14).

167.    The South Pacific loans were secured by Plaintiff's principal "dwelling" within the meaning of the TILA, 15 U.S.C. § 1602(v) and Regulation Z § 226.2(a)(19).

168.    The South Pacific loans were subject to Plaintiff's right of rescission as described by 15 U.S.C. § 1635 and Regulation Z §§ 226.23 and 226.15.

169.    Defendant, HOMECOMINGS, is subject to Plaintiff's rescission claim pursuant to 15 U.S.C. § 1641(c).

170.    Defendant, COUNTRYWIDE, is subject to Plaintiff's rescission claim pursuant to 15 U.S.C. § 1641(c).

171.    In connection with the senior loan transaction, the SOUTH PACIFIC Parties violated the TILA, 15 U.S.C. § 1638(a) and Regulation Z § 226.18 by failing to deliver to Plaintiff all "material" disclosures required by the TILA and Regulation Z, including the following:

a.    By failing to clearly and accurately disclose the "finance charge" using that term, in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z §§ 226.4 and 226.18(d).

b.    By failing to properly and accurately disclose the "amount financed," using

that term in violation of 15 U.S.C. § 1638(a)(2)(A) and Regulation Z § 226.18(b).

   c. By failing to clearly and accurately disclose the "annual percentage rate," using that term in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 226.18(e).

  172. In connection with the senior loan transaction, the SOUTH PACIFIC Parties failed to clearly and conspicuously disclose whether the loan is a negative amortizing loan and whether unpaid interest is being added to principal, as required by 15 U.S.C. § 1638(a)(14) and Regulation Z § 226.19(b)(2)(viii).

  173. In connection with the senior loan transaction, the SOUTH PACIFIC Parties failed to clearly and conspicuously disclose that the interest rate was discounted, as required by 15 U.S.C. § 1638 and Regulation Z § 226.19(b)(2)(v).

  174. In connection with the senior loan transaction, the SOUTH PACIFIC Parties failed to timely deliver to Plaintiff two copies of the notice of the right to rescind which clearly and conspicuously disclosed the date the rescission period expired, as required by 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b)(1)(v).

  175. In connection with the junior loan transaction, the SOUTH PACIFIC Parties failed to timely deliver to Plaintiff two copies of the notice of the right to rescind which clearly and conspicuously disclosed the date the rescission period expired, as required by 15 U.S.C. § 1635(a) and Regulation Z § 226.15(b)(5).

  176. Plaintiff had a continuing right to rescind the senior loan transaction until the third business day after receiving both the right of rescission notice described in paragraph 174 and all "material" disclosures described in paragraphs 171-73, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3).

  177. Plaintiff had a continuing right to rescind the junior loan transaction until the

third business day after receiving the right of rescission notice described in paragraph 175, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.15(a)(3).

178.    By reason of the failure of the SOUTH PACIFIC Parties to provide the proper disclosures, Plaintiff retained a right to rescind the South Pacific loans until three years from the date of the transactions.

179.    Plaintiff properly exercised his right to rescind the South Pacific loans in a timely fashion.

180.    As a result of the SOUTH PACIFIC Parties' violations of the TILA and Regulation Z, Plaintiff is entitled to an award of all monies paid to the SOUTH PACIFIC Parties, or anyone else in connection with the South Pacific loans, including, but not limited to, all closing costs and prepaid interest, all interest payments, and all prepayment penalties that have been paid, pursuant to 15 U.S.C. §§ 1635(b) and 1640(a)(1) and Regulation Z §§ 226.15(d)(2) and 226.23(d)(2).

181.    As a result of the SOUTH PACIFIC Parties' violations of the TILA and Regulation Z, Plaintiff is entitled to an award of $2,000.00 in affirmative damages together with costs and attorney's fees for the SOUTH PACIFIC Parties failure to rescind the transaction in conformity with the TILA and Regulation Z, pursuant to 15 U.S.C. § 1640(a)(2)(A).

182.    As a result of the SOUTH PACIFIC Parties' violation of the TILA and Regulation Z, Plaintiff is entitled to an award of his reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1640(a)(3).

183.    As a senior citizen subjected to the SOUTH PACIFIC Parties' abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

///

///

**SECOND CLAIM FOR RELIEF**

**Violation of the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and
Federal Reserve Board Regulation Z, 12 C.F.R. § 226 et seq.
(Against GREENPOINT Parties)**

184.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

185.    At all relevant times alleged in this Complaint, Defendant, GREENPOINT, was a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

186.    At all relevant times alleged in this Complaint, Defendant, GMAC, was a "creditor" within the meaning of the TILA, 15 U.S.C. § 1602(f) and Regulation Z § 226.2(a)(17).

187.    Plaintiff's transactions with the GREENPOINT Parties was a "consumer" "credit" transaction within the meaning of the TILA, 15 U.S.C. §§ 1602(h) and 1602(e) and Regulation Z §§ 226.2(a)(11) and 226.2(a)(14).

188.    The GreenPoint loans were secured by Plaintiff's principal "dwelling" within the meaning of the TILA, 15 U.S.C. § 1602(v) and Regulation Z § 226.2(a)(19).

189.    The GreenPoint loans were subject to Plaintiff's right of rescission as described by 15 U.S.C. § 1635 and Regulation Z §§ 226.23 and 226.15.

190.    Defendant, GMAC, is subject to Plaintiff's rescission claim pursuant to 15 U.S.C. § 1641(c).

191.    Because the GREENPOINT Parties initiated a non-judicial foreclosure process on the primary dwelling of Plaintiff, the provisions of 15 U.S.C. § 1635(i) and Regulation Z § 226.23(h) apply in this action.

192.    In connection with the senior loan transaction, the GREENPOINT Parties violated the TILA, 15 U.S.C. § 1638(a) and Regulation Z § 226.18 by failing to deliver to Plaintiff all

"material" disclosures required by the TILA and Regulation Z, including the following:

        a.   By failing to clearly and accurately disclose the "finance charge" using that term, in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z §§ 226.4 and 226.18(d).

        b.   By failing to properly and accurately disclose the "amount financed," using that term in violation of 15 U.S.C. § 1638(a)(2)(A) and Regulation Z § 226.18(b).

        c.   By failing to clearly and accurately disclose the "annual percentage rate," using that term in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z § 226.18(e).

193.   In connection with the senior loan transaction, the GREENPOINT Parties failed to clearly and conspicuously disclose whether the loan is a negative amortizing loan and whether unpaid interest is being added to principal, as required by 15 U.S.C. § 1638(a)(14) and Regulation Z § 226.19(b)(2)(viii).

194.   In connection with the senior loan transaction, the GREENPOINT Parties failed to clearly and conspicuously disclose that the interest rate was discounted, as required by 15 U.S.C. § 1638 and Regulation Z § 226.19(b)(2)(v).

195.   In connection with the senior loan transaction, the GREENPOINT Parties failed to timely deliver to Plaintiff two copies of the notice of the right to rescind which clearly and conspicuously disclosed the date the rescission period expired, as required by 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b)(1)(v).

196.   In connection with the junior loan transaction, the GREENPOINT Parties failed to timely deliver to Plaintiff two copies of the notice of the right to rescind which clearly and conspicuously disclosed the date the rescission period expired, as required by 15 U.S.C. § 1635(a) and Regulation Z § 226.15(b)(5).

197.   Plaintiff had a continuing right to rescind the senior loan transaction until the

third business day after receiving both the right of rescission notice described in paragraph 195 and all "material" disclosures described in paragraphs 192-94, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3).

198.    Plaintiff had a continuing right to rescind the junior loan transaction until the third business day after receiving the right of rescission notice described in paragraph 196, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.15(a)(3).

199.    By reason of the failure of the GREENPOINT Parties to provide the proper disclosures, Plaintiff retained a right to rescind the GreenPoint loans until three years from the date of the transactions.

200.    Plaintiff properly exercised his right to rescind the GreenPoint loans in a timely fashion.

201.    As a result of the GREENPOINT Parties' violations of the TILA and Regulation Z, Plaintiff is entitled to a determination that any security interest held by the GREENPOINT Parties in his principal dwelling is void, pursuant to 15 U.S.C. §§ 1635(b) and Regulation Z §§ 226.15(d)(1) and 226.23(d)(1).

202.    As a result of the GREENPOINT Parties' violations of the TILA and Regulation Z, Plaintiff is entitled to an award of all monies paid to the GREENPOINT Parties, or anyone else in connection with the GreenPoint loans, including, but not limited to, all closing costs and prepaid interest, all interest payments, and all prepayment penalties that have been paid, pursuant to 15 U.S.C. §§ 1635(b) and 1640(a)(1) and Regulation Z §§ 226.15(d)(1)-(2) and 226.23(d)(1)-(2).

203.    As a result of the GREENPOINT Parties' violations of the TILA and Regulation Z, Plaintiff is entitled to an award of $2,000.00 in recoupment for the GREENPOINT Parties disclosure violations of the TILA and Regulation Z, pursuant to 15 U.S.C. § 1640(a)(2)(A).

204.    As a result of the GREENPOINT Parties' violations of the TILA and Regulation Z, Plaintiff is entitled to an award of $2,000.00 in affirmative damages for the GREENPOINT Parties failure to rescind the transaction in conformity with the TILA and Regulation Z, pursuant to 15 U.S.C. § 1640(a)(2)(A).

205.    As a result of the GREENPOINT Parties' violation of the TILA and Regulation Z, Plaintiff is entitled to an award of his reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1640(a)(3).

206.    As a senior citizen subjected to the GREENPOINT Parties' abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

### THIRD CLAIM FOR RELIEF

**Real Estate and Settlement Procedures Act, 12 U.S.C. § 2601 *et seq*., and
Federal Reserve Board Regulation X, 24 C.F.R. § 3500 *et seq*.
(Against SOUTH PACIFIC Parties)**

207.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

208.    Congress enacted the Real Estate and Settlement Procedures Act ("RESPA") in 1974 as a response to abuses in the real estate settlement process.  Congress found that kickbacks and unearned fees in the settlement process resulted in unnecessarily high settlement charges.  Thus, the RESPA prohibits, among other things, the giving or receiving of "any fee, kickback or thing of value pursuant to any agreement or understanding, oral or otherwise, that businesses incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).  The RESPA also prohibits the splitting of unearned fees made or charged for a settlement service other than for services preformed.  12 U.S.C. § 2607(b).  Under the RESPA, a settlement service is any service provided in connection with a prospective or actual

settlement.  12 U.S.C. § 2602(3) and Regulation X, 24 C.F.R. § 3500.2.

209.    Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint the SOUTH PACIFIC Parties made and serviced numerous loans which are "federally related mortgage loans" as defined in the RESPA, 12 U.S.C. § 2602(1)(B)(iv) and Regulation X, 24 C.F.R. § 3500.2(b), in that they are secured by a lien on residential real property designed principally for the occupancy of from one to four families, and in that they are made by "creditors" which make or invest in residential real estate loans aggregating more than $1,000,000 per year.  The South Pacific loans are two such loans.

210.    The South Pacific loans were each a "federally related mortgage loan" as that term is defined in RESPA, 12 U.S.C. § 2602(1) and Regulation X, 24 C.F.R. § 3500.2.

211.    The SOUTH PACIFIC Parties' funding and origination of the South Pacific loans were "settlement services" as that term is defined in RESPA, 12 U.S.C. § 2602(3) and Regulation X, 24 C.F.R. § 3500.2.

212.    The Department of Housing and Urban Development ("HUD") explained their position regarding the payment of yield spread premiums in a Policy Statement issued in 2001 ("HUD 2001-1 Policy Statement").[9]

213.    HUD Policy Statement 2001-1 explains that yield spread premiums ". . . allow the broker to recoup up front costs incurred on the borrower's behalf in originating the loan."[10]

214.    RESIDENTIAL and CHAPMAN collected $5,776.00 in fees from Plaintiff and therefore Plaintiff alleges that RESIDENTIAL and CHAPMAN did not incur any up front costs to justify a yield spread premium.

215.    While elaborating on the test to determine the legality of yield spread premiums,

---

[9] RESPA Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 F.R. 53052, (Available online at: http://www.hud.gov/content/releases/respafinal.pdf).
[10] Id. at 53054.

HUD's 2001-1 Policy Statement explains that the second prong of its two part test to determine the legality of yield spread premiums may not be satisfied when the loan broker does not offer the borrower the option to pay a lower amount of total fees up front.[11]

216.     RESIDENTIAL and CHAPMAN failed to offer Plaintiff the option of paying a lower amount of total fees up front.

217.     The value of RESIDENTIAL's and CHAPMAN's actual services rendered in the brokering process of the South Pacific loans was roughly $0.00 because RESIDENTIAL and CHAPMAN falsified Plaintiff's loan application, failed to disclose material terms of the transaction and failed to obtain and provide Plaintiff with Spanish translations of documents as required by Cal. Civil Code § 1632.

218.     Additionally, RESIDENTIAL and CHAPMAN charged Plaintiff a $4,520.00 origination fee for their services which were ultimately unlawful, making the $10,170.00 yield spread premium grossly unnecessary.

219.     RESIDENTIAL's and CHAPMAN's acceptance of a yield spread premium, and SOUTH PACIFIC's payment of that yield spread premium, was an unlawful kickback and/or unearned fee under RESPA because it was not reasonably related to the performance of lawful services.

220.     SOUTH PACIFIC should have known that RESIDENTIAL and CHAPMAN did not earn the yield spread premium because, *inter alia,* ". . . common industry practice is that lenders follow underwriting standards that demand a review of originations and therefore lenders typically know that brokers have performed the services required . . . "[12]  If SOUTH PACIFIC had reviewed Plaintiff's loan origination, including his loan application, SOUTH PACIFIC would have learned of the obvious red flags it contained.

---

[11] *Id.*
[12] *Id.* at 53055.

221.    RESPA also prohibits any person from accepting an excessive or unearned fee.

222.    RESIDENTIAL and CHAPMAN violated RESPA by charging an underwriting fee in addition to the underwriting fee charged by SOUTH PACIFIC.

223.    CAMPOS violated RESPA by charging excessive fees in connection with her notary services and accepting unearned fees.

224.    As a result of the SOUTH PACIFIC Parties' violations of RESPA and Regulation X, Plaintiff is entitled to recover from the SOUTH PACIFIC Parties a civil penalty of three times the amount of any charge paid for settlement services, pursuant to 12 U.S.C. § 2607(d)(2) and Regulation X, 24 C.F.R. § 3500.19(b).

225.    As a result of the SOUTH PACIFIC Parties' violation of RESPA and Regulation X, Plaintiff is entitled to an award of his reasonable attorney's fees and costs pursuant to 12 U.S.C. § 2607(d)(5).

226.    As a senior citizen subjected to the SOUTH PACIFIC Parties' abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

### FOURTH CLAIM FOR RELIEF

**Real Estate and Settlement Procedures Act, 12 U.S.C. § 2601 *et seq*., and
Federal Reserve Board Regulation X, 24 C.F.R. § 3500 *et seq*.
(Against GREENPOINT Parties)**

227.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

228.    Congress enacted the Real Estate and Settlement Procedures Act ("RESPA") in 1974 as a response to abuses in the real estate settlement process.  Congress found that kickbacks and unearned fees in the settlement process resulted in unnecessarily high settlement charges.  Thus, the RESPA prohibits, among other things, the giving or receiving of "any fee, kickback or thing of value

pursuant to any agreement or understanding, oral or otherwise, that businesses incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).  The RESPA also prohibits the splitting of unearned fees made or charged for a settlement service other than for services preformed.  12 U.S.C. § 2607(b).  Under the RESPA, a settlement service is any service provided in connection with a prospective or actual settlement.  12 U.S.C. § 2602(3) and Regulation X, 24 C.F.R. § 3500.2.

229.    Plaintiff is informed, believes and thereon alleges, that at all relevant times alleged in this Complaint the GREENPOINT Parties made and serviced numerous loans which are "federally related mortgage loans" as defined in the RESPA, 12 U.S.C. § 2602(1)(B)(iv) and Regulation X, 24 C.F.R. § 3500.2(b), in that they are secured by a lien on residential real property designed principally for the occupancy of from one to four families, and in that they are made by "creditors" which make or invest in residential real estate loans aggregating more than $1,000,000 per year.  The GreenPoint loans are two such loans.

230.    The GreenPoint loans were each a "federally related mortgage loan" as that term is defined in RESPA, 12 U.S.C. § 2602(1) and Regulation X, 24 C.F.R. § 3500.2.

231.    The GREENPOINT Parties' funding and origination of the GreenPoint loans were "settlement services" as that term is defined in RESPA, 12 U.S.C. § 2602(3) and Regulation X, 24 C.F.R. § 3500.2.

232.    The Department of Housing and Urban Development ("HUD") explained their position regarding the payment of yield spread premiums in a Policy Statement issued in 2001 ("HUD 2001-1 Policy Statement").[13]

233.    HUD Policy Statement 2001-1 explains that yield spread premiums ". . . allow

---

[13]    RESPA Statement of Policy 2001-1: Clarification of Statement of Policy 1999-1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 F.R. 53052, (Available online at: http://www.hud.gov/content/releases/respafinal.pdf).

the broker to recoup up front costs incurred on the borrower's behalf in originating the loan."[14]

234.    ANDRUS & ASSOCIATES and ANDRUS collected at least $4,395.00 in fees from Plaintiff and therefore Plaintiff alleges that ANDRUS & ASSOCIATES and ANDRUS did not incur any up front costs to justify a yield spread premium.

235.    While elaborating on the test to determine the legality of yield spread premiums, HUD's 2001-1 Policy Statement explains that the second prong of its two part test to determine the legality of yield spread premiums may not be satisfied when the loan broker does not offer the borrower the option to pay a lower amount of total fees up front.[15]

236.    ANDRUS & ASSOCIATES and ANDRUS failed to offer Plaintiff the option of paying a lower amount of total fees up front.

237.    The value of ANDRUS & ASSOCIATES' and ANDRUS' actual services rendered in the brokering process of the GreenPoint loans was roughly $0.00 because ANDRUS & ASSOCIATES and ANDRUS falsified Plaintiff's loan application, failed to disclose material terms of the transaction and failed to obtain and provide Plaintiff with Spanish translations of documents as required by Cal. Civil Code § 1632.

238.    Additionally, ANDRUS & ASSOCIATES and ANDRUS charged Plaintiff $3,135.00 in origination fees for their services which were ultimately unlawful, making the $11,055.00 in yield spread premiums grossly unnecessary.

239.    ANDRUS & ASSOCIATES' and ANDRUS' acceptance of yield spread premiums, and GREENPOINT's payment of those yield spread premiums, were unlawful kickbacks and/or unearned fees under RESPA because they were not reasonably related to the performance of lawful services.

---

[14] *Id*. at 53054.
[15] *Id*.

240.    GREENPOINT should have known that ANDRUS & ASSOCIATES and ANDRUS did not earn the yield spread premiums because, *inter alia,* ". . . common industry practice is that lenders follow underwriting standards that demand a review of originations and therefore lenders typically know that brokers have performed the services required . . . "[16]  If GREENPOINT had reviewed Plaintiff's loan origination, including his loan application, GREENPOINT would have learned of the obvious red flags it contained.

241.    RESPA also prohibits any person from accepting an excessive or unearned fee.

242.    ANDRUS & ASSOCIATES and ANDRUS violated RESPA by charging excessive appraisal fees and an underwriting fee in addition to the underwriting fee charged by GREENPOINT.

243.    CAMPOS violated RESPA by charging excessive fees in connection with her notary services and accepting unearned fees.

244.    As a result of the GREENPOINT Parties' violations of RESPA and Regulation X, Plaintiff is entitled to recover from the GREENPOINT Parties a civil penalty of three times the amount of any charge paid for settlement services, pursuant to 12 U.S.C. § 2607(d)(2) and Regulation X, 24 C.F.R. § 3500.19(b).

245.    As a result of the GREENPOINT Parties' violation of RESPA and Regulation X, Plaintiff is entitled to an award of his reasonable attorney's fees and costs pursuant to 12 U.S.C. § 2607(d)(5).

246.    As a senior citizen subjected to the GREENPOINT Parties' abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

/ / /

/ / /

---

[16] *Id*. at 53055.

1

## FIFTH CLAIM FOR RELIEF

2

3

### Fraud
### (Against BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN)

4

247.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth

5

herein.

6

248.    BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and

7

8

CHAPMAN knowingly and willfully induced Plaintiff to enter into the South Pacific and GreenPoint

9

loans by making false oral statements and omitting material information regarding the terms of the loan

10

and Plaintiff's application.

11

249.    Specifically, BARRIOS falsely represented that he had secured refinance

12

mortgage loans for Plaintiff that provided low fixed rate interest terms.

13

14

250.    In fact, BARRIOS knew that he did not obtain home loans for Plaintiff on those

15

terms.

16

251.    BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and

17

CHAPMAN also knowingly and willingly concealed the fact that they had included false information

18

about Plaintiff's employment status and monthly income on Plaintiff's loan applications.

19

20

252.    BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and

21

CHAPMAN made these false statement with the intent to induce Plaintiff to rely on them so that they

22

would receive their brokerage fees upon the closing of the refinance mortgage loans.

23

253.    Plaintiff reasonably relied on all such misrepresentations and omissions.  Absent

24

those misrepresentations and omissions, Plaintiff would not have entered into the South Pacific and

25

GreenPoint loan transactions.

26

254.    As a result of BARRIOS, ANDRUS & ASSOCIATES, ANDRUS,

27

28

RESIDENTIAL and CHAPMAN's fraudulent representations and omissions, Plaintiff has sustained

damages in an amount to be proved at trial.

255. BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN's conduct as alleged herein was a substantial factor in causing the damages sustained by Plaintiff, and as a direct, proximate and legal result result of the above alleged fraudulent representations and omissions, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, damages for loss of property and money and damages for emotional distress.

256. Plaintiff is informed and believes, and thereon alleges that BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN were guilty of malice, fraud or oppression, as defined in Cal. Civil Code § 3294, and where appropriate Plaintiff should therefore recover, in addition to actual damages, damages to make an example of and punish these Defendants.

257. As a senior citizen subjected to BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN's abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

## SIXTH CLAIM FOR RELIEF

### Civil Conspiracy
### (Against All Defendants)

258. Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

259. Defendants, by their actions, engaged in a civil conspiracy to fraudulently induce Plaintiff to enter into the South Pacific and GreenPoint loan transactions and be bound by those loan transactions.

260. Plaintiff is informed and believes, and thereon alleges that Defendants entered into an agreement (either explicitly or tacitly) to fraudulently induce Plaintiff to enter into and be bound

by the South Pacific and GreenPoint loan transactions by intentionally making misrepresentations and concealing material facts as described herein.  All of Defendants' acts, including failing to provide Plaintiff with Spanish translations of documents as required by Cal. Civil Code § 1632, were directed toward the goal of the conspiracy.

261.    Indeed, each Defendant stood to gain from this conspiracy.    BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN earned fees.   SOUTH PACIFIC, GREENPOINT, HOMECOMINGS, COUNTRYWIDE and GMAC all earned excessive fees and substantial interest, including prepayment penalties.   GMAC has received and will continue to receive substantial interest payments and will, absent a change in the terms of the loan, will be in a position to foreclose on Plaintiff's home, thereby obtaining title to the home at a cost far below market value.

262.    Plaintiff is informed and believes, and thereon alleges that no party took any steps to withdraw from the conspiracy and therefore all participants in the conspiracy are liable for the actions of the others in effecting the conspiracy.

263.    Defendants knew that Plaintiff wanted a low fixed rate of interest on the senior loans.  They led Plaintiff to believe that these were or would be the terms of his loans.

264.    Plaintiff is informed and believes, and thereon alleges that Defendants SOUTH PACIFIC and GREENPOINT knew or should have known that the information on Plaintiff's loan application regarding his employment status and income were false or were intentionally ignorant as to the true facts of Plaintiff's loan application by deliberately failing to check Plaintiff's employment status and income.

265.    Defendants led Plaintiff to believe that his loan payments would amortize all interest and pay down the principal, when in truth the loans were interest only and included negative

amortization.

266.    Plaintiff reasonably relied on Defendants' words and actions, which led him to believe that he was getting loans under the terms that he specified.

267.    All Defendants acted in furtherance of this conspiracy to ensure the completion of the loan by, among the other actions alleged herein, (i) providing disclosures and notices that did not comply with TILA and Regulation Z requirements; (ii) failing to provide Plaintiff with Spanish translations of documents as required by Cal. Civil Code § 1632; and (iii) failing to investigate and verify Plaintiff's employment status, income or ability to repay the loans.

268.    Plaintiff suffered serious injury as the proximate result of his reasonable and justified reliance on such intentional and material misrepresentations and failures to disclose.

269.    Defendants' conduct as alleged herein was a substantial factor in causing the damages sustained by Plaintiff, and as a direct, proximate and legal result result of the above alleged civil conspiracy, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, damages for loss of property and money and damages for emotional distress.

270.    Plaintiff is informed and believes, and thereon alleges that Defendants were guilty of malice, fraud or oppression, as defined in Cal. Civil Code § 3294, and where appropriate Plaintiff should therefore recover, in addition to actual damages, damages to make an example of and punish Defendants.

271.    As a senior citizen subjected to Defendants' abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

/ / /

/ / /

**SEVENTH CLAIM FOR RELIEF**

**Breach of Fiduciary Duty**
**(Against BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN)**

272.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

273.    California law imposes on real estate agents and mortgage brokers, as fiduciaries, the same obligations of undivided service and loyalty that it imposes on a trustee in favor of a beneficiary.

274.    BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN, and each of them, owed Plaintiff fiduciary duties of the utmost loyalty, good faith and diligence.  Defendants breached those fiduciary duties by, *inter alia*:

      a.    misleading Plaintiff to believe that he was purchasing low fixed rate loan products;

      b.    failing to inform Plaintiff that he would be required to pay prepayment penalties on previous home loans in order to obtain new home loans;

      c.    failing to explain the terms of the loan transactions to Plaintiff;

      d.    inducing Plaintiff to sign loan documents by either misrepresenting the terms or failing to disclose the terms;

      e.    falsifying Plaintiff's employment status and income;

      f.    failing to investigate and verify Plaintiff's employment status and income;

      g.    failing to properly consider, investigate or evaluate Plaintiff's loan application and/or ability to repay;

      h.    directing Plaintiff to accept a loan product with a risk grade less favorable than the risk grade for which Plaintiff qualified;

i.    failing to disclose adequately, and in compliance with California and federal law, the nature and terms of the agreement between Plaintiff and Defendants;

j.    failing to provide Plaintiff with Spanish translations of documents as required by Cal. Civil Code § 1632;

k.    charging Plaintiff excessive and unearned broker fees;

l.    paying an unearned fee or kickback to CAMPOS; and

m.    refusing to investigate or rescind the transactions after Plaintiff notified them that he was exercising his right to rescind the transactions pursuant to 15 U.S.C. § 1635.

275.    BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN engaged in their conduct alleged in this Complaint for the purpose of advancing their own financial interests and in callous disregard for the foreseeable financial consequences to Plaintiff.

276.    BARRIOS, RESIDENTIAL and CHAPMAN, and each of them, operated as agents of SOUTH PACIFIC and abandoned their fiduciary duty to Plaintiff.

277.    BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, and each of them, operated as agents of GREENPOINT and abandoned their fiduciary duty to Plaintiff.

278.    BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN failed to act diligently by failing to evaluate Plaintiff's ability to to repay the loans, failing to disclose all material terms of the transaction, and failing to comply with applicable consumer protections in intended to benefit Plaintiff.

279.    As a result of Defendants' breach of their fiduciary duties to Plaintiff, Plaintiff has sustained damages in an amount to be proved at trial.

280.    Defendant's conduct as alleged herein was a substantial factor in causing the damages sustained by Plaintiff, and as a direct, proximate and legal result result of the above alleged

breach of fiduciary duty, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, damages for loss of property and money and damages for emotional distress.

281.    Plaintiff is informed and believes, and thereon alleges that BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN were guilty of malice, fraud or oppression, as defined in Cal. Civil Code § 3294, and where appropriate Plaintiff should therefore recover, in addition to actual damages, damages to make an example of and punish these Defendants.

282.    As a senior citizen subjected to BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN's abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

## EIGHTH CLAIM FOR RELIEF

### Negligence
### (Against BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN)

283.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

284.    Because a real estate agent is required to exercise reasonable care and diligence in any transaction and is bound to exercise his or her skill for the benefit of the principal, the agent is liable for any damages suffered by the principal as a result of any negligence in the performance of his or her agency duties.

285.    BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN owed Plaintiff a duty to act as reasonably prudent real estate agents and mortgage loan brokers.

286.    A reasonably prudent real estate agent and mortgage loan broker would not have directed Plaintiff to predatory loan products nor originated such loans.

287.    Defendants acted negligently in failing to properly consider, investigate or evaluate Plaintiff's loan application and/or ability to repay the loans.

288.    Defendants acted negligently in underwriting and originating the loans.

289.    Defendants knew or should have known to utilize the best practices for underwriting and originating loans but negligently failed to do so.

290.    As a result of Defendants' negligent underwriting and origination of Plaintiff's loan, Plaintiff has sustained damages in an amount to be proved at trial.

291.    Defendants' conduct as alleged herein was a substantial factor in causing the damages sustained by Plaintiff, and as a direct, proximate and legal result result of the above alleged negligence, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, damages for loss of property and money and damages for emotional distress.

292.    Plaintiff is informed and believes, and thereon alleges that BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN were guilty of malice, fraud or oppression, as defined in Cal. Civil Code § 3294, and where appropriate Plaintiff should therefore recover, in addition to actual damages, damages to make an example of and punish these Defendants.

293.    As a senior citizen subjected to BARRIOS, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN's abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

## NINTH CLAIM FOR RELIEF

### Negligent Training
### (Against ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN)

294.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

295.    ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN owed Plaintiff a duty of reasonable care to train their employees and agents to comply with all applicable laws, rules and/or regulations and in accordance with professional, industry-wide best practices standards.  These laws, rules, regulations and industry-wide best practices standards were enacted to protect individuals such as Plaintiff.

296.    ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN breached their duty to Plaintiff by failing to train their employees and agents adequately to conduct themselves within the law and by allowing their employees and agents to operate without such adequate training.  Moreover, Defendants' conduct fell below the standard of care as they trained and/or actively encouraged their employees and agents to act in violation of applicable laws, rules, and/or regulations and professional industry-wide best practices standards.  ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN failed to take reasonable steps to protect Plaintiff, even though they knew or had reason to know that their failure to adequately train their employees and/or agents would result in harm to Plaintiff.

297.    Specifically, ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN breached their duty by, *inter alia*, employing BARRIOS, an unlicensed person, to solicit Plaintiff in the Spanish language and negotiate home loans in the Spanish language and thereafter failing to provide Plaintiff with Spanish translations of documents as required by Cal. Civil Code § 1632.  Further, these Defendants instructed or allowed BARRIOS to represent above market rate adjustable loan products as low fixed rate loan products.  These Defendants failed to provide consumer disclosures and notices required by TILA and Regulation Z.  These Defendants also failed to investigate or rescind the transactions after Plaintiff notified them that he was exercising his right to rescind the transactions pursuant to 15 U.S.C. § 1635.

298.    As a result of these Defendants' negligent training of their agents and employees, Plaintiff has sustained damages in an amount to be proven at trial.

299.    ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN's conduct as alleged herein was a substantial factor in causing the damages sustained by Plaintiff, and as a direct, proximate and legal result of the above alleged negligent training, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, damages for loss of property and money, and damages for emotional distress.

300.    Plaintiff is informed and believes, and thereon alleges that ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN were guilty of malice, fraud or oppression, as defined in Cal. Civil Code § 3294, and where appropriate Plaintiff should therefore recover, in addition to actual damages, damages to make an example of and punish these Defendants.

301.    As a senior citizen subjected to ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN's abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

## TENTH CLAIM FOR RELIEF

### Negligent Supervision
### (Against ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN)

302.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

303.    ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN owed Plaintiff a duty of reasonable care that required these Defendants to supervise and ensure that their employees and agents complied with all applicable laws, rules and regulations and in accordance with professional, industry-wide best practices standards.  These laws, rules, regulations and industry-wide best practices standards were enacted to protect individuals such as Plaintiff.    ANDRUS &

ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN knew or had reason to know that their employees and agents posed a reasonably foreseeable threat to Plaintiff absent adequate supervision, control or regulation.

304.    ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN breached their duty to Plaintiff by failing to adequately and properly supervise, control or regulate their employees and agents to preclude them from engaging in the unlawful conduct described herein, or otherwise to take reasonable steps to protect Plaintiff.

305.    As a result of these Defendants' negligent supervision of their agents and employees, Plaintiff has sustained damages in an amount to be proven at trial.

306.    ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN's conduct as alleged herein was a substantial factor in causing the damages sustained by Plaintiff, and as a direct, proximate and legal result of the above alleged negligent supervision, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial, including, but not limited to, damages for loss of property and money, and damages for emotional distress.

307.    Plaintiff is informed and believes, and thereon alleges that ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN were guilty of malice, fraud or oppression, as defined in Cal. Civil Code § 3294, and where appropriate Plaintiff should therefore recover, in addition to actual damages, damages to make an example of and punish these Defendants.

308.    As a senior citizen subjected to ANDRUS & ASSOCIATES, ANDRUS, RESIDENTIAL and CHAPMAN's abusive, deceptive and unfair practices, Plaintiff is entitled to treble damages pursuant to Cal. Civil Code § 3345.

/ / /

/ / /

**ELEVENTH CLAIM FOR RELIEF**

**Violation of California Business and Professions Code § 17200 *et seq*.**
**(Against All Defendants)**

309.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

310.    Plaintiff brings this claim for relief on behalf of himself and in his capacity as a private attorney general against all Defendants for their unlawful business acts and/or practices pursuant to California Business and Professions Code § 17200 *et seq*., which prohibits all unlawful business acts and/or practices.

311.    Plaintiff asserts these claims as he is a representative of an aggrieved group and as a private attorney general on behalf of the general public and other persons who have expended funds that Defendants should be required to pay or reimburse under the equitable and restitutionary remedies provided by California Business and Professions Code § 17200 *et seq*.

312.    The unlawful acts and practices of Defendants alleged above constitute unlawful business acts and/or practices within the meaning of California Business and Professions Code § 17200 *et seq*.

313.    By engaging in the above-described acts and practices, Defendants have committed one or more acts of unfair competition within the meaning of California Business and Professions Code § 17200 *et seq*.

314.    Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws and/or regulations and said predicate acts are therefore *per se* violations of § 17200 *et seq*.  These predicate unlawful business acts and/or practices include Defendants' failure to comply with the disclosure requirements mandated by TILA, 15 U.S.C. § 1601 *et seq*., Regulation Z and the Official Staff Commentary issued by the Federal Reserve Board.  Additionally, as described in

more detail above, Defendants employed an unlicensed Spanish speaking salesman and Notary Public to solicit, negotiate and close home loans in the Spanish language with Plaintiff and other unsophisticated Spanish speaking consumers of the general public, many of whom were senior citizens, and then refuse to provide Plaintiff and members of the general public with Spanish language copies of their loan documentation and disclosures as required by California Civil Code § 1632. Defendants also allowed, condoned and failed to investigate or verify the employment status and income of Plaintiff and other members of the general public who were sold home loans by Defendants.

315.    Defendants' misconduct, as alleged herein, gave Defendants an unfair competitive advantage over their competitors.

316.    As a direct and proximate result of the aforementioned acts and/or practices, Defendants received monies and continue to hold the monies expended by Plaintiff and other members of the general public who were sold home loans by Defendants.

317.    In addition to the relief requested in the Prayer below, Plaintiff seeks the imposition of a constructive trust over, and restitution of, the monies collected and realized by Defendants.

318.    The unlawful acts and practices, as fully described herein, present a continuing threat to members of the public to be mislead and/or deceived by Defendants as described herein. Plaintiff and other members of the general public have no other remedy at law that will prevent Defendants' misconduct, as alleged herein, from occurring and/or reoccurring in the future.

319.    As a direct and proximate result of Defendants' unlawful conduct alleged herein, Plaintiff and members of the general public have lost thousands if not millions of dollars of equity in their homes. Plaintiff and other members of the general public are direct victims of Defendants' unlawful conduct, as alleged herein, and each has suffered injury in fact and have lost money or

property as a result of Defendants' unfair competition.

320.    Plaintiff and members of the general public are entitled to equitable relief, including restitution, restitutionary disgorgement of all profits accruing to Defendants because of their unlawful and deceptive acts and practices, attorney fees and costs, declaratory relief, and a permanent injunction enjoining Defendants from their unlawful activity.

## TWELVETH CLAIM FOR RELIEF

**Elder Abuse and Dependent Adult Civil Protection Act, Cal. Welf. & Inst. Code § 15610 *et seq.***
**(Against All Defendants)**

321.    Plaintiff incorporates all paragraphs in this Complaint as though fully set forth herein.

322.    Plaintiff brings this claim for relief against all Defendants under the Elder Abuse and Dependent Adult Civil Protection Act ("Elder Abuse Act"), California Welfare and Institutions Code § 15610 *et seq*.

323.    Plaintiff is an "elder" within the meaning of Cal. Welf. & Inst. Code § 15610.27.

324.    Defendants took, appropriated and/or retained Plaintiff's property (*i.e.*, equity in Plaintiff's home and mortgage loan proceeds) for a wrongful use or with the intent to defraud Plaintiff, in violation of Cal. Welf. & Inst. Code § 15610.30(a)(1);

325.    Plaintiff had the right to have the property (*i.e.*, equity in Plaintiff's home and mortgage loan proceeds) transferred or made readily available to Plaintiff.

326.    Defendants knew or should have known that Plaintiff had the right to have the property (*i.e.*, equity in Plaintiff's home and mortgage loan proceeds) transferred or made readily available to Plaintiff .

327.    Defendants' taking, appropriating and/or retaining the property (*i.e.*, equity in Plaintiff's home and mortgage loan proceeds) that Plaintiff was legally entitled to was the proximate

cause of Plaintiff's harm.

328.    Defendants' conduct was a substantial factor in causing Plaintiff's harm.

329.    As a proximate result of the aforementioned acts and omissions by Defendants, Plaintiff has suffered loss of monies in a sum to be proven at trial.

330.    As a proximate result of the aforementioned acts and omissions by Defendants, Plaintiff is entitled to an award of his reasonable attorney's fees and costs incurred in this action, in addition to all other remedies otherwise provided by law, pursuant to Cal. Welf. Inst Code § 15657.5(a).

331.    Plaintiff is informed and believes, and thereon alleges that the aforementioned acts were performed by Defendants fraudulently, maliciously, recklessly and oppressively, entitling Plaintiff to punitive damages, pursuant to Cal. Civil Code § 3294(b).

## PUNITIVE DAMAGES

332.    Plaintiff is informed and believes, and thereon alleges that Defendants' conduct was fraudulent, malicious, despicable and oppressive and was intended to harm Plaintiff.

333.    Plaintiff is informed and believes, and thereon alleges that an officer, director or managing agent of Defendants authorized, approved and ratified Defendants' wrongful and unlawful acts described herein.

334.    Defendants are liable for reasonable punitive damages in an amount sufficient to punish and educate Defendants and to educate other businesses engaged in similar activities that the courts and juries of California will not tolerate such conduct in California.

## REQUEST FOR RELIEF

Plaintiff requests that this Court:

1.    Assume jurisdiction in this proceeding;

2.    Award actual damages according to proof;

3.   Award compensatory damages as permitted by law;

4.   Award consequential damages as permitted by law;

5.   Award statutory damages as permitted by law;

6.   Award punitive damages as permitted by law;

7.   Award rescission;

8.   Award equitable relief, including restitution;

9.   Award restitutionary disgorgement of all profits Defendants obtained as a result of their unfair competition;

10.  Award interest as permitted by law;

11.  Award Declaratory Relief;

12.  Enter a mandatory injunction requiring Defendants to permanently cease all unlawful practices complained of in this action and impose affirmative injunctive relief requiring Defendants, their partners, agents, employees, assignees, and all persons acting in concert or participating with them, to take affirmative action to immediately implement policies designed to ensure: (i) that all prospective borrowers' loan applications do not contain false information, (ii) a thorough evaluation of all prospective borrowers' ability to repay any loans made available to them, (iii) training regarding applicable lending law for all of Defendants' employees and agents, and (iv) eliminating discriminatory policies and practices;

13.  Enter a mandatory injunction requiring Defendants to provide Spanish language documents pursuant to Cal. Civil Code § 1632 for all transactions solicited or negotiated in the Spanish language;

14.  Enter a mandatory injunction requiring Defendants to permanently include in every

Option ARM loan and disclosure statement: (i) clear and conspicuous disclosure of the actual interest rate on the Note(s) and disclosure statement(s) as required under 12 C.F.R. § 226.17 by; (ii) clear and conspicuous disclosure in the Note(s) and the disclosure statement(s) that payments on the variable interest rate loan during the initial period at the teaser rate will result in negative amortization and that the principal balance will increase as required under 12 C.F.R. § 226.19; and (iii) clear and conspicuous disclosure that the initial interest rate provided is discounted and does not reflect the actual interest that Plaintiff and members of the general public would be paying on the Note(s).

15. Award treble damages pursuant to Cal. Civil Code § 3345;

16. Award reasonable attorneys' fees and costs; and

17. Award such other relief as is just and proper.

CONSUMER LAW CENTER, INC.


By: /s/ Fred W. Schwinn
Fred W. Schwinn (SBN 225575)
CONSUMER LAW CENTER, INC.
12 South First Street, Suite 1014
San Jose, California 95113-2418
Telephone Number: (408) 294-6100
Facsimile Number: (408) 294-6190
Email Address: fred.schwinn@sjconsumerlaw.com

Balám O. Letona (SBN 229642)
LAW OFFICE OF BALÁM O. LETONA, INC.
1347 Pacific Avenue, Suite 203
Santa Cruz, California 95060-3940
Telephone Number: (831) 421-0200
Facsimile Number: (831) 621-9659
Email: letonalaw@gmail.com

Attorney for Plaintiffs
CARLOS H. PEREZ

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION PURSUANT TO CIVIL L.R. 3-16

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

/s/ Fred W. Schwinn
Fred W. Schwinn, Esq.

## DEMAND FOR JURY TRIAL

PLEASE TAKE NOTICE that Plaintiff, CARLOS H. PEREZ, hereby demands a trial by jury of all triable issues of fact in the above-captioned case.

/s/ Fred W. Schwinn
Fred W. Schwinn, Esq.

# Exhibit "A"

SEE "PREPAYMENT PENALTY ADDENDUM TO     TE" ATTACHED HERETO AND MADE A PART HE     F.

LOAN NO.: 41050309

# ADJUSTABLE RATE NOTE
## (MTA - Twelve Month Average Index - Payment Caps)

MIN: 100079600410503099
MERS Phone: 1-888-679-6377

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

| APRIL 14, 2005 | CALIFORNIA | CALIFORNIA |
|---|---|---|
| [Date] | [City] | [State] |

551 LOUMENA LANE, SAN JOSE, CA 95111
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $    452,000.00    (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed    ONE HUNDRED FIFTEEN AND 000/1000THS    percent ( 115.000 %) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is
SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS BANCORP

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    1.000    %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the    1st    day of    JUNE, 2005    , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

### (C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding    THREE AND 075/1000THS    percentage point(s) (    3.075    %) ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than    9.950    %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

Initials: _KP_ _NP_

3.  **PAYMENTS**

(A) **Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the  1st    day of each month beginning on       JUNE, 2005                     .
I will make these payments every month until I have paid all the Principal and Interest and any other charges described
below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied
to interest before Principal. If, on    MAY 01, 2035          , I still owe amounts under this Note, I will pay those
amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS BANCORP
10737 LAUREL STREET, STE 200, RANCHO CUCAMONGA, CA  91730
or at a different place if required by the Note Holder.

(B) **Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $     1,453.81
unless adjusted under Section 3 (F).

(C) **Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the first day of      JUNE, 2006       ,
and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment
also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum
Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment
Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of
the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided
in Section 3(F) or 3(G) below.

(D) **Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that
would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity
date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The
result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly
payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5%
limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply
to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by
taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the
number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me
to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also
have the option to pay the Full Payment for my monthly payment.

(E) **Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject
to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of
the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment
date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the
interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and
will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate
required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply
the payment as provided in Section 3(A).

(F) **Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to    ONE HUNDRED FIFTEEN  AND 000/1000THS    percent
( 115.000  %) of the Principal amount I originally borrowed. My unpaid principal could exceed that Maximum Limit due to

Initials: CP

10/04

NP

Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

    **(G) Required Full Payment**
    On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

    **(H) Payment Options**
    After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are **greater** than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
        **(i)**    **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
        **(ii)**    **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
        **(iii)**    **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
    These Payment Options are only applicable if they are greater than the Minimum Payment.

**4.   NOTICE OF CHANGES**
    The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**
    I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.
    I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**
    If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**
    **(A) Late Charges for Overdue Payments**
    If the Note Holder has not received the full amount of any monthly payment by the end of    **FIFTEEN**  ( 15 ) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    **5.000**   % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option

shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | | |
|---|---|---|
| _____ (Seal) | _____ (Seal) | |
| CARLOS H. PEREZ                -Borrower | NORMA C. PEREZ                -Borrower | |
| _____ (Seal) | _____ (Seal) | |
| -Borrower | -Borrower | |
| _____ (Seal) | _____ (Seal) | |
| -Borrower | -Borrower | |
| _____ (Seal) | _____ (Seal) | |
| -Borrower | -Borrower | |

## PREPAYMENT PENALTY ADDENDUM TO NOTE

MIN: 1000796004105030099                                        LOAN NO.: 41050309
MERS Phone: 1-888-679-6377

This "PREPAYMENT PENALTY ADDENDUM TO NOTE" (hereinafter "Addendum") is made this
_____14th_____ day of _____APRIL, 2005_____ , and is incorporated into and shall be deemed to amend
and supplement the Promissory Note (the "Note") of same date made by the undersigned (the "Borrower") to
SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS BANCORP

(the "Lender") which is secured by a Deed Of Trust or Mortgage ("Security Instrument") on real property
located at:                          551 LOUMENA LANE, SAN JOSE, CA  95111
                                      [Property Address]

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Note, Borrower and
Lender further covenant and agree that the paragraph entitled either "Borrower's Right To Prepay" or
"Borrower's Payments Before They Are Due", whichever is applicable, is replaced with the following new
section:

    I have the right to make payments of Principal at any time before they are due. A prepayment of all of the
unpaid principal is known as a "Full Prepayment." A prepayment of only part of the unpaid principal is known
as a "Partial Prepayment."

    Except as provided below, I may make a Full or Partial Prepayment without paying any penalty.  If I make
a Partial Prepayment equal to one or more of my monthly payments, my due date may be advanced no more
than one month.  If I make any other Partial Prepayments, I must still make each later payment as it becomes
due and in the same amount.  I may make a Full or Partial Prepayment at any time.

    In the event, during the first    THIRTY SIX    ( 36 ) months after the execution of the Deed of Trust, I
make a Full Prepayment or Partial Prepayment and the total of such prepayments in any twelve (12) month
period exceeds       TWENTY      percent ( 20.000 %) of the original Principal amount of the loan, I will
pay a prepayment charge in an amount equal to the payment of      SIX      ( 6 ) months' advance
interest on the amount prepaid which is in excess of      TWENTY      percent ( 20.000 %) of the
original Principal amount.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment
Penalty Addendum To Note.

_____ 04-15-05    _____
CARLOS H. PEREZ                    Borrower          Date

_____              _____
NORMA C. PEREZ                     Borrower      04-15-05    Date

_____              _____
                                   Borrower          Date

_____              _____
                                   Borrower          Date

Prepayment - HARD

LENDER SUPPORT SYSTEMS INC. PRE-CA.PRE (02/05)

# Exhibit "B"

DATE:  APRIL 14, 2005
BORROWER:CARLOS H. PEREZ  and NORMA C PEREZ

LOAN #:  41050310
PROPERTY ADDRESS:  551 LOUMENA LANE, SAN JOSE, CALIFORNIA 95111

HOME EQUITY CREDIT LINE AGREEMENT AND
DISCLOSURE STATEMENT

This Home Equity Credit Line Agreement and Disclosure Statement ("Agreement") governs my Home Equity Credit Line Account ("Account") with you,  SOUTH PACIFIC FINANCIAL CORPORATION

The words "I", "me" and "my" refer to the Borrower signing this Agreement. If more than one Borrower signs this Agreement, the words "I," "me" and "my" refer to all who sign, separately and jointly. The words "you" and "your" refer to
SOUTH  PACIFIC  FINANCIAL  CORPORATION  10737  LAUREL  STREET,  STE  200,  RANCHO CUCAMONGA, CALIFORNIA  91730
1. LOANS: DRAW AND REPAYMENT PERIOD. Subject to the limitations explained in this Agreement, upon my request for loans, you agree to lend money to me from time to time until the last day of the sixtieth (60th) consecutive calendar month following the date set forth above ("Initial Draw Period,") or until the last day of any renewed Draw Period, up to my Credit Limit indicated in paragraph 4 below. (You will not make any loans if my Account is sooner terminated or suspended under paragraphs 11.B, 11.D, 12.B or 16.A below.)  You will not make any loan before the fourth business day following the signing of this Agreement, except to the extent that the proceeds of this loan are for the purchase of the Property.

I agree that prior to the end of the Initial Draw Period, you have the right to review my Account to decide whether such Initial Draw Period will be renewed.  Unless you have sent me written notice not later than the sixtieth (60th) day before the Initial Draw Period ends that you have decided not to renew such Initial Draw Period, such Initial Draw Period will automatically renew for one additional sixty (60) month period, and the Draw Period on my Account shall thereafter be considered to be 120 months for purposes of this Agreement. If the Initial Draw Period is not renewed, then the Draw Period on my Account shall thereafter be considered to be 60 months for purposes of this Agreement.

After the Draw Period ends, I will no longer be able to obtain loans and then must pay the outstanding balance over the specified Repayment Period unless my Account is sooner terminated under paragraph 12.B below, in which case my Account is due and payable in full at the time of such termination.  The Repayment Period shall be 180 months.

2. MAKING LOANS. You will make loans under this Agreement by (i) honoring Equity Credit Line Checks you provide to me requesting advances of at least $250; (ii) paying closing costs and finance charges in accordance with paragraph 7.C below; (iii) paying certain other amounts on my behalf in accordance with my disbursement authorization provided to you at or before the time I sign this Agreement; (iv) paying any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement or the Deed of Trust; or (v) any other method or procedure you establish.

3. PROMISE TO PAY; MINIMUM PAYMENT; METHOD OF PAYMENT.

A. I promise to pay to your order, when and as due, all loans made under this Agreement, plus all unpaid finance charges, insurance premiums, collection costs and other charges I owe to you now or in the future. I agree to make my payments in the manner specified in my periodic statement, and if I do so such payments will be credited as of the day of receipt.

B. At a minimum, you will send me a periodic statement monthly, except that my first periodic statement may be generated and mailed to me between thirty and sixty days after I open my Account. The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance," my Annual Percentage Rate, the amount of my "Minimum Payment Due," my "Payment Due Date" and the place and manner of making payments.

C. I may pay all or any part of my "New Balance" at any time, subject to an Account Termination Fee described in paragraph 7.D below. As periodic finance charges will accrue on my Account balance until it is fully repaid, any periodic finance charges incurred for the billing cycle in which full payment of the New Balance shown on the previous periodic statement is received by you will be reflected on my next periodic statement. If I want to include those finance charges with the payment of the New Balance shown on my previous periodic statement, I will contact       SOUTH      PACIFIC FINANCIAL CORPORATION

for details concerning the amount I must include.

D. I may pay all or any part of my "New Balance" using an Equity Credit Line Check ("Check"). If I use a check to pay all or any part of my New Balance, I understand that:
(1)  The amount of the Check will be treated as any other advance under the terms and conditions of my Account. My Check will not be honored if I do not have sufficient availability on my Account.
(2)  If I make a payment using a Check, my principal balance will not decrease. The principal balance will increase by the amount of the Check.

Initials: _CP_
\ _NP_

(3) Interest will accrue on the total increased principal balance when I use a Check to make a payment on my Account.

(4) I may not use a Check to make a payment once the Draw Period ends. That is, a Check may not be used to make a payment during the Repayment Period.

E. Unless you terminate my Account and require immediate payment of the entire outstanding balance as provided in paragraph 12.B below, I must pay you at least the "Minimum Payment Due" for each billing cycle by the "Payment Due Date" shown on my periodic statement.

F. During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due." My "Minimum Payment Due" during the Draw Period will not reduce the principal balance that is outstanding on my account.

G. During the Repayment Period, if the Draw Period on my Account is 60 months or 120 months, my "Minimum Payment Due" equals 1/180th of the outstanding principal balance of my Account as of the last day of the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due."

**4. CREDIT LIMIT.** My Credit Limit under this Agreement is $    56,500.00    . I promise not to request a loan which will cause the unpaid principal balance of my Account to exceed my Credit Limit. You can increase the Credit Limit at any time without prior notice to me. You can refuse to make loans that cause my obligations under this Agreement to exceed my Credit Limit. You will make loans on my Account based on the "Available Credit Limit" shown on my most recent periodic statement. However, I agree that when I make payments on my Account by check or other non-cash method, you reserve the right to make loans based on the "Available Credit Limit" shown on the last periodic statement issued prior to the most recent periodic statement. In addition to each "Minimum Payment Due," I must pay immediately, without notice or demand from you, any part of the principal balance of my Account that exceeds my Credit Limit.

**5. ANNUAL PERCENTAGE RATE.**
   *One box must be checked by Lender.*

☐ A. The initial Daily Periodic Rate is                    %. The initial ANNUAL PERCENTAGE RATE is                    %. These rates are "discounted" rates. This means that these rates are lower than the rates that would be in effect if the formula set forth in paragraph 5.C below had been used, in which event the initial Daily Periodic Rate would be                    % and the initial ANNUAL PERCENTAGE RATE would be                    %. These discounted rates will be in effect from the date of this Agreement until                    . Thereafter, the Daily Periodic Rate and the Annual Percentage Rate will be determined using the formula set forth in paragraph 5.C below.

☒ B. The initial Daily Periodic Rate is          0.0247          % and the initial ANNUAL PERCENTAGE RATE is 9.0000                    %. These rates are not discounted.

C. My Annual Percentage Rate and Daily Periodic Rate may increase or decrease (beginning with the first day of the first billing cycle after my "discounted" rate has expired, if applicable) according to the following procedure: The ANNUAL PERCENTAGE RATE shall be the "Index" plus a "Margin." The "Index" will be the highest Prime Rate as published in the "Money Rates" table of The Wall Street Journal as of the first business day of the calendar month. The "Margin" is equal to the number of percentage points disclosed in paragraph 5.D below. Each billing cycle will end on the last day of the calendar month. Any new Index value shall be effective as of the first day of the billing cycle in which such new Index value is established.

Upon a change in the Index, any resulting change in my Daily Periodic Rate and Annual Percentage Rate will take effect without prior notice to me, and will apply to new loans and to the outstanding principal balance in my Account. The new Annual Percentage Rate and Daily Periodic Rate will apply to my then existing unpaid principal balance and all new loans I obtain until my Annual Percentage Rate and Daily Periodic Rate change again. The Daily Periodic Rate at any time equals the ANNUAL PERCENTAGE RATE divided by 365.

D. The "Margin" to be used under paragraph 5.C above to determine my ANNUAL PERCENTAGE RATE is     3.2500     %.

E. The Annual Percentage Rate is a simple interest rate. The Annual Percentage Rate includes only interest and not other costs. The ANNUAL PERCENTAGE RATE will never increase above          18.00          %.

F. If the Daily Periodic Rate (and the corresponding Annual Percentage Rate) increases, I will have to pay additional periodic finance charges and, as a result, I will have to pay larger "Minimum Payments."

**6. FINANCE CHARGE.** I agree to pay a finance charge on my Account as explained below.

A. Periodic FINANCE CHARGE.

(1) A loan represented by an Equity Credit Line Check will be posted to my Account on the date that such a check is presented to you for payment. The periodic finance charge begins to accrue on my Account from the time a loan is posted to my Account. You compute the periodic finance charge on my Account by applying the Daily Periodic Rate to the "Average Daily Balance" in my Account (including current transactions). To determine the periodic finance charge for any billing cycle, the "Average Daily Balance" is multiplied by the Daily Periodic Rate, then this product is multiplied by the number of days in the billing cycle.

(2) To get the "Average Daily Balance," you take the beginning principal balance of my Account each day, add any new loans and subtract any principal payments or credits. This gives you the Daily Balance. Then you add up all the Daily Balances for the billing cycle and divide by the total number of days in the billing cycle. This gives you the "Average Daily Balance."

B. Other FINANCE CHARGES.
SEE ATTACHED ADDENDUM TO HOME EQUITY CREDIT LINE AGREEMENT AND DISCLOSURE STATEMENT
(1) Points FINANCE CHARGE.

I agree to pay a Points FINANCE CHARGE of $ _____ at the time I sign this Agreement.

$ _____
$ _____
$ _____
$ _____

(2) Broker Fee FINANCE CHARGES.

I agree to pay Broker Fee FINANCE CHARGES of $ _____ at the time I sign this Agreement.

$ _____
$ _____
$ _____
$ _____

(3) Settlement Agent FINANCE CHARGES.

I agree to pay the following Settlement Agent FINANCE CHARGES at the time I sign this Agreement:

Sub Escrow/Full Escrow _____
_____
_____
_____
_____

$ _____
$ _____
$ _____
$ _____
$ _____

(4) Miscellaneous FINANCE CHARGES.

I agree to pay the following Miscellaneous FINANCE CHARGES at the time I sign this Agreement:

_____
_____
_____
_____

$ _____
$ _____
$ _____
$ _____

(5) Annual Maintenance Fee FINANCE CHARGES.

[X]   I agree to pay an annual maintance fee FINANCE CHARGE of $75 which you will charge to my Account on the first anniversary of this Agreement and every anniversary date thereafter, whether or not I have used or continue to use my Account; except that such fee shall be waived for the entire term of this Agreement if I meet both of the following conditions: (a) I maintain an average outstanding daily balance which does not fall below $20,000 from the date of this Agreement through the first anniversary of this Agreement; and (b) I make each monthly payment during that period on or before the due date for each such payment. You will not rebate any portion of the annual fee if my Account is terminated or suspended before the end of any annual period.

[ ]   I will not be charged an annual maintance fee FINANCE CHARGE on this loan.

**7. OTHER CHARGES.**

A. I agree to pay each of the charges listed below, which shall constitute additional indebtedness under this Agreement. Any charges assessed will be shown on my periodic statement for the billing cycle in which such charge is assessed:

(1) If I fail to make my "Minimum Payment Due" within 15 days of the "Payment Due Date," I agree to pay a late fee of 5% of the late payment or $5.00, whichever is greater.

(2) I agree to pay a Return Item Fee of $15 for each check you receive in payment of my Account which is returned unpaid upon second presentment.

**SEE ATTACHED ADDENDUM TO HOME EQUITY CREDIT LINE AGREEMENT AND DISCLOSURE STATEMENT**

B. I agree to pay you or my broker the following closing costs at or before the time I sign this Agreement:

| | |
|---|---|
| Survey | $ _____ |
| Appraisal | $ _____ |
| Document Preparation Fee | $ _____ |
| Credit Report | $ _____ |
| Stamp Tax | $ _____ |
| Recording Fee | $ _____ |
| Title Search | $ _____ |
| Title Insurance | $ _____ |
| Title Guaranty | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| _____ | $ _____ |
| LESS Amounts Paid by Lender | $ __SEE__ |
| | $ __ATTACHED__ |
| Total Paid by Borrower | __ADDENDUM__ |

C. I may elect to pay the closing costs described in paragraph 7.B above and the finance charges described in paragraph 6.B above in cash or by check at or before the time I sign this Agreement or I may elect to finance some or all of such costs and finance charges by allowing you to make a loan under my Account to pay some or all of such costs and finance charges.

D. I agree to pay an Account Termination Fee (considered a prepayment penalty under federal law) of $350 to cover your costs of processing and administering my Account, if I pay in full and terminate my Account with you and ask you to satisfy my mortgage lien on or before the fifth (5th) anniversary of this Agreement.

**8. PROPERTY SECURITY.** To secure the payment of all loans I obtain and the performance of all promises I make in this Agreement, I and all co-owners are giving you a Deed of Trust (the "Deed of Trust") covering my dwelling located at **551 LOUMENA LANE, SAN JOSE, CALIFORNIA 95111** (the "Property"). The Deed of Trust is security for my current and future obligations under this Agreement. I will continue to be obligated to make payment to you under this Agreement even if the Property is damaged or destroyed and whether or not any insurance proceeds are available.

**9. SECTION INTENTIONALLY OMITTED.**

**10. PROPERTY INSURANCE.** I agree to obtain and maintain property insurance against loss or damage to the Property, in such amounts, against such risks (including, but not limited to, flood damage insurance required by law), and according to such terms as you may require in the Deed of Trust or otherwise. I may obtain property insurance from any company of my choice that is acceptable to you. If the amount of the premiums for property insurance increases at any time during the term of my Account, I agree to pay any such increase(s).

**11. YOUR RIGHTS TO TEMPORARILY SUSPEND MY LOANS OR REDUCE MY CREDIT LIMIT.**

A. You may take the actions listed in paragraph 11.B below during the period that any of the following events or conditions occur:

(1)    the value of the Property declines significantly below its appraised value for the purposes of my Account;

(2)    you reasonably believe that I will not be able to meet the repayment requirements under my Account due to a material change in my financial circumstances, such as the filing of a bankruptcy petition by or against me;

(3)    I am in default of any material obligation of this Agreement, such as my important obligations listed in paragraph 14 below;

(4)    government action (such as enactment of a state usury law) prevents you from imposing the Annual Percentage Rate provided for in this Agreement;

(5)    government action (such as imposition of a tax lien) impairs the priority of the lien of the Deed of Trust such that the value of the lien of the Deed of Trust is less than 120% of my Credit Limit;

(6)    the maximum Annual Percentage Rate set forth in paragraph 5.E above is reached;

(7)    the creditor is notified by its regulatory agency that continued advances constitute an unsafe and unsound practice.

Initials: _ICP_
_WP_

B. During the period in which a condition described in paragraph 11.A above occurs, you may refuse to make any additional loans or reduce my Credit Limit or do both. You will mail or deliver written notice to me after you suspend my Account or reduce my Credit Limit and this notice will describe the specific reasons for your action. You are obligated to reinstate my credit privileges when the condition(s) which caused the suspension or reduction have been cured or have changed, provided I have notified you in writing, explaining in detail and documenting how the condition(s) have been cured or have changed and no new condition(s) under paragraph 11.A above or 12.A below have occurred.

C. Before reinstating my right to obtain loans, or restoring my Credit Limit, you may conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) as you deem appropriate, and you may require me to reimburse you on demand for any costs you actually incur for obtaining credit reports and appraisals. You may take these steps to verify that (i) the condition(s) that caused your suspension of my loans or reduction of my Credit Limit no longer exist, and (ii) the priority of the lien of the Deed of Trust is not impaired.

D. If more than one Borrower signs this Agreement and any such Borrower requests that you cease making loans, you may comply with such a request. All Borrowers who have signed this Agreement must join in any request to reinstate the loans for such request to be effective. If all such persons subsequently request reinstatement of the loans, you must honor such a request unless a condition listed in paragraph 11.A above or 12.A below has occurred.

E. If an event or condition described in paragraph 11.A above occurs which is also an event or condition described in paragraph 12.A below, your rights and remedies described under paragraph 12.B below apply and supersede your rights described in this paragraph 11.

12. YOUR RIGHTS TO TERMINATE AND ACCELERATE MY ACCOUNT AND TAKE OTHER ACTION.

A. You may take the actions listed in paragraph 12.B below if any of the following events or conditions occur:

(1)     I fail to meet the repayment terms of this Agreement, such as my failure to make any Minimum Payment Due to you on or before the Payment Due Date;

(2)     I engage at any time in fraud or material misrepresentation in connection with my Account, whether in any application, in this Agreement or in the Deed of Trust;

(3)     I sell or transfer title to the Property without first obtaining your written permission (also, see paragraph 18.N below);

(4)     I fail to maintain insurance on the Property as required under this Agreement or the Deed of Trust;

(5)     I act or fail to act and as a result a lien senior to the lien of the Deed of Trust is filed against the Property;

(6)     I die and I am not survived by another person obligated as a Borrower under this Agreement;

(7)     All or part of the Property is taken through eminent domain, condemnation or similar government taking;

(8)     A prior lienholder on the Property begins foreclosure under its security document;

(9)     The Property is used for an illegal purpose which could subject the Property to seizure;

(10)    I fail to pay taxes on the Property; or

(11)    My action or inaction adversely affects the Real Property or your rights in the Property. Such action or inaction could include, for example, the following:

    (a)     A judgment is filed against me;

    (b)     I commit waste or otherwise destructively use or fail to maintain the Property;

    (c)     I die and I am survived by another person obligated as a Borrower under this Agreement; or

    (d)     I move out of the Property.

B. If an event described in paragraph 12.A above occurs, subject to any notice or other limitation of applicable law, you may do any combination of the following things:

(1)     you may terminate any of my rights under my Account;

(2)     you may temporarily or permanently refuse to make any additional loans;

(3)     you may declare all sums owing under this Agreement and any other agreement I have made with you to be immediately due and payable;

(4)     you may foreclose the Deed of Trust;

(5)     you may reduce my Credit Limit; and

(6)     you may take any other action permitted by this Agreement, by law or in equity.

13. SALE OF PREMISES: I will not sell, transfer ownership of, mortgage, or otherwise dispose of my interest in the Premises, in whole or in part, or permit any other lien or claim against the Premises, or transfer possession, whether by lease, rental, or otherwise, or discontinue to use the Premises as my primary and/or personal residence without your prior written consent.

**14. MY IMPORTANT OBLIGATIONS.** I agree that:

A. I will pay all of my existing and future debts to you under any existing or future agreement with you and I will pay all of my existing and future debts to my other creditors as they become due and will not allow a creditor to obtain a judgment against me.

B. I will not permit any person or entity to levy upon, attach, garnish or otherwise take any money, account or other property in your possession that belongs to me.

C. From time to time, if requested, I will supply you with current financial information about me.

D. I have not made and will not make any misrepresentation in connection with my Account whether in my application, in this Agreement, or in the Deed of Trust.

E. I will not permit a receiver, sequestrator, liquidator, trustee, guardian, conservator or other judicial representative to be appointed for me or any of my property or for the Property.

F. I will not use or allow use of the Property for any illegal purpose.

G. I will not move out of the Property.

H. I will not permit a lien to be filed which takes priority over the Deed of Trust for future advances made under this Agreement.

I. I will not break any promise made in this Agreement or in the Deed of Trust such as:

(1)  my promise not to exceed my Credit Limit; and

(2)  my "Important Obligations" listed in the Deed of Trust.

**15. COSTS OF COLLECTION.** Subject to any limits of applicable law, I must pay for your reasonable and actual costs of collection, or foreclosure such as your court costs and reasonable attorney's or trustee's fees. Periodic finance charges will continue to accrue at the rates provided in this Agreement before and after I default and before and after you obtain a judgment against me.

**16. MY RIGHTS TO TERMINATE MY RIGHTS TO OBTAIN LOANS.**

A. _Termination by Me._ I may terminate my right to obtain loans by sending you a written notice which will become effective upon receipt by you. If more than one person signs this Agreement as Borrower, my right to obtain loans may be terminated by written notice pursuant to this paragraph 16.A signed by any one or more of such persons. I may also suspend my right to obtain loans pursuant to paragraph 11.D above.

B. _Termination by You._ My right to future advances under my Account will terminate at the end of the Draw Period or any renewed Draw Period if not sooner upon your exercise of your termination or suspension rights under paragraphs 11.B or 12.B above or my exercise of my suspension or termination rights under paragraphs 11.D or 16.A above.

C. _Effect of Termination._ Upon termination or suspension of my Account, whether by you or by me, I must continue to pay the "Minimum Payment Due" on or before my "Payment Due Dates" until all amounts owed to you under this Agreement are paid in full. However, I may be required to repay all my obligations to you immediately if you exercise your rights under paragraph 12.B above. I must return unused Equity Credit Line Checks to you upon termination. I may be required to pay an Account Termination Fee pursuant to paragraph 7.D above.

**17. CHANGES TO AGREEMENT.**

A. You may change this Agreement to the extent not prohibited by federal or state law, such as the changes listed as follows:

(1)  if the original Index is no longer available, you may change the Index and Margin;

(2)  you may make any change I agree to in writing;

(3)  you may make a change which is unequivocally beneficial to me, such as offering me more minimum payment options, extensions or renewals of my Account, reductions in the rate or fees, and additional means to access loans; and

(4)  you may make insignificant changes, such as changing the address to which payments must be sent, name changes, operational changes involving the billing cycle date, the date the Minimum Payment is due, the day of the month on which Index values are measured to determine my rate, your rounding rules and the balance computation method.

B. If required by applicable law, you will mail me notice of such a change before the effective date of the change. The change will be effective as to any existing unpaid balance and as to any future transactions under this Agreement.

**18. OTHER PROVISIONS.**

A. _Third Parties._ This Agreement obligates me and my estate, heirs and personal representatives. This Agreement benefits you and your successors and assigns. You may add or release parties, or permit the addition or substitution of real property collateral that secures this Agreement, or modify, extend or amend this Agreement without in any way affecting my or any non-borrower co-owner's obligations under this Agreement. My rights under this Agreement belong only to me, I cannot transfer or assign them to anyone else. You may transfer and assign your rights and obligations under this Agreement and the Deed of Trust at any time without my consent.

B. Additional Credit Reports and Appraisals. I authorize you to conduct such searches, verifications and evaluations (such as credit reports, appraisals and lien searches) concerning me, the Property and the Deed of Trust as you may deem necessary from time to time. I will cooperate in having the Property reappraised.

C. Tax Deductibility. I know that I should consult a tax adviser regarding the deductibility of interest and charges.

D. Applicable Law. I agree that this Agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the Property is located.

E. Application of Payments. You may apply payments and proceeds of the Property in such order as you shall deem advisable or as otherwise required by applicable law.

F. Failure to Perform. If I violate or fail to perform any term or condition of this Agreement (or the Deed of Trust), you may (but are under no obligation to) perform on my behalf. All costs you incur will be added to the unpaid principal of my Account and finance charges will be figured at the rates described above. I agree to pay these costs and finance charges on demand. Your performance of any of my obligations will not be a waiver of any of your rights or remedies under this Agreement.

G. Waiver of Jury Trial. I waive my right to a jury trial.

H. Complete Understanding of the Parties. There are no oral agreements concerning this Agreement. This Agreement will not be amended or modified orally. If any provision of this Agreement is held to be void or unenforceable, the rest of this Agreement shall remain in effect.

I. Waiver of Notice. I waive presentment, demand, protest, notice of default, nonpayment, partial payments and all other notices and formalities in connection with the delivery, acceptance, performance, default or enforcement of this Agreement, except those notices that are required by federal Regulation Z.

J. Meaning of Words. All words in this Agreement will be read to be of such gender and number as the context may require. The section headings in this Agreement are for convenience and do not limit or amend any of the Agreement's provisions. Any list of conditions or events in this Agreement preceded by the phrase "such as" is not intended as a full or comprehensive list, but merely as a set of examples of such conditions or events. Other conditions or events are intended to be included to the fullest extent permitted under federal and state law, even if different from the listed conditions or events.

K. Payment Marked "Payment in Full". I agree not to submit any checks to you in payment of my Account marked "Payment in Full" or similar wording unless the amount of the check is equal to the total amount then owing on my Account. If I do submit a check to you marked "Payment in Full" or similar wording for a sum less than the total amount then owing on my Account, you may accept it in partial payment of my Account but will not be bound by the "Payment in Full" or similar notation. Communications concerning a dispute as to amounts owing on my Account, including any checks submitted to you as full satisfaction of my Account, must be sent to   SOUTH PACIFIC FINANCIAL CORPORATION 10737 LAUREL STREET, STE 200, RANCHO CUCAMONGA, CALIFORNIA 91730

L. Enforcement. You can accept any late or partial payment or otherwise waive or delay enforcing your rights under this Agreement and still exercise your rights at a later time.

M. Notices. Except for any notice required under applicable law to be given in another manner, (a) any notice to me provided for in this Agreement shall be given by delivering it or by mailing such notice to me by regular first class mail, addressed to me at my last address appearing on your records or at such other address as I may designate by written notice to you as provided in this paragraph 18.M and (b) any notice to you provided for in this Agreement shall be given by mailing such notice to you by certified mail, return receipt requested, at   SOUTH PACIFIC FINANCIAL CORPORATION 10737 LAUREL STREET, STE 200, RANCHO CUCAMONGA, CALIFORNIA 91730

or to such other address as you may designate by written notice to me as provided in this paragraph 18.M.

N. Sale or Transfer of Property. I understand that one of the provisions of the Deed of Trust states: "Upon default by Trustor [the owner(s) of the Property] in the performance of any payment or other obligation secured hereby or in the performance of any agreement hereunder, or if, whether voluntarily or involuntarily, there is a sale or transfer of all or any part of (i) the Property or an interest therein, or (ii) a beneficial interest in Trustor and Trustor is not a natural person, or if Trustor ceases to use the Property as Trustor's primary residence, Beneficiary [you] may declare all sums secured hereby immediately due without notice or demand and no waiver of this right shall be effective unless in writing and signed by Beneficiary."

O. Riders/Addenda. The covenants and agreements of the rider/addendum checked below are incorporated into and supplement and amend the terms of this Agreement.

[X] Billing Rights Notice
[X] Addendum to Home Equity Credit Line Agreement and Disclosure Statement

Initials: CP
NP

BY SIGNING BELOW, (1) I AGREE THAT I HAVE READ ALL PAGES OF THIS AGREEMENT INCLUDING ANY RIDERS/ADDENDA, (2) I AGREE AND INTEND TO BE LEGALLY BOUND BY ALL OF ITS TERMS AND CONDITIONS, INCLUDING ANY TERMS AND CONDITIONS LISTED IN ANY RIDERS/ADDENDA, AND (3) I ALSO ACKNOWLEDGE RECEIVING A COMPLETED COPY OF THIS AGREEMENT AND ANY RIDERS/ADDENDA. I ALSO ACKNOWLEDGE THAT I RECEIVED A COPY OF YOUR HOME EQUITY EARLY DISCLOSURE ENTITLED, "IMPORTANT TERMS OF OUR HOME EQUITY LINE OF CREDIT", THE HOME EQUITY BROCHURE ENTITLED, "WHEN YOUR HOME IS ON THE LINE" AND TWO COPIES OF THE HOME EQUITY LINE OF CREDIT NOTICE OF RIGHT TO CANCEL.

Borrower: _____ Date _____
CARLOS H. PEREZ

Borrower: _____ Date _____
NORMA C PEREZ

Borrower: _____ Date _____

Borrower: _____ Date _____

PAY TO THE ORDER OF
COUNTRYWIDE     DOCUMENT     CUSTODY
SERVICES, a division of TREASURY BANK, N.A.

WITHOUT RECOURSE
SOUTH PACIFIC FINANCIAL CORPORATION

BY:_____
        Signature of Corporate Officer

TITLE:_____
        Printed Name and Corporate Title

DATE:_____

DATE: APRIL 14, 2005
BORROWER:  CARLOS H. PEREZ  and NORMA C PEREZ

LOAN #: 41050310
PROPERTY ADDRESS: 551 LOUMENA LANE, SAN JOSE, CALIFORNIA 95111

# ADDENDUM TO
# HOME EQUITY CREDIT LINE
# AGREEMENT AND DISCLOSURE STATEMENT

**6.B. Other FINANCE CHARGES.**
(1) Points FINANCE CHARGE.

| | |
|---|---|
| ADMIN FEE | 250.00 |
| Broker Fee FINANCE CHARGE. | 0.00 |
| Settlement Agent FINANCE CHARGE. | 0.00 |
| Miscellaneous FINANCE CHARGE. | 0.00 |

**7. OTHER CHARGES**
   B.

| | |
|---|---|
| Title Insurance | 110.00 |
| Recording Fees | 60.00 |

| | |
|---|---|
| Total | $ 420.00 |

By  signing  below,  I  hereby acknowledge receipt of this Addendum to the Home Equity Line Agreement and
Disclosure Statement.

Borrower
CARLOS H. PEREZ

Borrower
NORMA C PEREZ

Borrower

Borrower

# Exhibit "C"

DOCUMENT:  18336175

Pages: 22

| Fees.. | 72 00 |
| Taxes . | |
| Copies . | |
| AMT PAID | 72.00 |

BRENDA DAVIS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Financial Title Company

RDE # 011
4/22/2005
8:00 AM

RECORDING REQUESTED BY
FINANCIAL TITLE COMPANY

Recording Requested By:
SOUTH PACIFIC FINANCIAL CORPORATION

Return To:
SOUTH PACIFIC FINANCIAL CORPORATION

10737 LAUREL STREET, SUITE 200
RANCHO CUCAMONGA, CA  91730

Prepared By:

SOUTH PACIFIC FINANCIAL CORPORATION
10737 LAUREL STREET, SUITE 200
RANCHO CUCAMONGA, CA  91730
(909) 476-4182

———————————[Space Above This Line For Recording Data]———————————

# DEED OF TRUST

LOAN NO.:  41050309
ESCROW NO.:  43081759-504

MIN  100079600410503099
MERS Phone: 1-888-679-6377

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated          APRIL 14, 2005
together with all Riders to this document.
(B) "Borrower" is
CARLOS H. PEREZ AND NORMA C. PEREZ, HUSBAND AND WIFE AS JOINT TENANTS

Borrower's address is 551 LOUMENA LANE, SAN JOSE, CA  95111
Borrower is the trustor under this Security Instrument.
(C) "Lender" is
SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS BANCORP

Lender is a  CORPORATION
organized and existing under the laws of  CALIFORNIA

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS       Form 3005  1/01
VMP-6A(CA) (0207)                    Page 1 of 16       LENDER SUPPORT SYSTEMS, INC MERS6ACA NEW (06/03)

Lender's address is
2010 CROW CANYONE PLACE SUITE 100, SAN RAMON, CA  94583
(D) "Trustee" is
UNITED TITLE COMPANY, A CALIFORNIA CORPORATION
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary
under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an
address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated        APRIL 14, 2005        .
The Note states that Borrower owes Lender

FOUR HUNDRED FIFTY TWO THOUSAND AND NO/100 X X X X X X X X X X X X X X X X X X X X    Dollars
(U.S. $ 452,000.00                      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than    MAY 01, 2035          .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "RIDERS" means all riders to this Security Instrument that are executed by Borrower. The following
riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [XX] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [ ] Other(s) [specify] | | |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments, and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: CP NP

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| **COUNTY** | of | **SANTA CLARA** | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**SEE COMPLETE LEGAL DESCRIPTION DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.**

Parcel ID Number: 497-27-086                                   which currently has the address of

551 LOUMENA LANE                                              [Street]

SAN JOSE                          [City], California    95111    [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

Initials: C NP

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

Initials: CPP

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials

VMP-6A(CA) (0207)                    Page 6 of 15                    Form 3005  1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials:

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials _____

Form 3005  1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any RIDER executed by Borrower and recorded with it.

Witnesses:

_____
                                    -Witness

_____
                                    -Witness


_____ (Seal)     _____ (Seal)
CARLOS H. PEREZ            -Borrower   NORMA C. PEREZ            -Borrower

_____ (Seal)     _____ (Seal)
                          -Borrower                            -Borrower

_____ (Seal)     _____ (Seal)
                          -Borrower                            -Borrower

_____ (Seal)     _____ (Seal)
                          -Borrower                            -Borrower


VMP-6A(CA) (0207)                    Page 14 of 15                    Form 3005  1/01

State of   CALIFORNIA
County of   _Santa Clara_                    } ss.

On _April 15, 200X8_ before me,   _V. Campos_        personally appeared

CARLOS H. PEREZ AND NORMA C. PEREZ

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_L. Campos_          (Seal)

L. CAMPOS
COMM. # 1536296
NOTARY PUBLIC - CALIFORNIA
CONTRA COSTA
My Comm. Expires DEC. 18, 2008
MFR. 6 B E 1

Initials: _____

43081759 -504 -RMD

## Legal Description

All that certain real property situate in the City of San Jose, County of Santa Clara, State of California, described as follows:

Lot 6, as shown on that certain Map of TRACT NO. 2287, which Map was filed for record in the office of the Recorder of the County of Santa Clara, State of California on February 18, 1960, in Book 117 of Maps, Page(s) 3.

EXCEPTING THEREFROM the underground water or rights thereto, with no right of surface entry, as granted to Valley Title Company of Santa Clara County, a California corporation by Instrument recorded March 3, 1960 in Book 4715, Page 466, Official Records.

# ADJUSTABLE RATE RIDER

## (MTA-Twelve Month Average Index - Payment Caps)

LOAN NO.: 41050309

MIN: 100079600410503099
MERS Phone: 1-888-679-6377

THIS ADJUSTABLE RATE RIDER is made this 14th day of          APRIL, 2005          , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS BANCORP
("Lender") of the same date and covering the property described in the Security Instrument and located at:

551 LOUMENA LANE, SAN JOSE, CA 95111

[Property Address]

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agrees as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for changes in the interest rate and the monthly payments, as follows:

### 2. INTEREST

#### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          1.000          %. The interest rate I will pay may change.

Initials:

PayOption MTA ARM Rider
FE-5315 (0412)                    Page 1 of 6          10/04
                                              LENDER SUPPORT SYSTEMS, INC. COU-5315 COU(02/05)

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

**(B) Interest Rate Change Dates**
The interest rate I will pay may change on the        1st        day of        JUNE, 2005        , and on that day every month thereafter.  Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**(C) Index**
Begining with the first Rate Change Date, my adjustable interest rate will be based on an index. The "Index" "Twelve Month Average" of the annual yields on actively traded United States Treasurey Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".
If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding        THREE AND 075/1000THS        percentage point(s)        3.075        % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than        9.950        %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

Initials
10/04

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the 1st day of each month beginning on JUNE, 2005 .

I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MAY 01, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS BANCORP 10737 LAUREL STREET, STE 200, RANCHO CUCAMONGA, CA 91730 or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1,453.81 unless adjusted under Section 3(F).

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the first day of JUNE, 2006 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment.

PayOption MTA ARM Rider
FE-5315 (0412)                          Page 3 of 6                          Initials: ___ 10/04

This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

### (E) Additions to My Unpaid Principal

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3(D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000THS percent ( 115.000 %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

### (G) Required Full Payment

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H) Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)    **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)    **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)    **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that

PayOption MTA ARM Rider
FE-6315 (0412)                                    Page 5 of 6                          Initials: ___

10/04

obligates the transferee to keep all the promises and agreements made in the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)    _____ (Seal)
CARLOS H. PEREZ          -Borrower  NORMA C. PEREZ          -Borrower

_____ (Seal)    _____ (Seal)
                         -Borrower                          -Borrower

_____ (Seal)    _____ (Seal)
                         -Borrower                          -Borrower

_____ (Seal)    _____ (Seal)
                         -Borrower                          -Borrower

PayOption MTA ARM Rider
FE-5316 (0412)              Page 6 of 6                    10/04

STATE OF CALIFORNIA
County of Santa Clara        } SS.

I, REGINA ALCOMENDRAS, Clerk Recorder of the above
entitled County, do hereby certify that the annexed is a full, true
and correct copy of the original Deed of Trust

recorded in my office.
WITNESS my hand and Official Seal this

4     day of Jan     2008

By Sarah Daquino                    , Deputy

Sarah Daquino

# Exhibit "D"

RECORDING REQUESTED BY
FINANCIAL TITLE COMPANY

Recording Requested By:
**SOUTH     PACIFIC     FINANCIAL
CORPORATION**
**10737 LAUREL STREET, STE 200
RANCHO              CUCAMONGA,
CALIFORNIA 91730**
After Recording Return To:
**SOUTH     PACIFIC     FINANCIAL
CORPORATION**
**10737 LAUREL STREET, STE 200
RANCHO              CUCAMONGA,
CALIFORNIA 91730**

| DOCUMENT: 18336176 | | Pages: 11 |
|---|---|---|
| | Fees. | 46.00 |
| | Taxes . | |
| | Copies . | |
| | AMT PAID | 46.00 |

BRENDA DAVIS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Financial Title Company

RDE # 011
4/22/2005
8:00 AM

Prepared By:
 SOUTH PACIFIC FINANCIAL CORPORATION 10737 LAUREL STREET, STE 200 RANCHO
CUCAMONGA, CALIFORNIA 91730

_43081759_            —— [Space Above This Line For Recording Data] ——

DOC ID #: 41050310

## DEED OF TRUST AND ASSIGNMENT OF RENTS

CHL #: 92175473                  MIN   100079600410503107

This deed of trust secures an obligation which calls for payment of interest at a variable interest rate.
THIS DEED OF TRUST is made this      **14TH**      day of **APRIL, 2005**        , between

**CARLOS H. PEREZ and NORMA C PEREZ, HUSBAND And WIFE AS JOINT TENANTS**

herein called "Trustor,"
**UNITED TITLE COMPANY A CALIFORNIA CORPORATION**

herein called "Trustee," and "Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as
nominee for
**SOUTH PACIFIC FINANCIAL CORPORATION**                                      ,
(hereinafter "you" or "Lender" and Lender's successors and assigns.) MERS is organized and existing
under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI
48501-2026, tel. (888) 679-MERS, herein called "Beneficiary."

Trustor irrevocably grants, transfers and assigns to Trustee, in trust and with power of sale, all of the real
property in the City or Town of      **SAN JOSE**                    , County of
**SANTA CLARA**                  , State of California, having the street address of
**551 LOUMENA LANE, SAN JOSE, CALIFORNIA 95111**
and more specifically described as:

HELOC - CA Deed of Trust with MERS                Page 1 of 10
FE-4331(CA) (0204)         *FORMSEDGE* - (800)836-4111        Initials: _\ cP_
PLATINUM/GMD                                                          _\ N P_        4/00

**PLEASE ATTACH LONG LEGAL**

Parcel ID Number:                                    together with all improvements
now or hereafter erected on the property, and all easements, rights, appurtenances, rents (subject however
to the rights and authorities given herein to Beneficiary to collect and apply such rents), royalties, mineral,
oil and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter
attached to the property, all of which, including replacements and additions thereto, shall be deemed to be
and remain a part of the property covered by this deed of trust; and all of the foregoing, together with said
property (or the leasehold estate if this deed of trust is on a leasehold) are herein referred to as the
"Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by
Borrower in this Deed of Trust; but, if necessary to comply with law or custom, MERS, (as nominee for
Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests,
including, but not limited to, the right to foreclose and sell the Property; and to take any action required of
Lender including, but not limited to, releasing or canceling this Deed of Trust.

1.      THIS DEED OF TRUST SECURES:

        a.     All of the obligations of Trustor in favor of Beneficiary or order under the terms of a
        revolving credit agreement dated **APRIL 14, 2005**            , herein called Agreement. The
        Agreement provides, among other things, for the payment of all sums advanced by Beneficiary
        from time to time pursuant to the Agreement and for the payment of interest. The maximum
        principal obligation under the Agreement to be secured by this deed of trust at any one time is
        **FIFTY-SIX THOUSAND FIVE HUNDRED AND 00/100ths**
        Dollars ($ **56,500.00**            ) unless Beneficiary, with Trustor's written consent, hereafter
        increases this amount. Advances made by Beneficiary to protect the security of this deed of trust
        or to preserve the Property shall not be subject to the limitation of the preceding sentence.

        The security of this deed of trust shall not be affected by the extension, renewal or modification
        from time to time of the obligations, instruments or agreements described above.

        b.     Payment of any and all obligations and liabilities, whatsoever, whether primary, secondary,
        direct, indirect, fixed or contingent, whether now or hereafter due from Trustor (or any successor
        in interest to Trustor) whether created directly or acquired by assignment if the document
        evidencing such obligation or liability or any other writing signed by Trustor (or any successor in
        interest to Trustor) specifically provides that said obligation or liability is secured by this deed of
        trust.

        c.     Performance of each agreement of Trustor herein contained or contained in any other
        agreement, instrument or other writing to which Trustor is a party if the same is written in
        connection with any of the foregoing.

                                                                        Initials. _CP_
FE-4331(CA) (0204)              Page 2 of 10                                      _NP_

d.    Payment of all sums to be expended by the Beneficiary or Trustee pursuant to the terms hereof.

2.    TO PROTECT THE SECURITY OF THIS DEED OF TRUST, TRUSTOR AGREES:

a.    To keep the Property in good condition and repair; not to remove or demolish any building or improvement thereon; to complete or cause to be completed any construction of buildings or other improvements thereon which are financed in whole or in part by the indebtedness secured hereby and to restore promptly and in good and workmanlike manner any building or other improvement which may be damaged or destroyed thereon and to pay when due all claims for labor performed and materials furnished therefor; to comply with all laws affecting the Property or requiring any alteration or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, weed, fertilize, fumigate, spray, prune and do all other acts which from the character or use of the Property may be reasonably necessary, the specific enumerations herein not excluding the general.

b.    To provide, maintain and deliver to Beneficiary fire and other insurance on the Property satisfactory to and with loss payable to Beneficiary. The amount collected under any fire or other insurance policy may be applied by Beneficiary upon indebtedness secured hereby and in such order as Beneficiary may determine, or at option of Beneficiary, the entire amount so collected or any part thereof may be released to Trustor. Such application or release shall not cure or waive any default hereunder or invalidate any act done pursuant to such notice.

c.    To appear in and defend any action or proceeding purporting to affect the security hereof or the rights or powers of Beneficiary or Trustee; and to pay all costs and expenses, including cost of evidence of title and attorney's fees in a reasonable sum, in any such action or proceeding in which Beneficiary or Trustee may appear, and in any suit brought by Beneficiary to foreclose this deed of trust.

d.    To pay at least ten days before delinquency all taxes and assessments affecting the Property, including, without limitation, assessment on appurtenant water stock, all encumbrances, charges and liens on the Property or any part thereof, and all costs, fees and expenses of this Trust.

e.    That should Trustor fail to make any payment or do any act as herein provided, then Beneficiary or Trustee, but without obligation so to do and without notice to or demand upon Trustor and without releasing Trustor from any obligation hereof, may:

(1)    Make or do the same in such manner and to such extent as either may deem necessary or appropriate to protect the security hereof, Beneficiary or Trustee being authorized to enter upon the Property for such purposes.

(2)    Appear in and defend any action or proceeding purporting to affect the security hereof or the rights or power of Beneficiary or Trustee.

(3)    Pay, purchase, contest or compromise any encumbrance, charge or lien which in the judgment of either appears to be prior and superior hereto.

(4)    In exercising any such powers, pay necessary expenses, employ counsel and pay his or her reasonable fees.

f.    To pay immediately and without demand all sums so expended by Beneficiary or Trustee, with interest from date of expenditure at the maximum rate allowed by law in effect at the date hereof or at the option of Beneficiary, such sums may be added to the principal balance of any indebtedness secured hereby and shall bear the highest rate of interest as any such indebtedness.

g.    To pay for any statement provided for by the law in effect on the date hereof regarding the obligation secured hereby in the amount demanded by the Beneficiary but not to exceed the maximum allowed by law at the time the statement is demanded.

3.    IT IS FURTHER AGREED THAT:

a.    Any award of damages in connection with any condemnation for public use of or injury to the Property or any part thereof is hereby assigned and shall be paid to Beneficiary who may apply or release such monies received by him in the same manner and with the same effect as above provided for disposition of proceeds of fire or other insurance.

b.    By accepting payment of any sum secured hereby after its due date, or after the filing of notice of default and of election to sell, Beneficiary shall not waive its right to require prompt payment when due of all other sums so secured, or to declare default for failure so to pay, or to proceed with the sale under any such notice of default and of election to sell, for any unpaid balance of said indebtedness. If Beneficiary holds any additional security for any obligation secured hereby, it may enforce the sale thereof at its option, either before, contemporaneously with, or after the sale is made hereunder, and on any default of Trustor, Beneficiary may, at its option, offset against any indebtedness owing by it to Trustor, the whole or any part of the indebtedness secured hereby.

c.    Without affecting the liability of any person, including, without limitation, Trustor, for the payment of any indebtedness secured hereby, or the lien of this deed of trust on the remainder of the Property for the full amount of any indebtedness unpaid, Beneficiary and Trustee are respectively empowered as follows:

(1)    Beneficiary may from time to time and without notice (a) release any person liable for the payment of any of the indebtedness, (b) extend the time or otherwise alter the terms of payment of any of the indebtedness, (c) accept additional security therefor of any kind, including deeds of trust or mortgages, (d) alter, substitute or release any of the Property securing the indebtedness.

(2)    Trustee may, at any time, and from time to time, upon the written request of Beneficiary (a) consent to the making of any map or plat of the Property, (b) join in granting any easement or creating any restriction thereon, (c) join in any subordination or other agreement affecting this deed of trust or the lien or charge thereof or, (d) reconvey, without any warranty, all or any part of the Property.

d.    Upon (a) written request of Beneficiary or (b) performance of all obligations of the Trustor hereunder and under each and every note, guarantee, Agreement or other writing evidencing the indebtedness secured hereby, and upon surrender of this deed of trust to Trustee for cancellation and retention and upon payment of its fees, Trustee shall reconvey, without warranty, the Property then held hereunder. The recital in such reconveyance of any matters of facts shall be conclusive proof of the truthfulness thereof. The grantee in such reconveyance may be described

Initials *CP*
*N P*

as "the person or persons legally entitled thereto." Five years after issuance of such reconveyance, Trustee may destroy said note, guarantee, Agreement or other evidence of indebtedness and this deed of trust (unless directed in such request to retain them).

e.    Trustor hereby gives to and confers upon Beneficiary the right, power and authority during the continuance of these trusts to collect the rents, issues and profits of the Property and of any personal property located thereon, and hereby absolutely and unconditionally assigns all such rents, issues and profits to Beneficiary; provided, however, that Beneficiary hereby consents to the collection and retention of such rents, issues and profits as they accrue and become payable only if Trustor is not, at such time, in default with respect to payment of any indebtedness secured hereby or in the performance of any agreement hereunder. Upon any such default, Beneficiary may at any time, without notice, either in person, by agent, or by a receiver to be appointed by a court, without regard to the adequacy of any security for the indebtedness hereby secured and without limiting the generality of Section 2.e.(1), above, enter upon and take possession of the Property or any part thereof, and in its own name sue for or otherwise collect such rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees, upon any indebtedness secured hereby, and in such order as Beneficiary may determine; also perform such acts of repair, nurturing, cultivation, irrigation, weeding, fertilizing, fumigation, spraying, pruning or protection, as may be necessary or proper to conserve the value of the Property or any trees, planting or crops growing thereon; also lease the same or any part thereof for such rental, term, and upon such conditions as its judgment may dictate;  also prepare for harvest, sever, remove, and sell any crops that may be growing upon the premises, and apply the net proceeds thereof to the indebtedness secured hereby. The entering upon and taking possession of the Property and performance or failure to perform any of the acts described in the preceding sentence, the collection of or failure to collect such rents, issues and profits, and the application thereof as aforesaid, shall not waive or cure any default or notice of default hereunder, or invalidate any act done pursuant to such notice and shall not constitute or otherwise result in any assumption by or liability of Beneficiary for maintenance, depreciation, misuse or risk of loss other than for damage or loss to the Property due to Beneficiary's gross negligence or intentional torts. Trustor also assigns to Trustee, as further security for the performance of the obligations secured hereby, all prepaid rents and all monies which may have been or may hereafter be deposited with said Trustor by any lessee of the premises herein described, to secure the payment of any rent, and upon default in the performance of any of the provisions hereof, Trustor agrees to deliver such rents and deposits to the Trustee.

f.    Upon default by Trustor in the performance of any payment or other obligation secured hereby or in the performance of any agreement hereunder, or if, whether voluntarily or involuntarily, there is a sale or transfer of all or any part of (i) the Property or an interest therein, or (ii) a beneficial interest in Trustor and Trustor is not a natural person, or if Trustor ceases to use the Property as Trustor's primary residence, Beneficiary may declare all sums secured hereby immediately due without notice or demand and no waiver of this right shall be effective unless in writing and signed by Beneficiary.

g.    Waiver of a right granted to Beneficiary hereunder as to one transaction or occurrence shall not be deemed to be a waiver of the right as to any subsequent transaction or occurrence. Beneficiary may rescind any notice before Trustee's sale by executing a notice of rescission and recording the same. The recordation of such notice shall constitute also a cancellation of any prior declaration of default and demand for sale, and of any acceleration of maturity of indebtedness

Initials: _C P_
            _N P_

affected by any prior declaration or notice of default. The exercise by Beneficiary of the right of rescission shall not constitute a waiver of any default then existing or subsequently occurring, nor impair the right of the Beneficiary to execute other declarations of default and demand for sale, or notices of default and of election to cause the Property to be sold, nor otherwise affect the note or deed of trust, or any of the rights, obligations or remedies of the Beneficiary or Trustee hereunder.

h.    At least three months or any lesser period required by law having elapsed between the recordation of the notice of default and the date of sale, Trustee, having first given notice of sale as then required by law, shall sell the Property at the time and place of sale fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as the Trustee may determine, at public auction to the highest bidder for cash, in lawful money of the United State of America, payable at the time of sale except as otherwise permitted by law. Trustee may postpone sale of all or any portion of the Property by public announcement at the time of sale, and from time to time thereafter may postpone the sale by public announcement, all as permitted by law. Trustee shall deliver to the purchaser its deed conveying the Property so sold, but without any covenant or warranty, expressed or implied. The recital in any such deed of any matters or facts, stated either specifically or in general terms, or as conclusions of law or fact, shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary, may purchase at the sale. After deducting all costs, fees and expenses of Trustee and of this trust, including costs of evidence of title in connection with the sale, the Trustee shall apply the proceeds of this sale to the payment of all sums then secured hereby, in such order and manner as may be required by the Beneficiary; the remainder, if any, to be paid to the person or persons legally entitled thereto. If Beneficiary shall elect to bring suit to foreclose this deed of trust in the manner and subject to the provisions, rights and remedies relating to the foreclosure of a mortgage, Beneficiary shall be entitled to reasonable attorney's fees and litigation costs.

i.    Beneficiary, or any successor in ownership of any indebtedness secured hereby, may from time to time, by instrument in writing, substitute a successor or successors to any Trustee named herein or acting hereunder, which instrument, executed by the Beneficiary and duly acknowledged and recorded in the office of the recorder of the county or counties where said property is situated, shall be conclusive proof of proper substitution of such successor Trustee or Trustees, who shall, without conveyance from the Trustee predecessor, succeed to all its title, estate, rights, powers and duties. Said instrument must contain the name of the original Trustor, Trustee and Beneficiary hereunder, the book and page where this deed of trust is recorded and the name and address of the new Trustee.

j.    This deed of trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors and assigns. The term Beneficiary shall mean the owner and holder, including, without limitation, pledgees, of the note, guarantee, Agreement, or other evidence of indebtedness secured hereby, whether or not named as Beneficiary herein. In this deed of trust, whenever the context so requires, the singular number includes the plural.

k.    Trustee accepts this Trust when this deed of trust, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party hereto of pending sale under any other deed of trust or of any action or proceeding in which Trustor, Beneficiary or Trustee shall be a party unless brought by Trustee.

FE-4331(CA) (0204)                          Page 6 of 10                          Initials CP
                                                                                   NP

l.    If Trustor or any successor in interest to Trustor sells, transfers or encumbers any interest in the Property, whether voluntarily or involuntarily, or if a beneficial interest in Trustor is sold or transferred, voluntarily or involuntarily, and Trustor is not a natural person: (a) the transferor and the transferee shall each immediately give written notice of said transfer to the Beneficiary, at its address designated on the first page of this deed of trust; (b) if the deed of trust secures Trustor's obligation under an Agreement as defined herein, all credit extended by Beneficiary under the Agreement, whether before or after the property is transferred, shall be secured under this deed of trust as if no transfer had occurred except for credit extended by Beneficiary more than five days after it has received the written notices required by this paragraph.

m.    The pleading of any statute of limitations as a defense to any and all obligations secured by this deed of trust is hereby waived to the full extent permitted by law.

4.    WITH REGARD TO ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES, TRUSTOR AGREES:

a.    As used in this Paragraph 4:

(1)  "Environmental Law" means all federal, state and local law concerning the public health, safety or welfare, environment or a Hazardous Substance, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Sec. 9601 et seq., Resource Conservation and Recovery Act, 42 U.S.C. Sec. 6901 et seq., Toxic Substances Control Act, 15 U.S.C. Sec. 2601 et seq., Hazardous Materials Transportation Act, 49 U.S.C. Sec. 1801 et seq., Clean Water Act and Water Quality Act of 1987, 33 U.S.C. Sec. 1251 et seq., Safe Drinking Water Act, 41 U.S.C. Sec. 300f et seq., Clean Air Act, 42 U.S.C. Sec. 7901 et seq., Carpenter-Presley-Tanner Hazardous Account Act, Cal.Health & Safety Code Sec. 25300 et seq., Hazardous Waste Control Law, Cal.Health & Safety Code Sec. 25100 et seq., Porter-Cologne Water Quality Control Act, Cal.Water Code Sec. 1300 et seq., Hazardous Waste Disposal Land Use Law, Cal.Health & Safety Code Sec. 25220 et seq., Safe Drinking Water and Toxic Enforcement Act of 1986, Cal.Health & Safety Code Sec. 25249.5 et seq., Hazardous Substances Underground Storage Tank Law, Cal.Health & Safety Code Sec. 25280 et seq., Air Resources Law, Cal.Health & Safety Code Sec. 3900 et seq., Hazardous Materials Release Response Plans and Inventory, Cal.Health & Safety Code Sec. 25500 et seq., and Toxic Pits Cleanup Act of 1984, Cal.Health & Safety Code Sec. 25208 et seq.

(2)  "Hazardous Substance" means any substance which has characteristics of ignitability, corrosivity, toxicity, reactivity or radioactivity or other characteristics which render it dangerous or potentially dangerous to public health, safety or welfare or the environment, including without limitation, (i) petroleum or any fraction or other byproduct thereof, (ii) asbestos, (iii) lead, (iv) cyanide, (v) polychlorinated biphenyls, (vi) urea formaldehyde and (vii) anything defined as a "hazardous material," "toxic substance," "hazardous substance," "hazardous waste" or "waste" under any Environmental Law, including without limitation, "hazardous substance" as defined in Cal.Health & Safety Code Sec. 25316 and "waste" and "hazardous substance" as defined in Cal.Water Code Sec. 13050(d) and Sec. 13050(p)(l), respectively. The term is intended by Trustor and Beneficiary to be interpreted in its most comprehensive and cumulative sense.

b.    Trustor represents and warrants that except as disclosed to and acknowledged in writing by Beneficiary before the date of this deed of trust:

(1)  No Hazardous Substance has been located, used, manufactured, generated, treated, handled, stored, spilled, disposed of, discharged or released by any person on, under or about the Property.

(2)  Trustor has no knowledge of or reason to believe that there is any pending or threatened investigation, assessment, claim, demand, action or proceeding of any kind relating to (i) any alleged or actual Hazardous Substance located under or about the Property or (ii) alleged or actual violation or noncompliance by Trustor or any tenant of Trustor with regard to any Environmental Law involving the Property.

(3)  Neither Trustor nor any tenant of Trustor is required by any Environmental Law to obtain or maintain any permit, license, financial responsibility certificate or other approval as a condition to its business operations or in connection with its use, development or maintenance of the Property.

c.    Trustor represents and warrants that Trustor and every tenant of Trustor have been, are and will remain in full compliance with any Environmental Law applicable to its business operations and its use, development or maintenance of the Property.

d.    Trustor agrees to permit, or cause any tenant of Trustor to permit, Beneficiary to enter and inspect the Property at any reasonable time for purposes of determining, as Beneficiary deems necessary or desirable: (i) the existence, location and nature of any Hazardous Substance on, under or about the Property, (ii) the existence, location, nature, magnitude and spread of any Hazardous Substance that has been spilled, disposed of, discharged or released on, under or about the Property or (iii) whether or not Trustor and any tenant of Trustor are in compliance with applicable Environmental Law. If Trustor or its tenant fails to comply fully with the terms hereof, Beneficiary may obtain affirmative injunctive relief therefor.

e.    Trustor agrees to indemnify and hold Beneficiary and its successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including, without limitation, all costs of litigation and attorneys' fees, which Beneficiary and its successors and assigns may directly or indirectly sustain or suffer as a consequence of any inaccuracy or breach of any representation, warranty or promise made in this deed of trust in connection with any Hazardous Substance or Environmental Law. Notwithstanding any of the language in the deed of trust to the contrary, this indemnity covers claims asserted after all the indebtedness secured by this deed of trust has been paid and discharged, whether or not the deed of trust has also been reconveyed to Trustor. The only exclusions hereto may relate to claims arising out of the affirmative acts of Beneficiary or of a third party after Trustor's interest in the Property has terminated.

f.    The provisions of this Paragraph 4 shall not be affected by the acquisition by Beneficiary or its successors or assigns of any ownership or other interest in the Property beyond Beneficiary's security interest in the Property created under this deed of trust, whether or not such acquisition is pursuant to the foreclosure of this deed of trust or a merger of the interest of the Beneficiary or its successors and assigns in the Property.

Initials: _____

5.    ADDITIONAL PROVISIONS:

    a.    The execution of this deed of trust by any person who has no present interest in the Property shall not be deemed to indicate that such an interest presently exists. Rather, execution of this deed of trust by such a person shall constitute such person's agreement that if such person hereafter acquires an interest in the Property, such interest shall be subject to Beneficiary's interest hereunder.

    b.    The execution of this deed of trust by any person who has a present interest in the Property shall not in itself be deemed to indicate that such person is liable to Beneficiary for any obligation described in Section 1., above. Any personal liability of such person to Beneficiary shall be determined on an independent basis (such as execution of the document or documents evidencing the obligation described in Section 1., above). Execution of this deed of trust by any such person shall nevertheless indicate that such person's interest in the Property shall be subject to Beneficiary's interest hereunder.

    The undersigned Trustors request that a copy of any notice of default, and of any notice of sale hereunder, be mailed to their respective addresses set forth opposite each signature.

By signing below, Trustor agrees to all the terms and conditions of this deed of trust.

Mailing Address For Notices

**551 LOUMENA LANE
SAN JOSE, CALIFORNIA 95111**

CARLOS H. PEREZ

NORMA C PEREZ

State of California
County of *Santa Clara*
On *April 15, 2005*          , before me *L. Campos*
                                                              , personally appeared
CARLOS H. PEREZ and NORMA C PEREZ , HUSBAND And WIFE AS JOINT TENANTS

, personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that
by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.
      WITNESS my hand and official seal.

L. CAMPOS
COMM. # 1536296
NOTARY PUBLIC - CALIFORNIA
CONTRA COSTA
My Comm. Expires DEC. 18, 2008
MFR. 5 B E 1

FE-4331(CA) (0204)                    Page 10 of 10

43081759 -504 -RMD

Legal Description

All that certain real property situate in the City of San Jose, County of Santa Clara, State of California, described as follows:

Lot 6, as shown on that certain Map of TRACT NO. 2287, which Map was filed for record in the office of the Recorder of the County of Santa Clara, State of California on February 18, 1960, in Book 117 of Maps, Page(s) 3.

EXCEPTING THEREFROM the underground water or rights thereto, with no right of surface entry, as granted to Valley Title Company of Santa Clara County, a California corporation by Instrument recorded March 3, 1960 in Book 4715, Page 466, Official Records.

STATE OF CALIFORNIA   }
County of Santa Clara  }  SS.

    I, REGINA ALCOMENDRAS, Clerk Recorder of the above entitled County, do hereby certify that the annexed is a full, true and correct copy of the original

Deed of Trust

recorded in my office.
    WITNESS my hand and Official Seal this

4 day of _____ Jan _____ 2008

By _____ , Deputy

Sarah Daquino

# Exhibit "E"

**FEDERAL TRUTH - IN - LENDING DISCLOSURE STATEMENT**
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

**Creditor:**
SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS BANCORP

2010 CROW CANYON PLACE, SUITE 100
SAN RAMON, CA  94583
**Date:**   APRIL 14, 2005
Check box if applicable:

**Borrower:**
CARLOS H. PEREZ AND NORMA C. PEREZ

551 LOUMENA LANE
SAN JOSE, CA  95111
**Loan Number:** 41050309

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | Amount Financed | Total of Payments | [ ] Total Sale Price |
|---|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. | The total cost of your purchase on credit including your down-payment of $ N/A |
| 5.480 % | $ 519,050.50 | $ 444,568.10 | $ 963,618.60 | $ N/A |

[ ] REQUIRED DEPOSIT: The annual percentage rate does not take into account your required deposit.
PAYMENTS:  Your payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning: | | | Monthly Beginning: | | | Monthly Beginning: |
| 12 | 1,453.81 | 06/01/2005 | | | | | | |
| 12 | 1,562.85 | 06/01/2006 | | | | | | |
| 12 | 1,680.06 | 06/01/2007 | | | | | | |
| 12 | 1,806.06 | 06/01/2008 | THE PAYMENT SCHEDULE AND ANNUAL PERCENTAGE RATE DISCLOSED HERE ARE ESTIMATED | | | | | |
| 12 | 1,941.52 | 06/01/2009 | ASSUMING THAT THE CURRENT INDEX RATE WILL NOT INCREASE NOR DECREASE THROUGHOUT | | | | | |
| 300 | 2,874.29 | 06/01/2010 | THE LOAN TERM. | | | | | |

[ ] DEMAND FEATURE: This obligation has a demand feature.
[XX] VARIABLE RATE: Your loan contains variable rate features.
    [ ] Information regarding the variable rate features of your loan have been provided to you earlier in a separate document.
    [XX] Information regarding the variable rate features of your loan are provided hereinafter.  The annual percentage rate may increase or decrease during the term of this transaction with increases or decreases in the value of the "Index" (or "Reference Rate").  The rate that you will pay may not be changed more often than every ___ONE___ ___MONTH___ commencing ___06/01/2005___ .
    [ ] Rate Change Limits: The rate may not be changed by more than _____ % on any one Rate Change Date.
    [XX] The rate will never be greater than ___9.950___ %
    [ ] Any increase in the rate will result in a corresponding increase in the payment.
    [XX] Rate increases may occur without immediate and/or corresponding payment increases.
    [XX] Unpaid interest will be added to the principal.
      The "Index" (or "Reference Rate") is the:
THE TWELVE MONTH AVERAGE OF THE MONTHLY YIELDS ON UNITED STATES TREASURY SECURITIES, ADJUSTED TO A CONSTANT MATURITY OF ONE YEAR, AS MADE AVAILABLE BY THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM.

INSURANCE:  The following insurance is required to obtain credit:
[ ] Credit life insurance and credit disability    [X] Property insurance    [ ] Flood insurance
You may obtain the insurance from anyone you want that is acceptable to creditor.
[ ] If you purchase [ ] property [ ] flood insurance from creditor you will pay $ _____ for one year term.
SECURITY:  You are giving a security interest in:
 551 LOUMENA LANE, SAN JOSE, CA  95111
[ ] The goods or property being purchased    [X] Real property you already own.
FILING FEES: $  120.00
LATE CHARGE: If a payment is more than  15  days late, you will be charged  5.00  % of the Principal & Interest payment.
PREPAYMENT: If you pay off early, you
[X] may    [ ] will not  have to pay a penalty.
[ ] may    [X] will not  be entitled to a refund of part of the finance charge.
ASSUMPTION:  Someone buying your property
[ ] may    [ ] may, subject to conditions    [X] may not  assume the remainder of your loan on the original terms.
See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.
[ ] e means an estimate    [ ] all dates and numerical disclosures except the late payment disclosures are estimates.

The undersigned acknowledge receiving and reading a completed copy of this disclosure.
Neither you nor the creditor previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure.
[XX] I/We have received the Variable Rate Disclosure for the loan program for which I/We have applied.


_____    _____
CARLOS H. PEREZ           Date

_____    _____
NORMA C. PEREZ           Date

_____    _____
                   Date

_____    _____
                   Date

"FEDERAL TRUTH - IN - LENDING DISCLOSURE STATEMENT" - PAGE 2
"ITEMIZATION OF AMOUNT FINANCED"

**Creditor:**
SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS BANCORP
2010 CROW CANYON PLACE, SUITE 100
SAN RAMON, CA  94583

**Re:**
CARLOS H. PEREZ AND NORMA C. PEREZ

551 LOUMENA LANE
SAN JOSE, CA  95111

**Date:** APRIL 14, 2005
**Initial Interest Rate:** 1.000 %
**BROKER'S LICENSE #:** 00442386
**DEPT. OF REAL ESTATE LICENSE INFO LINE:** (916) 227-0931

**Loan Number:** 41050309

**Loan Amount:** 452,000.00

| Ref HUD-1 Statement | | ** Amount Paid on your Account | *Broker = B    Other = O | |
|---|---|---|---|---|
| | | | PAID | FINANCED | * |
| | | $ | | | |
| | | $ | | | |
| | | $ | | | |
| | **Amount Paid To Others on your Behalf:** | | | | |
| 809 | APPRAISAL FEE TO FIRST SECURITY LOAN | | $ | 350.00 | B |
| 804 | CREDIT REPORT FEE TO FIRST SECURITY LOAN | | $ | 16.00 | B |
| 1001 | HAZARD INSURANCE 2 MONTHS @ $ 125.00 PER MO. | | $ | 250.00 | |
| 1004 | COUNTY PROPERTY TAXES 4 MONTHS @ $ 141.49 PER MO. | | $ | 565.96 | |
| 1106 | NOTARY FEES TO NOTARY PUBLIC | | $ | 150.00 | |
| 1201 | RECORDING FEE TO FINANCIAL TITLE CO. | | $ | 120.00 | |
| 1304 | DESK REVIEW FEE TO SOUTH PACIFIC FINANCIAL CORP | | $ | 75.00 | |
| 1108 | TITLE POLICY TO FINANCIAL TITLE CO. | | $ | 1,013.00 | |
| | AGGREGATE ADJUSTMENT | | $ | (16.51) | |
| | | | $ | | |
| | | | $ | | |
| | | | $ | | |
| | | | $ | | |
| | **LOAN PROCEEDS PAID TO:**    FINANCIAL TITLE CO. | | $ | 442,044.65 | |
| | | **AMOUNT FINANCED** | $ | 444,568.10 | |

| | **Prepaid Finance Charge:** | | PAID | FINANCED | * |
|---|---|---|---|---|---|
| 815 | PROCESSING FEE TO FIRST SECURITY LOAN | | $ | 695.00 | B |
| | TAX SERVICE FEE TO SOUTH PACIFIC FINANCIAL CORP | | $ | 85.00 | |
| 901 | INTEREST 17 DAYS @ $ 12.560 /DAY | | $ | 213.52 | |
| 809 | FLOOD CERTIFICATION FEE TO SOUTH PACIFIC FINANCIAL CORP | | $ | 25.00 | |
| 806 | ADMINISTRATION FEE TO SOUTH PACIFIC FINANCIAL CORP | | $ | 635.00 | ✓ |
| 822 | BROKER ADMIN FEE TO FIRST SECURITY LOAN | | $ | 195.00 | ✓ B |
| 801 | ORIGINATION FEE TO BROKER TO FIRST SECURITY LOAN    1% pt | | $ | 4,520.00 | ✓ B |
| 817 | DOCUMENT PREPARATION FEE TO SOUTH PACIFIC FINANCIAL CORP | | $ | 100.00 | ✓ |
| 824 | MAILING/MESSENGER FEE TO FINANCIAL TITLE CO. | | $ | 70.00 | ✓ |
| 1101 | ESCROW FEE TO FINANCIAL TITLE CO. | | $ | 768.38 | |
| 823 | WIRE TRANSFER FEE TO SOUTH PACIFIC FINANCIAL CORP | | $ | 25.00 | ✓ |
| 1105 | ESCROW DOC PREP TO FINANCIAL TITLE CO. | | $ | 100.00 | |
| | | | $ | | |
| | | | $ | | |
| | **Total Prepaid Finance Charge:** | | $ | 7,431.90 | |
| | **These are FEES NOT paid by the Borrower** | | | | |
| | YIELD SPREAD PREMIUM 2.250 % = | | $ | 10,170.00 | ✓ |
| | | | $ | | |
| | | | $ | | |

| **Total Estimated Funds needed to close** | | **Total Estimated Monthly Payment** | |
|---|---|---|---|
| Down Payment | $ | Principal & Interest | $ 1,453.81 |
| Estimated Closing Costs | $ 8,942.38 | Total Real Estate Taxes | $ 141.49 |
| Estimated Prepaid Items/Reserves | $ 1,012.97 | Flood & Hazard Insurance | $ 125.00 |
| Other: TOTAL PAYOFFS | $ | Mortgage Insurance | $ |
| | | Total Other Impounds | $ |
| **TOTAL EST. FUNDS NEEDED TO CLOSE** | $ 9,955.35 | **TOTAL MONTHLY PAYMENT** | $ 1,720.30 |

This form does not cover all items you will be required to pay in cash at settlement; for example, deposits in escrow for real estate taxes and insurance may be different. You may wish to inquire as to the amounts of such other items. You may be required to pay other additional amounts at settlement.

Neither you nor the lender previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure. Each of the Undersigned acknowledge receiving and reading a completed copy of this disclosure.

[XX] All disclosures are estimates

| CARLOS H. PEREZ | Date | NORMA C. PEREZ | Date |
|---|---|---|---|
| | | | |
| | Date | | Date |

# Exhibit "F"

# NOTICE OF RIGHT TO CANCEL

Transaction I.D. No.:

Loan Number: 41050309

Borrower: CARLOS H. PEREZ

Property Address: 551 LOUMENA LANE, SAN JOSE, CA 95111

**YOUR RIGHT TO CANCEL:**
You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1.  the date of the transaction, which is                                            ; or
2.  the date you receive your Truth in Lending disclosures; or
3.  the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us in writing.

Name of Creditor:  SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS BANCORP

at

2010 CROW CANYON PLACE, SUITE 100
SAN RAMON, CA 94583

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send a notice **no later than midnight of** _____ (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL

_____          _____
Date                                         Customer's Signature

## ACKNOWLEDGEMENT OF RECEIPT

BY SIGNING BELOW, I, THE UNDERSIGNED, HEREBY ACKNOWLEDGE THAT ON THE DATE LISTED ABOVE I RECEIVED TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME OF MY RIGHT TO CANCEL THIS TRANSACTION.

DATE: _____          CARLOS H. PEREZ
                                    _____
                                    Customer's Name

                                    CARLOS H. PEREZ
                                    _____
                                                Customer's Signature

# NOTICE OF RIGHT TO CANCEL

Transaction I.D. No.:                          Loan Number: 41050309

Borrower: NORMA C. PEREZ

Property Address: 551 LOUMENA LANE, SAN JOSE, CA 95111

---

**YOUR RIGHT TO CANCEL:**
You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is                                          ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us in writing.

Name of Creditor:   SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS
                    BANCORP

at                  2010 CROW CANYON PLACE, SUITE 100
                    SAN RAMON, CA 94583

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send a notice no later than midnight of _____ (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____            _____
       Date                                  Customer's Signature

---

## ACKNOWLEDGEMENT OF RECEIPT

BY SIGNING BELOW, I, THE UNDERSIGNED, HEREBY ACKNOWLEDGE THAT ON THE DATE LISTED ABOVE I RECEIVED TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME OF MY RIGHT TO CANCEL THIS TRANSACTION.

DATE: _____        NORMA C. PEREZ
                             _____
                             Customer's Name

                             NORMA C. PEREZ
                             _____
                                                  Customer's Signature

## NOTICE OF RIGHT TO CANCEL

Transaction I.D. No.:                                    Loan Number: 41050309

Borrower: CARLOS H. PEREZ

Property Address: 551 LOUMENA LANE, SAN JOSE, CA 95111

**YOUR RIGHT TO CANCEL:**
You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is                                    ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien, or security interest on/in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us in writing.

Name of Creditor:  SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS
                   BANCORP

at                 2010 CROW CANYON PLACE, SUITE 100
                   SAN RAMON, CA 94583

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send a notice **no later than midnight of** _____ (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

### I WISH TO CANCEL

_____          _____
        Date                              Customer's Signature

---

### ACKNOWLEDGEMENT OF RECEIPT

BY SIGNING BELOW, I, THE UNDERSIGNED, HEREBY ACKNOWLEDGE THAT ON THE DATE LISTED ABOVE I RECEIVED TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME OF MY RIGHT TO CANCEL THIS TRANSACTION.

DATE: _____          CARLOS H. PEREZ
                                    _____
                                    Customer's Name

                                    _____
                                    CARLOS H. PEREZ
                                                              Customer's Signature

## NOTICE OF RIGHT TO CANCEL

Transaction I.D. No.:                    Loan Number: 41050309

Borrower: NORMA C. PEREZ

Property Address: 551 LOUMENA LANE, SAN JOSE, CA 95111

**YOUR RIGHT TO CANCEL:**
You are entering into a transaction that will result in a mortgage, lien, or security interest on/in your home.
You have a legal right under federal law to cancel this transaction, without cost, within three business
days from whichever of the following events occurs last:

1. the date of the transaction, which is                              ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien, or security interest is also cancelled. Within 20 calendar
days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage,
lien, or security interest on/in your home has been cancelled, and we must return to you any money or
property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above,
but you must then offer to return the money or property. If it is impractical or unfair for you to return the
property, you must offer its reasonable value. You may offer to return the property at your home or at
the location of the property. Money must be returned to the address below. If we do not take possession
of the money or property within 20 calendar days of your offer, you may keep it without further
obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us in writing.

Name of Creditor:    SOUTH PACIFIC FINANCIAL CORP dba FUNDING SOLUTIONS
                     BANCORP

at                      2010 CROW CANYON PLACE, SUITE 100
                      SAN RAMON, CA 94583

You may use any written statement that is signed and dated by you and states your intention to cancel, or
you may use this notice by dating and signing below. Keep one copy of this notice because it contains
important information about your rights.

If you cancel by mail or telegram, you must send a notice **no later than midnight of**
_____ (or midnight of the third business day following the latest of the
three events listed above). If you send or deliver your written notice to cancel some other way, it must be
delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____       _____
      Date                                   Customer's Signature

### ACKNOWLEDGEMENT OF RECEIPT

BY SIGNING BELOW, I, THE UNDERSIGNED, HEREBY ACKNOWLEDGE THAT ON THE DATE LISTED
ABOVE I RECEIVED TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL IN THE
FORM PRESCRIBED BY LAW ADVISING ME OF MY RIGHT TO CANCEL THIS TRANSACTION.

DATE: _____     NORMA C. PEREZ
                               Customer's Name

                               NORMA C. PEREZ

                                         Customer's Signature

# Exhibit "G"

DATE:    APRIL 14, 2005                                          CHL #: 92175473
BORROWER:    CARLOS H. PEREZ and NORMA C PEREZ, HUSBAND And WIFE AS JOINT TENANTS
CASE #:
LOAN #:    41050310
PROPERTY ADDRESS:    551 LOUMENA LANE, SAN JOSE, CALIFORNIA 95111

## NOTICE OF RIGHT TO CANCEL
### Home Equity Line of Credit

**Your Right to Cancel:** We have agreed to establish an open-end credit account for you, and you have agreed to give us a security interest in your home as security for the account. If all or some portion of your account is used to finance the downpayment for the purchase of the property identified above ("the Purchase Portion"), we are permitted to disburse the Purchase Portion of your account prior to the expiration date indicated below in the section entitled "**How to Cancel**."

You have a legal right under federal law to cancel the security interest applicable to the remainder of the funds available in your account ("the Nonpurchase Portion"), without cost, within three business days after the latest of the following events:

1. the opening date of your account which is    04-14-05    ; or
2. the date you received your Truth-in-Lending disclosures; or
3. the date you received this notice of your right to cancel the account.

The Nonpurchase Portion of your line includes any funds from the Purchase Portion that you subsequently repay and then use again for some other purpose. If none of the account is being used to purchase the property identified above, then the Nonpurchase Portion is the entire amount of the account. If you cancel, your cancellation will apply only to the Nonpurchase Portion and to the security interest resulting from that portion. It will not affect the amount you owe for the Purchase Portion, and it will not affect the security interest we have in your home for the Purchase Portion but it will terminate your ability to take additional funds from your account. Within 20 days of receiving your notice, we must take the necessary steps to reflect the fact that the security interest in your home has been reduced by the amount of the Nonpurchase Portion or cancelled, if applicable. If we require you to sign any documents or take any actions in connection with reducing the security interest, you must do so. We must return to you any money or property you have given to us or to anyone else in connection with the Nonpurchase Portion.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address shown below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

---

**How to Cancel:** If you decide to cancel the account, you may do so by notifying us, in writing, at:

   **SOUTH PACIFIC FINANCIAL CORPORATION**
   **10737 LAUREL STREET, STE 200, RANCHO CUCAMONGA, CALIFORNIA 91730**


You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice no matter how you notify us because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of    APRIL 18, 2005    (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way it must be delivered to the above address no later than that time.

**I WISH TO CANCEL**

_____                    _____
Consumer's Signature                                    Date

---

The undersigned each acknowledge receipt of two completely filled in copies of the above Notice of Right to Cancel.

Each of the undersigned has the right to cancel. The exercise of this right by one of the undersigned shall be effective as to all of the undersigned.


_____                    _____
Consumer's Signature                                    Date
**CARLOS H. PEREZ**


_____                    _____
Consumer's Signature                                    Date
**NORMA C PEREZ**


● HELOC - Notice of Right to Cancel
FE-3162 (0408)                                                      8/04
**PLATINUM/GMD**

# Exhibit "H"

# CONSUMER LAW CENTER, INC.

Fred W. Schwinn
fred.schwinn@sjconsumerlaw.com

12 South First Street, Suite 1014
San Jose, CA 95113-2418

(408) 294-6100
Fax (408) 294-6190

March 22, 2008

Homecomings Financial, LLC
c/o Corporation Service Company, Agent for Service
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833-3503

**CERTIFIED MAIL**
**7007 0710 0001 0498 6707**

Homecomings Financial, LLC
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, MN 55437

**CERTIFIED MAIL**
**7007 0710 0001 0498 6714**

South Pacific Financial Corporation
c/o Timothy Cahill, Agent for Service
2548 Brennen Way
Fullerton, CA 92835

**CERTIFIED MAIL**
**7008 0150 0001 3205 7168**

South Pacific Financial Corporation
10737 Laurel Street, Suite 200
Rancho Cucamonga, CA 91730

**CERTIFIED MAIL**
**7008 0150 0001 3205 7175**

South Pacific Financial Corporation
d/b/a Funding Solutions Bankcorp
2010 Crow Canyon Place, Suite 100
San Ramon, CA 94583

**CERTIFIED MAIL**
**7008 0150 0001 3205 7182**

Re:     Carlos H.L. Perez
        551 Loumena Lane
        San Jose, California 95111-2246
        South Pacific Loan No. 41050309
        Homecomings Loan No. 0439317967

Dear Sir/Madam:

This office represents Carlos H.L. Perez concerning the above referenced loan transaction which he and his wife entered into with South Pacific Financial Corporation on or about April 14, 2005. We have been authorized by our client to rescind this transaction and hereby exercise that right pursuant to the Federal Truth in Lending Act (TILA), 15 U.S.C. § 1635 and Regulation Z, 12 C.F.R. § 226.23.

South Pacific Financial Corporation failed the provide the TILA disclosures to our client or the TILA disclosures provided to our client failed to meet the requirements of the Federal Truth in Lending Act and Regulation Z in the following respects:

- 1 -

(a)   Our client was not provided the disclosures that are required by the Federal Truth in Lending Act, 15 U.S.C. § 1635(a) and Regulation Z, 12 C.F.R. § 226.23(b)(1)(v), in that our client was not provided with two properly completed copies of the Notice of Right to Cancel disclosure in a credit transaction in which a security interest was retained or acquired in our client's principal dwelling.

It appears that Homecomings Financial, LLC, is a successor in interest to the Deed of Trust which secured the subject consumer transaction. As a result of the above described violations of the Truth in Lending Act and Regulation Z, South Pacific Financial Corporation and Homecomings Financial, LLC, have twenty days after receipt of this notice of rescission to return to our client all monies paid including, but not limited to, all closing costs and prepaid interest, all interest payments, and all prepayment penalties that have been paid.

Please be advised that if you do not return all consideration paid by our client you may be held responsible for actual damages, statutory damages, attorney fees and costs pursuant to 15 U.S.C. § 1640(a). Our client reserves all rights to raise additional or alternative grounds for rescission as may be subsequently identified under state or federal law.

Very Truly Yours,

Fred W. Schwinn

cc:    Carlos H.L. Perez

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 5.21 |

Sent To Homecoming Financial LLC
Street, Apt. No.; or PO Box No. 3030 GATEWAY OAKS DR #10
City, State, ZIP+4 SACRAMENTO, CA 95833-3503

PS Form 3800, August 2006    See Reverse for Instructions

7007 0710 0001 0498 6707

---

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 5.21 |

Sent To South Pacific Financial Corp
Street, Apt. No.; or PO Box No. 10417 LAUREL STREET #200
City, State, ZIP+4 RANCHO CUCAMONGA CA 91730

PS Form 3800, August 2006    See Reverse for Instructions

7008 0150 0001 3205 7175

---

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 5.21 |

Sent To Homecoming Financial LLC
Street, Apt. No.; or PO Box No. 10000 NORMANDALE LAKE BLD #10
City, State, ZIP+4 MINNEAPOLIS, MN 55437

PS Form 3800, August 2006    See Reverse for Instructions

7007 0710 0001 0498 6714

---

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ .01 |
| Certified Fee | 2.65 |
| Return Receipt Fee (Endorsement Required) | 2.15 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 5.21 |

Sent To South Pacific Financial Corp
Street, Apt. No.; or PO Box No. 2000 CROW CANYON PLACE #100
City, State, ZIP+4 SAN RAMON, CA 94583

PS Form 3800, August 2006    See Reverse for Instructions

7008 0150 0001 3205 7182

---

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 5.21 |

Sent To South Pacific Financial Corp
Street, Apt. No.; or PO Box No. 868 BRENNEN WAY
City, State, ZIP+4 FULLERTON, CA 92535

PS Form 3800, August 2006    See Reverse for Instructions

7008 0150 0001 3205 7168

# Exhibit "I"

# CONSUMER LAW CENTER, INC.

Fred W. Schwinn
fred.schwinn@sjconsumerlaw.com

12 South First Street, Suite 1014
San Jose, CA  95113-2418

(408) 294-6100
Fax (408) 294-6190

March 31, 2008

Countrywide Home Loans, Inc.
c/o The Prentice-Hall Corporation System, Inc.
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA  95833-3503

**CERTIFIED MAIL**
**7007 0710 0001 0498 6370**

Countrywide Home Loans, Inc.
4500 Park Granada
Calabasas, CA  91302-1613

**CERTIFIED MAIL**
**7007 0710 0000 0498 6387**

South Pacific Financial Corporation
c/o Timothy Cahill, Agent for Service
2548 Brennen Way
Fullerton, CA  92835-4217

**CERTIFIED MAIL**
**7007 0710 0001 0498 6394**

South Pacific Financial Corporation
10737 Laurel Street, Suite 200
Rancho Cucamonga, CA  91730-3837

**CERTIFIED MAIL**
**7007 0710 0001 0498 6400**

South Pacific Financial Corporation
d/b/a Funding Solutions Bankcorp
2010 Crow Canyon Place, Suite 100
San Ramon, CA  94583-1344

**CERTIFIED MAIL**
**7007 0710 0001 0498 6417**

Re:    Carlos H.L. Perez
       551 Loumena Lane
       San Jose, California  95111-2246
       South Pacific Loan No. 41050310
       Countrywide Loan No. 92175473-5

Dear Sir/Madam:

This office represents Carlos H.L. Perez concerning the above referenced loan transaction which he and his wife entered into with South Pacific Financial Corporation on or about April 15, 2005.  We have been authorized by our client to rescind this transaction and hereby exercise that right pursuant to the Federal Truth in Lending Act (TILA), 15 U.S.C. § 1635 and Regulation Z, 12 C.F.R. § 226.15.

South Pacific Financial Corporation failed the provide the TILA disclosures to our client or the TILA disclosures provided to our client failed to meet the requirements of the Federal Truth in Lending Act and Regulation Z in the following respects:

- 1 -

(a)  Our client was not provided the disclosures that are required by the Federal Truth in Lending Act, 15 U.S.C. § 1635(a) and Regulation Z, 12 C.F.R. § 226.15(b)(5), in that our client was not provided two properly completed copies of the Notice of Right to Cancel disclosure in a credit transaction in which a security interest was retained or acquired in our client's principal dwelling.

It appears that Countrywide Home Loans, Inc., is a successor in interest to the Deed of Trust which secured the subject consumer transaction.  As a result of the above described violations of the Truth in Lending Act and Regulation Z, South Pacific Financial Corporation and Countrywide Home Loans, Inc., have twenty days after receipt of this notice of rescission to return to our client all monies paid including, but not limited to, all closing costs and prepaid interest, all interest payments, and all prepayment penalties that have been paid.

Please be advised that if you do not return all consideration paid by our client you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).  Our client reserves all rights to raise additional or alternative grounds for rescission as may be subsequently identified under state or federal law.

Very Truly Yours,

Fred W. Schwinn

cc:    Carlos H.L. Perez

**U.S. Postal Service** ™
**CERTIFIED MAIL** ™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To Countrywide Home Loans, Inc.
Street, Apt. No.; or PO Box No. 10700 Gateway Oaks Dr. St. 100
City, State, ZIP+4 Sacramento, CA 95833-3503

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service** ™
**CERTIFIED MAIL** ™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To South Pacific Financial Corp
Street, Apt. No.; or PO Box No. 10057 Laurel Street Suite 200
City, State, ZIP+4 Rancho Cucamonga Ca 91730-3837

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service** ™
**CERTIFIED MAIL** ™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To Countrywide Home Loans, Inc.
Street, Apt. No.; or PO Box No. 4500 Park Granada
City, State, ZIP+4 Calabasas, CA 91302-1613

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service** ™
**CERTIFIED MAIL** ™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To South Pacific Financial Corp.
Street, Apt. No.; or PO Box No. 2010 Crow Canyon Place Suite 100
City, State, ZIP+4 San Ramon, CA 94583-1344

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service** ™
**CERTIFIED MAIL** ™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To South Pacific Financial Corp.
Street, Apt. No.; or PO Box No. 2644 Brennen Way
City, State, ZIP+4 Fullerton, CA 95035-4217

PS Form 3800, August 2006          See Reverse for Instructions

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X Becky DeGeorge      APR 0 3 2008    □ Agent
                                      □ Addressee

B. Received by (Printed Name)    C. Date of Delivery

D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:        □ No

1. Article Addressed to:

Countrywide Home Loans, Inc.
C/o The Prentice-Hall Corp.
        System, Inc.
2730 Gateway Oaks Drive
        Suite 100
Sacramento, CA.
        95833-3503

3. Service Type
   ☒ Certified Mail      □ Express Mail
   □ Registered          □ Return Receipt for Merchandise
   □ Insured Mail        □ C.O.D.

4. Restricted Delivery? (Extra Fee)    □ Yes

2. Article Number
   (Transfer from service label)    7007 0710 0001 0498 6370

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X                                □ Agent
                                 □ Addressee

B. Received by (Printed Name)    C. Date of Delivery
   Lorenzo Barroso              MAR 0 3 2008

D. Is delivery address different from item 1?  □ Yes
   If YES, enter delivery address below:        □ No

1. Article Addressed to:

Countrywide Home Loans, Inc
4500 Park Granada
Calabasas, CA
        91302-1613

3. Service Type
   ☒ Certified Mail      □ Express Mail
   □ Registered          □ Return Receipt for Merchandise
   □ Insured Mail        □ C.O.D.

4. Restricted Delivery? (Extra Fee)    □ Yes

2. Article Number
   (Transfer from service label)    7007 0710 0001 0498 6387

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _T. Coulombe_    ☐ Agent    ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
Taylore Coulombe    4/2

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

APR 0 2 2008

1. Article Addressed to:

South Pacific Financial Corporation
C/o Timothy Cahill, Agent for service
2548 Brennen Way
Fullerton, CA. 92835-4217

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 6394

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X    ☐ Agent    ☐ Addressee

B. Received by ( Printed Name )    C. Date of Delivery
4/2

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

1. Article Addressed to:

South Pacific Financial Corp.
10737 Laurel St. Suite 200
Rancho Cucamonga, CA 91730-3837

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7007 0710 0001 0498 6400

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

# Exhibit "J"

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Homecomings Financial LLC
c/o Corp. Service Co.
2730 Gateway Oaks Dr
Suite 10
Sacramento, CA
95833-3503

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

Becky DeGeorge      MAR 2 4 2008      ☐ Addressee

Becky DeGeorge      ☐ Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7007 0710 0001 0498 6707

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Homecoming Financial LLC
8400 Normandale Lake Blvd
Suite 250
Minneapolis, MN.
55437

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X _____      ☒ Agent
                        ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
   J. Seine                      2-27-08

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
   ☒ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7007 0710 0001 0498 6714

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

SOUTH PACIFIC FINANCIAL
CORP.
C/O Timothy CAHILL, Agent
for service
2548 BRENNEN WAY
FULLERTON, CA 92835

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Jenna Cahill
☐ Agent
☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
Tammy Cahill    MAR 24 2008

D. Is delivery address different from item 1?    ☐ Yes
If YES, enter delivery address below:    ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7008 0150 0001 3205 7168

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

SOUTH PACIFIC FINANCIAL
CORP.
10747 LAUREL ST. Suite
200
RANCHO Cucamonga, CA
91730

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X    ☑ Agent
☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
3/24

D. Is delivery address different from item 1?    ☐ Yes
If YES, enter delivery address below:    ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)    7008 0150 0001 3205 7175

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

# Exhibit "L"

Loan Number: 0202806022

# ADJUSTABLE RATE NOTE
# (Monthly Treasury Average Index - Payment and Rate Caps)

MIN: 100013802028060228

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED AND MY INTEREST RATE INCREASES ARE LIMITED.**

| March 2, 2006 | Pleasanton | CALIFORNIA |
|---|---|---|
| *[Date]* | *[City]* | *[State]* |

**551 Loumena Lane, San Jose, CA 95111**
*[Property Address]*

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. **$528,000.00** (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **GreenPoint Mortgage Funding, Inc.**. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

**(A)    Interest Rate**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **1.500%**. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)    Interest Change Dates**

The interest rate I will pay may change on the first day of **May, 2006**, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."

The new rate of interest will become effective on each Interest Change Date.

**(C)    Interest Rate Limit**

My interest rate will never be greater than **12.000%**.

**(D)    The Index**

Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(E)    Calculation of Interest Rate Changes**

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 500/1000ths** percentage points (**3.500%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest



G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 0

one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

3.    **PAYMENTS**

    (A)    **Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **May 1, 2006**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **April 1, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 79363, City of Industry, CA 91716-9363** or at a different place if required by the Note Holder.

    (B)    **Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$1,822.24**. This amount may change.

    (C)    **Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the **1st** day of **May, 2007**, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

    (D)    **Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

    (E)    **Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

    (F)    **Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred ten percent (110%) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount which would be sufficient to repay my then unpaid principal in full on the Maturity Date at my current interest rate in substantially equal payments.

    (G)    **Required Full Payment**

On **May 1, 2011** and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

4.    **NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of this Note. The notice will also include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

---

Multistate Adjustable Rate Note (Monthly Treasury Average Index)-- Single Family--Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding             Page 2 of 4             Modified Form 3602  01/01
March 2, 2006                              Modified By GreenPoint Mortgage Funding H94684MU 06/05



G  P  M  W  D  0  2  0  2  8  0  6  0  2  2  1  4  0

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)    Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **10** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **6.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)    Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)    Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)    No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)    Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one-person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person, who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder



may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.
>
> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.
>
> If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
   **Carlos H. Perez**  -Borrower           **Norma C. Perez**  -Borrower

_____ (Seal)        _____ (Seal)
   -Borrower           -Borrower

*[Sign Original Only]*



G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 0

Loan Number: 0202806022

# INTERIM INTEREST ADDENDUM TO
# ADJUSTABLE RATE NOTE

This Addendum is made this **2nd** day of **March, 2006**, and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note (the "Note") of the same date herewith, given by undersigned ("Borrower") to evidence Borrower's indebtedness to **GreenPoint Mortgage Funding, Inc.** its successors and assigns ("Lender") which indebtedness is secured by a Security Instrument and covering the property described in the Security Instrument and located at:

### 551 Loumena Lane, San Jose, CA 95111

Notwithstanding anything to the contrary set forth in the Note, Rider and Security Instrument, Lender and Borrower hereby acknowledge and agree to the following.

2. **INTEREST**
   **(A) Interest Rate**
   Interest will be charged on unpaid principal until the full amount of Principal has been paid. Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) of the Note, I will pay interest at a yearly rate of **7.375%**. Thereafter, I will pay interest at a yearly rate of **1.500%**, until the first Interest Change Date (as defined in Section 2(B) of the Note).

   The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

All other provisions of the Note, Rider and Security Instrument are unchanged by this Addendum and remain in full force and effect.

| | |
|---|---|
| _____ (Seal) | _____ (Seal) |
| **Carlos H. Perez**          -Borrower | **Norma C. Perez**          -Borrower |
| | |
| _____ (Seal) | _____ (Seal) |
|                              -Borrower |                              -Borrower |



G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 0

# PREPAYMENT FEE ALLONGE

Loan Number: **0202806022**

This Prepayment Fee Allonge ("Allonge") is made this **2nd** day of **March, 2006**, and is incorporated into and intended to form a part of the note dated the same date as this Allonge (Note) and also amends and supplements the mortgage, deed of trust, security deed, or security instrument (the "Security Instrument") dated the same date as this Allonge and the Note. To the extent that the provisions of this Allonge are inconsistent with the provisions of the Note and/or the Security Instrument, the provisions of this Allonge shall prevail over and will supercede any inconsistent provisions of the Note and/or the Security Instrument.

The section of the Note entitled **Borrower's Right to Prepay** is amended by adding the following paragraph as the last paragraph of such section:

   If I make a Prepayment within **3** year(s) of the date of this Note, I will pay a Prepayment fee on the aggregate Prepayments made within any consecutive twelve month period which exceed 20% o f the original Principal amount stated in the Note. The Prepayment fee I will pay shall be an amount equal to six (6) months advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the twelve (12) month period immediately preceding the date of the Prepayment, exceeds twenty percent (20%) of the original Principal amount of this Note. I will not be obligated to pay a Prepayment fee if I make a full Prepayment at any time after the **3rd** anniversary of the date of this Note. In no event will such a charge be made if it violates state or federal law.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | |
|---|---|
| _____ (Seal) | _____ (Seal) |
| **Carlos H. Perez**          -Borrower | **Norma C. Perez**          -Borrower |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |

*[Sign Original Only]*

Prepayment Fee Allonge - (California)
GreenPoint Mortgage Funding                    Page 1 of 1                    H85000CA 06/05



G P M W D 0 2 0 2 8 0 6 0 2 2 1 2 1

# Exhibit "L"

Loan Number: 0202806022

# ADJUSTABLE RATE NOTE
# (Monthly Treasury Average Index – Payment and Rate Caps)

MIN: 100013802028060228

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES MAY BE LIMITED AND MY INTEREST RATE INCREASES ARE LIMITED.**

| March 2, 2006 | Pleasanton | CALIFORNIA |
|---|---|---|
| *[Date]* | *[City]* | *[State]* |

**551 Loumena Lane, San Jose, CA 95111**
*[Property Address]*

1.   **BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. **$528,000.00** (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **GreenPoint Mortgage Funding, Inc..** I will make all payments under this Note in the form of cash, check or money order.
    I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.   **INTEREST**
    **(A)    Interest Rate**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **1.500%**. The interest rate I will pay may change.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.
    **(B)    Interest Change Dates**
    The interest rate I will pay may change on the first day of **May, 2006,** and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."
    The new rate of interest will become effective on each Interest Change Date.
    **(C)    Interest Rate Limit**
    My interest rate will never be greater than **12.000%**.
    **(D)    The Index**
    Beginning with the first Interest Change Date, my interest rate will be based on an Index. The "Index" is the Twelve Month Average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
    The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
    **(E)    Calculation of Interest Rate Changes**
    Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 500/1000ths** percentage points (**3.500%**) to the Current Index. The Note Holder will then round the result of this addition to the nearest

G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 0

one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

3.    **PAYMENTS**

(A)    **Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **May 1, 2006**.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on **April 1, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 79363, City of Industry, CA 91716-9363** or at a different place if required by the Note Holder.

(B)    **Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. **$1,822.24**.  This amount may change.

(C)    **Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the **1st** day of **May, 2007**, and on that day every 12th month thereafter.  Each of these dates is called a "Payment Change Date."  My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

(D)    **Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date.  The result of this calculation is called the "Full Payment."  The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075.  The result of this calculation is called the "Limited Payment."  Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

(E)    **Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments.  If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal.  The Note Holder will also add interest on the amount of this difference to my unpaid principal each month.  The interest rate on the interest added to Principal will be the rate required by Section 2 above.

(F)    **Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred ten percent (110%) of the Principal amount I originally borrowed.  My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases.  If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment.  The new monthly payment will be in an amount which would be sufficient to repay my then unpaid principal in full on the Maturity Date at my current interest rate in substantially equal payments.

(G)    **Required Full Payment**

On **May 1, 2011** and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again.  I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

4.    **NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will contain the interest rate or rates applicable to my loan for each month since the prior notice or, for the first notice, since the date of this Note.  The notice will also include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

---



G  P  M  W  D  0  2  0  2  8  0  6  0  2  2  1  4  0

**5.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.    LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.    BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A)    Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **10** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **6.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

    **(B)    Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C)    Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D)    No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E)    Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one-person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person, who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder



G  P  M  W  D  0  2  0  2  8  0  6  0  2  2  1  4  0

may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| _____ | (Seal) | _____ | (Seal) |
| Carlos H. Perez | -Borrower | Norma C. Perez | -Borrower |

| _____ | (Seal) | _____ | (Seal) |
| | -Borrower | | -Borrower |

*[Sign Original Only]*



G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 0

Loan Number: 0202806022

# INTERIM INTEREST ADDENDUM TO
# ADJUSTABLE RATE NOTE

This Addendum is made this **2nd** day of **March, 2006**, and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note (the "Note") of the same date herewith, given by undersigned ("Borrower") to evidence Borrower's indebtedness to **GreenPoint Mortgage Funding, Inc.** its successors and assigns ("Lender") which indebtedness is secured by a Security Instrument and covering the property described in the Security Instrument and located at:

**551 Loumena Lane, San Jose, CA 95111**

Notwithstanding anything to the contrary set forth in the Note, Rider and Security Instrument, Lender and Borrower hereby acknowledge and agree to the following.

2.    **INTEREST**
      **(A)  Interest Rate**
      Interest will be charged on unpaid principal until the full amount of Principal has been paid.  Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) of the Note, I will pay interest at a yearly rate of **7.375%**.  Thereafter, I will pay interest at a yearly rate of **1.500%**, until the first Interest Change Date (as defined in Section 2(B) of the Note).

      The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

All other provisions of the Note, Rider and Security Instrument are unchanged by this Addendum and remain in full force and effect.

_____  (Seal)          _____  (Seal)
**Carlos H. Perez**                -Borrower          **Norma C. Perez**                -Borrower

_____  (Seal)          _____  (Seal)
                                   -Borrower                                             -Borrower

---

Interim Interest Addendum to Adjustable Rate Note
GreenPoint Mortgage Funding                          Page 1 of 1                          H61000MU 08/05 Rev. 12/05
March 2, 2006



G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 0

# PREPAYMENT FEE ALLONGE

Loan Number: **0202806022**

This Prepayment Fee Allonge ("Allonge") is made this **2nd** day of **March, 2006**, and is incorporated into and intended to form a part of the note dated the same date as this Allonge (Note) and also amends and supplements the mortgage, deed of trust, security deed, or security instrument (the "Security Instrument") dated the same date as this Allonge and the Note. To the extent that the provisions of this Allonge are inconsistent with the provisions of the Note and/or the Security Instrument, the provisions of this Allonge shall prevail over and will supercede any inconsistent provisions of the Note and/or the Security Instrument.

The section of the Note entitled **Borrower's Right to Prepay** is amended by adding the following paragraph as the last paragraph of such section:

   If I make a Prepayment within **3** year(s) of the date of this Note, I will pay a Prepayment fee on the aggregate Prepayments made within any consecutive twelve month period which exceed 20% o f the original Principal amount stated in the Note. The Prepayment fee I will pay shall be an amount equal to six (6) months advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the twelve (12) month period immediately preceding the date of the Prepayment, exceeds twenty percent (20%) of the original Principal amount of this Note. I will not be obligated to pay a Prepayment fee if I make a full Prepayment at any time after the **3rd** anniversary of the date of this Note. In no event will such a charge be made if it violates state or federal law.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | (Seal) | | (Seal) |
|---|---|---|---|
| **Carlos H. Perez** | -Borrower | **Norma C. Perez** | -Borrower |

| | (Seal) | | (Seal) |
|---|---|---|---|
| | -Borrower | | -Borrower |

*[Sign Original Only]*

Prepayment Fee Allonge - (California)
GreenPoint Mortgage Funding       Page 1 of 1       H85000CA 06/05



G P M W D 0 2 0 2 8 0 6 0 2 2 1 2 1

# Exhibit "M"

# HOME EQUITY LINE OF CREDIT AGREEMENT
# AND PROMISSORY NOTE
## (SECONDARY LIEN)

**Borrower's Name and Address:**
**Carlos H. Perez and Norma C. Perez**
**551 Loumena Lane, San Jose, CA 95111 USA**


**Property Serving as Security (the "Property"):**
**551 Loumena Lane, San Jose, CA 95111**



**Lender's Name and Address:**
**GreenPoint Mortgage Funding, Inc.**
**100 Wood Hollow Drive, Novato, CA 94945**

| | | |
|---|---|---|
| **No.: 0202806220** | **Initial Advance: $ 66,000.00** | **Maturity Date: March 15, 2021** |
| **Date: March 2, 2006** | **Minimum Advance: $ 100.00** | **Billing Cycle: Monthly** |
| **Line of Credit: $ 66,000.00** | **Draw Period: 60 months** | **Payment Date: Monthly** |
| | **Repayment Period: 120 months** | |

1.　　**GENERAL TERMS AND DEFINITIONS.** This is the Agreement establishing your Home Equity Line of Credit.

In this Agreement, many of the terms we use have special meanings:
(a) "You," "your" and "yours" means each and all Borrowers who sign this Agreement and any persons who use the Line of Credit, jointly and severally.
(b) "We," "us" and "our" means Lender, and its successors and assigns.
(c) "Account" means the Line of Credit Account established by this Agreement.
(d) "Billing Cycle" means the period of time normally covered by periodic billing statements and includes such period of time even when a statement is not sent because there is otherwise no balance in your Account for that period.
(e) "Credit Limit" means the maximum amount of principal shown above that we will ordinarily allow you to owe us at any time under this Agreement.
(f) "Credit Line Checks" means the checks used to access the Line of Credit funds during the Draw Period.
(g) "Draw Period" means the period of time shown above during which you can receive advances under this Agreement.
(h) "Initial Advance" means the amount of money we will require you to accept as an advance to open the Account.
(i) "Line of Credit" means the home equity line of credit offered to Borrower by Lender pursuant to the terms of this Agreement.
(j) "Loan Account Balance" means the sum of the unpaid principal of advances made under your Line of Credit, plus unpaid but earned finance charges, plus any costs, expenses, and fees that are due.
(k) "Maturity Date" for Line of Credit is **March 15, 2021**. On this date, you promise to pay any remaining Loan Account Balance.
(l) "Minimum Advance" means the smallest amount of money we will advance to you under this Agreement.
(m) "Minimum Payment" means the minimum payment you must make on the Line of Credit, as reflected on each periodic billing statement Lender will deliver to you for each Billing Cycle.
(n) "Plan" refers to this Home Equity Line of Credit collectively.

G P M W D 0 2 0 2 8 0 6 2 2 0 1 4 0

(o) "Repayment Period" means the period of time shown above during which you must repay the outstanding balance of your Account, with accrued interest, but may not request further advances. The Repayment Period begins at the end of the Draw Period, and ends on the earlier of the Maturity Date or the date when final payment of the Loan Account Balance has actually been made.

This is a personal line of credit which we are making available to you to obtain loans up to the Credit Limit on the terms and conditions contained in this Agreement. You will be able to obtain such loans from time to time, and in such amounts that we may advance and re-advance to you up to the Credit Limit, subject to the terms of this Agreement.

2.    **PROMISE TO PAY; CREDIT LIMIT.** You promise to pay to Lender, or order, the total of all funds which are advanced and re-advanced to you from time to time under this Agreement, plus interest thereon, as set forth below. You also promise to pay Lender, or order, all other amounts, fees, costs and charges you are responsible for under this Agreement and that are permitted or not prohibited by applicable law. You must repay the entire outstanding Loan Account Balance, plus all accrued interest and any fees and charges due and payable on the Account, on or before the Maturity Date shown above. In the event all such sums are not paid on or before the Maturity Date, then interest shall continue to accrue on the Loan Account Balance using the same method of calculating your interest rate as set forth below.

Your Credit Limit is set forth at the beginning of this Agreement. You agree not to allow the principal amount that you owe on the Account to exceed the Credit Limit. If you do exceed the Credit Limit, you will repay the excess immediately.

3.    **SECURITY.** All amounts due under the Account are secured by a mortgage, deed of trust, or security deed (the "Security Instrument") on the Property. You agree to pay all amounts due from you, and otherwise perform all covenants and obligations required of you, under the Security Instrument. If it becomes necessary for us to advance funds to you beyond the Credit Limit to protect our security interest, those amounts in excess of the Credit Limit will be owed by you and will be secured by the Security Instrument. The Security Instrument and this Agreement are related documents and a default under one document will be treated as a default under the other document. To the extent permitted by applicable law, the lien of the Security Instrument will continue and will have the same priority of claim if, with your consent, we renew, extend, amend, modify or substitute this Agreement. In the event of such renewal, extension, modification or substitution, you agree to execute any additional documents necessary to accomplish the action being taken.

Property securing any other loans that you have with us may also secure this Agreement.

4.    **LOAN ADVANCES.** We are not obligated to advance any funds to you under this Agreement until: (a) the Security Instrument: (i) has been reviewed by us for accuracy and completeness, (ii) has been recorded in the appropriate land records of the jurisdiction in which the Property is located, and (iii) constitutes a valid lien on the Property, with no other encumbrances on the Property except for any prior mortgage or deed of trust and declarations, easements or restrictions of record listed in a schedule of exceptions to coverage in the title insurance policy insuring Lender's interest in the Property and to which Lender has agreed; and (b) any applicable right of rescission has expired without exercise of that right.

After these conditions have been satisfied, you may obtain advances on your Account by using the Credit Line Checks. You may only write Credit Line Checks during the Draw Period, and only for amounts equal to or greater than the Minimum Advance amount shown above, subject to your Credit Limit. If your request is for less than the Minimum Advance, we may, at our option, grant the request. However, granting the request does not mean we will be required to grant requests for less than the Minimum Advance in the future. We always have the option to deny any such request. During the Draw Period, you may draw upon your Account, within the Credit Limit, until it is terminated or unless additional advances are otherwise prohibited, as provided below. We will not honor Credit

Home Equity Line of Credit Agreement and Promissory Note – California (Secondary Lien)
**GreenPoint Mortgage Funding**                    **Page 2 of 11**                    HAGT2CA (06/02) (Rev. 02/05)

G  P  M  W  D  0  2  0  2  8  0  6  2  2  0  1  4  0

Line Checks received by us following the expiration of the Draw Period, regardless of whether you issue such Credit Line Checks during the Draw Period. We are not required to honor any request for any transfer or draw that would cause your outstanding indebtedness to exceed your Credit Limit. If we do make the advance, it does not mean that your Line of Credit has been increased. We may require you to repay the amount over your Line of Credit at once.

5.    **VARIABLE RATE.** The interest rate is variable, and the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) and the periodic payment may change. The **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) includes interest only and not other costs.

6.    **INITIAL INTEREST RATE.** Until 1 month(s) after the funding date (the "Initial Rate Period"), the daily periodic rate of **FINANCE CHARGE** is **0.0137** %, which corresponds to an **ANNUAL PERCENTAGE RATE** of **5.000** %. The periodic rate and corresponding **ANNUAL PERCENTAGE RATE** described above are the initial rates assessed under this Agreement, and are not based on the Index and Margin (defined below) used for later rate adjustments. Had these rates been based on the current Index and Margin, the daily periodic rate of finance charge and **ANNUAL PERCENTAGE RATE** would have been higher. Ask us for the current Index value, Margin, discount, and **ANNUAL PERCENTAGE RATE**. After you open this Line of Credit, rate information will be provided on periodic billing statements that we send you.

7.    **SUBSEQUENT INTEREST RATE.** After the Initial Rate Period and until the Final Maturity Date, the method of calculating your **ANNUAL PERCENTAGE RATE** will change and your interest rate and Minimum Payment may increase. Beginning **after the initial period**, the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) will equal the value of an "Index" as of the last publication date of the Index preceding the start of the Billing Cycle plus a "Margin" of **One and 00/1000ths** percentage points **(1.000 %)**, rounded to the nearest one-eighth of one percentage point (0.125%). The "Index" is the rate published in The Wall Street Journal under the designation "Money Rates" and shown as "prime rate" or "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks," or substantially similar words.

The **ANNUAL PERCENTAGE RATE** may change on the first day of every month during the term of this Agreement ("Change Date") and the rate will be effective until the ensuing Change Date. The **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) will not change more than once each Billing Cycle. An increase in the Index will result in an increase in the **FINANCE CHARGE** and corresponding **ANNUAL PERCENTAGE RATE**, which may have the effect of increasing your Minimum Payment. A decrease in the Index will have the opposite effect of an increase. If the Index changes more frequently than the **ANNUAL PERCENTAGE RATE** is scheduled to change, we will always use the Index in effect on the day we adjust the **ANNUAL PERCENTAGE RATE** to determine the new **ANNUAL PERCENTAGE RATE**. In such a case, we will ignore any changes in the Index that occur between **ANNUAL PERCENTAGE RATE** adjustments.

Your maximum **ANNUAL PERCENTAGE RATE** will be 18%. Except for this 18% "cap," there is no limit on the amounts by which the **ANNUAL PERCENTAGE RATE** may increase or decrease on any Change Date or over the life of the Line of Credit.

If the Index becomes unavailable, we will select a new index (and, if necessary, a new margin) that will result in an **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) that is substantially similar to the rate in effect at the time the original Index became unavailable.

8.    **CALCULATION OF FINANCE CHARGES.** You agree to pay a periodic **FINANCE CHARGE** (which we will refer to as "interest") on your Account based on the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) derived in accordance with Sections 6 and 7. The **FINANCE CHARGE** begins to accrue on the day that your Account has been debited for each advance, and continues to so accrue until the day the outstanding Loan Account Balance is paid in full.



GPMWD020280622014 0

To determine the **FINANCE CHARGE** for a Billing Cycle, we apply a daily periodic rate of **FINANCE CHARGE** to the balance of your Loan Account Balance each day ("Daily Balance") during the Billing Cycle. To determine the daily periodic rate, we divide the **ANNUAL PERCENTAGE RATE** (corresponding to a daily periodic rate) in effect for the Billing Cycle by 365. To obtain the Daily Balance, we take the unpaid balance of your Account at the beginning of each day, add any new advances and other debits, except late charges, credit insurance premiums and returned check fees, and subtract payments or credits and unpaid finance charges. This results in your daily principal balance for each day in the Billing Cycle. We then determine the **FINANCE CHARGE** for each day by multiplying the Daily Balance for such day by the daily periodic rate. These daily finance charges are added together to obtain the total periodic **FINANCE CHARGE** for the period covered by the Billing Cycle.

9.    **ADDITIONAL FINANCE CHARGES:** You agree to pay us the following additional **FINANCE CHARGES:**

- See Fee Schedule

10.    **MONTHLY PAYMENTS.**
       **(A.) DRAW PERIOD.** Each month, we will send you a periodic statement applicable to your Account. You must pay us at least the Minimum Payment indicated on the periodic statement by the date indicated on the statement. If, however, the unpaid balance in your Account is less than the Minimum Payment, your Minimum Payment will be equal to the balance in your Account. The Minimum Payment will include (a) late charges and any other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument; (b) accrued but unpaid interest for prior Billing Cycles; (c) premiums for any optional credit life insurance you may decide to obtain through us; and (d) an amount equal to the amount by which your Loan Account Balance exceeds your Credit Limit.

You can pay off all or any part of what you owe at any time. However, so long as you owe any amount, you must continue to make the Minimum Payment. During the Draw Period the Minimum Payment will not reduce the principal outstanding on your Line of Credit.

**(B.) REPAYMENT PERIOD.** During the Repayment Period, the Minimum Payment will be an amount equal to the accrued and unpaid finance charges, late charges and other charges authorized by this Agreement, including, without limitation, any expenses or advances incurred by us under the Security Instrument, plus 0.8333% of the Loan Account Balance outstanding at the end of the Draw Period. During the Repayment Period, payment of the Minimum Payment only may not fully repay your Loan Account Balance. If paying the Minimum Payment will neither reduce nor fully repay your Loan Account Balance, you will then be required to pay the entire balance in a single balloon payment on the Maturity Date shown above. We are not obligated to refinance any portion of that indebtedness, but will consider your request to do so. You must be prepared to repay the full amount due upon the expiration of this Agreement. If you refinance this Account at maturity, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain financing from us.

11.    **APPLICATION OF PAYMENTS.** We will apply all payments which we receive from you in the following order: to pay (a) amounts due under the Security Instrument to secure the amounts advanced under your Account and to protect our security; (b) any escrow payments, if we require such payments under the Security Instrument; (c) any late charges; (d) any other fees and charges other than finance charges; (e) accrued and unpaid finance charges; and (f) any unpaid principal balance.

12.    **PREPAYMENT.** You may repay all or any part of your outstanding Loan Account Balance, at any time, without penalty. During the Draw Period, any amounts that you repay will subsequently be available to you for advances, subject to your Credit Limit and other limitations in this Agreement. However, so long as you owe any amount you must continue to make your periodic Minimum Payment. Even if the entire outstanding Loan Account Balance has been repaid, the Account will remain open for future advances during the Draw Period, until you or your agent

Home Equity Line of Credit Agreement and Promissory Note – California (Secondary Lien)
GreenPoint Mortgage Funding                    Page 4 of 11                    HAGT2CA (06/02) (Rev. 02/05)

G P M W D 0 2 0 2 8 0 6 2 2 0 1 4 0

instructs us in writing to close the Account. The Security Instrument will remain in effect for all such future advances under your Account.

13. **ADDITIONAL REPAYMENT TERMS.** If you fail to make a payment, we may, but are not required to, advance money to you to make the payment. All of the terms of this Agreement would apply to such an advance.

You can pay off all or part of what you owe at any time. However, so long as you owe any amount you must continue to make your periodic Minimum Payment. Even if you pay more than the Minimum Payment, this does not affect your obligation to pay at least the Minimum Payment on subsequent payment due dates.

14. **SET-OFF.** You agree that we may set-off any amount due and payable under the terms of this Agreement against your right to receive money from us, unless prohibited by applicable law. For example, our right of set-off does not apply to an Individual Retirement Account; other tax-deferred retirement accounts; or federal benefit, wage, salary and retirement payments held in an electronic transfer account (ETA). In addition, our right of set-off does not apply to an account or other obligation if your rights arise only in a representative capacity or if you can obtain credit under this Agreement by using a credit card.

Your right to receive money from us includes any deposit or share account balance you have with us; any money owed to you on an item presented to us or in our possession for collection or exchange; and any repurchase agreement or other non-deposit obligation. "Any amount due and payable under the terms of this Agreement" means the total amount which we are entitled to demand payment of under the terms of this Agreement at the time we set-off.

15. **CHANGING THE TERMS OF THIS AGREEMENT.** Generally, we may not change any term of this Agreement. However, we may change a term in the following circumstances: (a) we may prohibit additional extensions of credit or reduce your credit limit during the period that the maximum **ANNUAL PERCENTAGE RATE** is reached; (b) we may make specified changes that you have specifically agreed to in writing; (c) we may make changes that unequivocally benefit you throughout the remainder of the Plan; (d) we may make insignificant changes to the terms of this Agreement; or (e) if this is a variable rate plan, we may change the Index and Margin if the original Index described in this Agreement is no longer available. Any new index will have a historical movement similar to the original Index, and, together with a new margin, will result in an interest rate substantially similar to the rate in effect at the time the original Index became unavailable.

If we are required to send notice of a change in terms, we will send the notice to your address listed in this Agreement.

16. **ADDITIONAL CHARGES.** You agree to pay the following additional charges pursuant to your Line of Credit:

- Late Fee. A late charge on any payment not paid within **10** days of the payment due date of **6.00%** of the payment;

- Annual Membership Fee. An annual fee of $ **75.00** for each twelve-month period during the Draw Period. This fee will be added to your Loan Account Balance on a yearly basis;

- Returned Check Fee. A fee of $ **25.00** for any check that you have issued in connection with this Plan that is returned dishonored;

- A Termination Fee of $750.00 will be charged if your Home Equity Line of Credit is closed and the Security Instrument is reconveyed within the first 12 months after the date of closing or $500.00 if reconveyed after the first 12 months but prior to the 37th month. This will be charged only if permitted by applicable law;

Home Equity Line of Credit Agreement and Promissory Note – California (Secondary Lien)
GreenPoint Mortgage Funding                    Page 5 of 11                    HAGT2CA (06/02) (Rev. 02/05)

G P M W D 0 2 0 2 8 0 6 2 2 0 1 4 0

• (Other) See Fee Schedule

17. **INSURANCE.** You must maintain on the Property a homeowner's policy of casualty and liability insurance and flood insurance, if applicable, in such amount(s) and for such period(s) of time as we may require. To open your Account, you must provide us with written proof, such as a current certificate of insurance, showing the required insurance coverage on the Property, as well as an endorsement of such policy in favor of us. In addition, the policy must require that your insurance company provide us with at least fifteen (15) days written notice of any change in insurance coverage or of cancellation of your policy. We may refuse to honor checks or to make other advances or transfers of funds under the Account until we receive satisfactory evidence with respect to these items. You may purchase insurance from anyone you want who is acceptable to us. The Security Instrument more fully describes your insurance obligations.

18. **TERMINATION AND ACCELERATION.** You will be in default of this Agreement, and we can terminate your Account and require immediate payment of the entire outstanding Loan Account Balance, plus accrued interest and other charges if any of the following occur: (a) you engage in fraud or material misrepresentation in connection with any phase of this Line of Credit; (b) you fail to meet the repayment terms of this Agreement for any outstanding balance; or (c) your action or inaction adversely affects the Property, our security interest or any other right that we have in the Property, including, but not limited to: (i) failure to maintain required insurance on the Property; (ii) the sale, transfer, conveyance, or encumbrance of the Property in violation of the Security Instrument; (iii) failure to maintain the Property or use of the Property in a destructive or illegal manner; (iv) commission of waste; (v) failure to pay taxes on the Property or otherwise act or fail to act and thereby cause a lien to be filed against the Property that is senior to the lien of the Security Instrument; (vi) your death, if you are solely obligated under this Agreement, or if the death of one of several Borrowers under this Agreement causes our security to be adversely affected; (vii) the Property is taken through eminent domain; (viii) a judgment is filed against you and subjects you and the Property to action that adversely affects our interest; (ix) a prior lienholder forecloses on the Property and as a result, our interest is adversely affected; or (x) you move out of the dwelling and our security interest is thereby adversely affected.

The Security Instrument also describes how and under what conditions you may be required to make immediate payment of the entire outstanding Loan Account Balance, plus accrued interest and other charges you owe under this Agreement. Some of those conditions are described as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.
>
> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **REMEDIES.** We may terminate your Line of Credit, require you to pay the entire outstanding Loan Account Balance in one payment, charge you a termination fee (if provided for in this Agreement), and charge you any other

Home Equity Line of Credit Agreement and Promissory Note – California (Secondary Lien)
GreenPoint Mortgage Funding                Page 6 of 11                HAGT2CA (06/02) (Rev. 02/05)

G P M W D 0 2 0 2 8 0 6 2 2 0 1 4 0

fees related to the collection of the amount owing if you are in default in any manner described above. Furthermore, in that instance we may also take any other action short of termination, such as charging you a fee if you fail to maintain required property insurance and we purchase insurance. If you fail to pay the Loan Account Balance after notice and demand thereof, and as required by applicable law, we may foreclose the Security Instrument and sell the Property. We can elect to exercise or delay enforcement of any of our rights under this Agreement and/or the Security Instrument without losing any such rights. If we elect not to exercise or enforce any of our rights, such election shall not be deemed a waiver of any of those rights. If we elect to terminate this Plan and accelerate the amounts owing on your Account, we may use our right to set-off, unless prohibited by applicable law.

20.    **SUSPENSION OF CREDIT AND REDUCTION OF CREDIT LIMIT.** We may temporarily prohibit you from obtaining additional advances or reduce your Credit Limit during any period in which: (a) the value of the dwelling that secures this Line of Credit declines significantly below the dwelling's appraised value for purposes of this Plan; (b) we reasonably believe you will not be able to fulfill the repayment obligations because of a material change in your financial circumstances; (c) you are in default of any material obligation of this Agreement, or any agreement securing this Agreement; (d) a government action prevents us from imposing the Annual Percentage Rate provided for in this Agreement; (e) the priority of our security interest is adversely affected by a government action to the extent that the value of the security interest is less than 120% of the Line of Credit; (f) the Annual Percentage Rate corresponding to the daily periodic rate reaches the maximum rate allowed under this Agreement; or (g) we have been notified by a regulatory agency that continued advances constitute an unsafe and unsound business practice.

In the event that we suspend your right to additional advances or reduce your Line of Credit, we will send you notice of our decision to do so at the address listed in this Agreement. If we have based our decision to suspend or reduce your credit privileges on an assessment of your financial condition or performance under this Plan and you believe that your situation has changed, you must request that we re-evaluate your situation in order to reinstate your privileges.

21.    **FINANCIAL AND CREDIT INFORMATION.** You will promptly provide us with personal financial information, including a financial statement, if we should request it for the purpose of reviewing your Account or updating your credit file. We may request such information from time to time, whether or not we have reason to believe that there are any problems with your Account or with your creditworthiness. Any advances or transfers made under the Account are made in reliance upon the information that you provide us, which you represent and warrant to us is true and accurate as of the date such information is given. You authorize us to make or have made any credit inquiries we feel are necessary. You also authorize the person or agencies to whom we make these inquiries to supply us with the information we request.

**As required by California law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.**

22.    **COLLECTION COSTS.** If you default on this Agreement, and we must take steps to collect amounts you owe us under this Agreement or to protect the lien of the Security Instrument or the security of the Property, you agree to pay all of our costs and expenses incurred in connection with such actions, including reasonable attorneys' fees and court costs.

23.    **GOVERNING LAW AND ENFORCEABILITY.** Federal law applies to certain aspects of this Agreement. This Agreement will be governed by the laws of the jurisdiction in which the Property is located, except to the extent federal law applies. If any part of this Agreement is determined to be invalid, then we may enforce the remainder of this Agreement as if the invalid provision did not exist.

24.    **TERMINATION OF AGREEMENT.** Your Account will automatically terminate on the earlier of the Maturity Date shown above or on the date we give you notice of the termination as the result of an occurrence of a default (as described in Section 18). Upon termination of the Account, the entire Loan Account Balance then outstanding, with

Home Equity Line of Credit Agreement and Promissory Note – California (Secondary Lien)
GreenPoint Mortgage Funding                          Page 7 of 11                          HAGT2CA (06/02) (Rev. 02/05)

G P M W D 0 2 0 2 8 0 6 2 2 0 1 4 0

accrued interest and any fees and charges owing on the Account, will be due and payable in full on that date. You can terminate this Agreement by written notice of termination of this Agreement and a request for a discharge of the Security Instrument mailed or delivered to us at any time. Your notice of termination will be effective on the first business day after we receive it and the entire principal balance outstanding on your Account, plus interest accrued thereon, together with fees and charges owing on the Account, will be due and payable in full on that date.

25. **JOINT AND SEVERAL LIABILITY; TERMINATION OF ACCOUNT.** If this Account is jointly held, each of you authorizes any other Borrower, on his or her request alone and without the consent or knowledge of the other(s), to cancel the Line of Credit, to request and receive advances of principal under your Line of Credit Account, to take any action or to give or receive any notice under this Agreement, and to take all other actions in connection with this Agreement. In addition, any notice given by us to one of you shall be effective as to all of you. In any event, each of you will be legally responsible for payment of the total amount of the Loan Account Balance and applicable charges, regardless of any divorce, legal separation or other legal proceedings.

26. **NOTICES.** We will mail statements and notices to you at the address set forth above. You must notify us in writing of any change in your name, address, or place of employment. You may send written notices to us at the address set forth above or at such other address that we designate in writing.

27. **REPRESENTATIONS AND WARRANTIES.** You represent and warrant to us that the information contained in the loan application, in each material respect, was true at the time the loan application was completed. You represent and warrant to us that the terms of any existing deed of trust, mortgage, or security deed on the Property permit us to enter into this Agreement and that the loans secured by such existing deed of trust, mortgage, or security deed are current in all material respects and are not in default.

28. **TAX DEDUCTIBILITY.** You acknowledge that we (including our employees and representatives) do not make any representations or warranties to you about the tax consequences of you establishing or using this Line of Credit (including the deductibility of interest or fees), and we will not be liable if interest or fees are not deductible. You should consult a tax advisor regarding the deductibility of interest, charges, and fees under this Agreement.

29. **BILLING ERRORS.** Your rights and responsibilities with regard to billing errors are explained in the document under the heading "YOUR BILLING RIGHTS," which is attached to this Agreement.

30. **LOAN CHARGES.** If the Account is subject to a law that sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected, or to be collected, in connection with the Account exceeds the permitted limits, then: (i) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from you which exceeded permitted limits shall be refunded to you. We will refund the excess either by reducing the principal owed under the Account or by making a direct payment to you. If we apply the excess toward reducing the principal balance, the reduction will be treated as a partial prepayment.

31. **ASSIGNS.** This Agreement shall be binding upon you and each of your heirs, executors, administrators, successors and assigns, subject to the limitations on selling, transferring or otherwise conveying the Property contained in this Agreement and the Security Instrument.

32. **WAIVERS.** To the extent not prohibited by law and subject to any required notice and opportunity to cure a default for failure to make a required payment, you waive protest, presentment for payment, demand, notice of dishonor, notice of acceleration, notice of intent to accelerate, and notice of nonpayment.

33. **TERMINATION FEE.** To the extent permitted by applicable law, you will be charged a Termination Fee if this Line of Credit is closed and reconveyed within the first 36 months after the Account is established.

Home Equity Line of Credit Agreement and Promissory Note – California (Secondary Lien)
GreenPoint Mortgage Funding                    Page 8 of 11                    HAGT2CA (06/02) (Rev. 02/05)

GPMWD0202806220140

By executing this Agreement, you acknowledge that you have read this Agreement and that you agree to its terms and conditions. You also acknowledge that each person owning an interest in the Property has received a copy of this Agreement and two copies of the Notice of Right to Cancel, if applicable.

<table>
<tr><td>_____</td><td></td><td>_____</td><td></td></tr>
</table>

**Carlos H. Perez**                          (Borrower)      **Norma C. Perez**                          (Borrower)

_____ (Borrower)      _____ (Borrower)

LENDER:  **GreenPoint Mortgage Funding, Inc.**

Home Equity Line of Credit Agreement and Promissory Note – California (Secondary Lien)
GreenPoint Mortgage Funding                          Page 9 of 11                          HAGT2CA (06/02) (Rev. 02/05)

G P M W D 0 2 0 2 8 0 6 2 2 0 1 4 0

# OUR BILLING RIGHTS
## KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

### *Notify Us In Case of Errors or Questions About Your Bill*

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information:

- Your name and account number.

- The dollar amount of the suspected error.

- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings, checking, share draft or other account, you can stop the payment on any amount you think is wrong. To stop payment your letter must reach us three business days before the automatic payment is scheduled to occur.

### *Your Rights and Our Responsibilities*
### *After We Receive Your Written Notice*

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any mistaken amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. We must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

G P M W D 0 2 0 2 8 0 6 2 2 0 1 4 0

# Fee Schedule

| ADDITIONAL FINANCE CHARGES | |
| --- | --- |
| **Description** | **Amount** |
| Origination Fee to Broker* | $495.00 |
| Funding Fee to GPM* | $150.00 |
| Process/Admin Fee to Broker* | $150.00 |
| Settlement/Closing Fee | $100.00 |
| Wire Fee to Settlement Agent | $25.00 |

| ADDITIONAL OTHER CHARGES | |
| --- | --- |
| **Description** | **Amount** |
| Title Insurance | $100.00 |
| Title Endorsement | $25.00 |
| Recording Fees | $80.00 |

GreenPoint Mortgage Funding, Inc. will be paying the Broker for services provided in this transaction in the amount of $ 495.00

Home Equity Line of Credit Agreement and Promissory Note – California (Secondary Lien)
GreenPoint Mortgage Funding     Page 11 of 11     HAGT2CA (06/02) (Rev. 02/05)

G P M W D 0 2 0 2 8 0 6 2 2 0 1 4 0

# Exhibit "N"

RECORDING REQUESTED BY
FINANCIAL TITLE COMPANY

Recording Requested By:

GreenPoint Mortgage Funding, Inc.
*[Company Name]*

And When Recorded Mail To:

GreenPoint Mortgage Funding, Inc.
*[Company Name]*

*[Name of Natural Person]*

981 Airway Court, Suite E
*[Street Address]*

Santa Rosa, CA, 95403-2049
*[City, State Zip Code]*

43113307 JF1 405 *[Space Above This Line For Recording Data]*



DOCUMENT:  18838195          Pages: 21

Fees.... 69 00
Taxes.
Copies .
AMT PAID 69 00

BRENDA DAVIS                    RDE #  010
SANTA CLARA COUNTY RECORDER     3/10/2006
Recorded at the request of      8.00 AM
Financial Title Company

# DEED OF TRUST

MIN: 100013802028060228

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated **March 2, 2006**, together with all Riders to this document.

**(B)** "Borrower" is **Carlos H. L Perez and Norma C. Perez, Husband And Wife** . Borrower is the trustor under this Security Instrument.

**(C)** "Lender" is **GreenPoint Mortgage Funding, Inc.**. Lender is a **Corporation** organized and existing under the laws of **the State of New York**. Lender's address is **100 Wood Hollow Drive, Novato, CA 94945**.

**(D)** "Trustee" is **Marin Conveyancing Corp.**.

**(E)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F)** "Note" means the promissory note signed by Borrower and dated **March 2, 2006**. The Note states that Borrower owes Lender **Five Hundred Twenty Eight Thousand  and 00/100ths** Dollars (U.S. **$528,000.00**) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **April 1, 2036**.

**(G)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

---

California Deed of Trust–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    MERS Modified Form 3005 01/01
—THE COMPLIANCE SOURCE, INC.—                                                              14301CA 008/00
www.compliancesource.com                        Page 1 of 13                    © 2000, The Compliance Source, Inc



G P M W D 0 2 0 2 8 0 6 0 2 2 1 1 7

**(H)** **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I)** **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

☒ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider
☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider
☐ 1-4 Family Rider    ☐ Revocable Trust Rider
☒ Other(s) *[specify]* **Occupancy Rider**

**(J)** **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K)** **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L)** **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M)** **"Escrow Items"** means those items that are described in Section 3.

**(N)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P)** **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County of Santa Clara:**

                                          *[Type of Recording Jurisdiction]*           *[Name of Recording Jurisdiction]*

**As more particularly described in exhibit "A" attached hereto and made a part hereof.**

Assessor's Identification Number:  **497-27-086**

which currently has the address of **551 Loumena Lane**

                                      *[Street]*

**San Jose**                        , California 95111               ("Property Address"):

           *[City]*                                     *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided

any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender, and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in

connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the

insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against

California Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 9 of 13

MERS Modified Form 3005 01/01
14301CA 08/00
© 2000, The Compliance Source, Inc



G P M W D 0 2 0 2 8 0 6 0 2 2 1 1 7

agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period, which must elapse before certain action can be taken, that time

G P M W D 0 2 0 2 8 0 6 0 2 2 1 1 7

period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the



GPMWD0202806022117

sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

   23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

   24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

   25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

   BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:



_____    _____ (Seal)
                              **Carlos H. Perez**                -Borrower
                                                               *[Printed Name]*


_____    _____ (Seal)
                              **Norma C. Perez**                 -Borrower
                                                               *[Printed Name]*


                              _____ (Seal)
                                                                 -Borrower
                                                               *[Printed Name]*


                              _____ (Seal)
                                                                 -Borrower
                                                               *[Printed Name]*


_____ *[Acknowledgment on Following Page]* _____

G P M W D 0 2 0 2 8 0 6 0 2 2 1 1 7

State of _Ca_                                    §
County of _Santa Clara_                          §
                                                 §
On _March 2, 2006_, before me, _L. Campos, Notary Public_     *[name and title of officer]*
personally appeared **Carlos H. Perez and Norma C. Perez**

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument in person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _L. Campos_                  (Seal)

```
L. CAMPOS
COMM. # 1536298
NOTARY PUBLIC - CALIFORNIA
CONTRA COSTA
My Comm. Expires DEC. 18, 2008
MFR. 5 B E 1
```

## REQUEST FOR FULL RECONVEYANCE

TO TRUSTEE:
     The undersigned is the holder of the note or notes secured by this Deed of Trust, which was recorded in the office of the Recorder of _____ County, State of California, in book _____, page _____ of official records. Said note or notes, together with all other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey, without warranty, all the estate now held by you under this Deed of Trust to the person or persons legally entitled thereto.

_____          Date:_____
       (Trustee)

43113307 -405 -JF1

Legal Description

All that certain real property situate in the City of San Jose, County of Santa Clara, State of California, described as follows:

Lot 6, as shown on that certain Map of TRACT NO. 2287, which Map was filed for record in the office of the Recorder of the County of Santa Clara, State of California on February 18, 1960, in Book 117 of Maps, Page 3.

EXCEPTING THEREFROM the underground water or rights thereto, with no right of surface entry, as granted to Valley Title Company of Santa Clara County, a California corporation by Instrument recorded March 3, 1960 in Book 4715, Page 466, Official Records.

497-27-086

Loan Number: 0202806022

# INTERIM INTEREST RIDER TO
# ADJUSTABLE RATE RIDER AND MORTGAGE, DEED OF TRUST OR DEED TO SECURE DEBT

This Rider is made this **2nd** day of **March, 2006**, and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Rider (the "Rider") and the Mortgage, Deed of Trust or Deed to Secure Debt (the "Security Instrument") of the same date herewith, given by undersigned ("Borrower") to evidence Borrower's indebtedness to **GreenPoint Mortgage Funding, Inc.** its successors and assigns ("Lender") which indebtedness is secured by a Security Instrument and covering the property described in the Security Instrument and located at:

**551 Loumena Lane, San Jose, CA 95111**

Notwithstanding anything to the contrary set forth in the Note, Rider and Security Instrument, Lender and Borrower hereby acknowledge and agree to the following.

2.  **INTEREST**
    **(A) Interest Rate**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid. Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) of the Note, I will pay interest at a yearly rate of **7.375%**. Thereafter, I will pay interest at a yearly rate of **1.500%**, until the first Interest Change Date (as defined in Section 2(B) of the Note).

    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

All other provisions of the Note, Rider and Security Instrument are unchanged by this Addendum and remain in full force and effect.

_____ (Seal)      _____ (Seal)
Carlos H. Perez          -Borrower   Norma C. Perez          -Borrower

_____ (Seal)      _____ (Seal)
                         -Borrower                            -Borrower

Interim Interest Rider to Adjustable Rate Rider and Mortgage, Deed of Trust or Deed to Secure Debt
GreenPoint Mortgage Funding                    Page 1 of 1                    H61002MU 12/05
March 2, 2006



G  P  M  W  D  0  2  0  2  8  0  6  0  2  2  1  4  0

Loan Number: 0202806022

# ADJUSTABLE RATE RIDER
# (Monthly Treasury Average Index - Payment and Rate Caps)

MIN: 100013802028060228

THIS ADJUSTABLE RATE RIDER is made this 2nd day of **March, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **GreenPoint Mortgage Funding, Inc.** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**551 Loumena Lane, San Jose, CA 95111**
*[Property Address]*

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE BORROWER'S MONTHLY PAYMENT INCREASES MAY BE LIMITED AND THE INTEREST RATE INCREASES ARE LIMITED.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

---

Multistate Adjustable Rate Rider (Monthly Treasury Average Index)— Single Family--Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                    Page 1 of 4                    Modified Form 3112
                                                                    Modified By GreenPoint Mortgage Funding H94686MU 06/05

March 2, 2006



G P M W D 0 2 0 2 8 0 6 0 2 2 1 1 7

**2.    INTEREST**
    **(A)    Interest Rate**
    Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of **1.500%**.  The interest rate I will pay may change.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.
    **(B)    Interest Change Dates**
    The interest rate I will pay may change on the first day of May, **2006**, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Change Date."
    The new rate of interest will become effective on each Interest Change Date.
    **(C)    Interest Rate Limit**
    My interest rate will never be greater than **12.000%**.
    **(D)    The Index**
    Beginning with the first Interest Change Date, my interest rate will be based on an Index.  The "Index" is the Twelve Month Average of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields").  The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
    The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.  The Note Holder will give me notice of this choice.
    **(E)    Calculation of Interest Rate Changes**
    Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **Three and 500/1000ths** percentage points (**3.500%**) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limit stated in Section 2(C) above, the rounded amount will be my new interest rate until the next Interest Change Date.

**3.    PAYMENTS**
    **(A)    Time and Place of Payments**
    I will pay principal and interest by making a payment every month.
    I will make my monthly payments on the first day of each month beginning on **May 1, 2006**.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on April 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
    I will make my monthly payments at **P.O. Box 79363, City of Industry, CA 91716-9363** or at a different place if required by the Note Holder.
    **(B)    Amount of My Initial Monthly Payments**
    Each of my initial monthly payments will be in the amount of U.S. **$1,822.24**.  This amount may change.

---

Multistate Adjustable Rate Rider (Monthly Treasury Average Index)— Single Family--Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                  Page 2 of 4                        Modified Form 3112
                                                         Modified By GreenPoint Mortgage Funding H94686MU 06/05

March 2, 2006



GPMWD0202806022117

**(C)    Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the 1st day of May, 2007, and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment will also change at any time Section 3(F) or 3(G) below requires me to pay the Full Payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)    Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." The Note Holder will then calculate the amount of my monthly payment due the month preceding the Payment Change Date multiplied by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, I may choose to pay the Limited Payment.

**(E)    Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

**(F)    Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred ten percent (110%) of the Principal amount I originally borrowed. My unpaid principal could exceed that maximum amount due to the Limited Payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount which would be sufficient to repay my then unpaid principal in full on the Maturity Date at my current interest rate in substantially equal payments.

**(G)    Required Full Payment**

On  May 1, 2011 and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again.  I will also begin paying the Full Payment as my monthly payment on the final Payment Change Date.

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.**  If all or any part of the Property or any Interest in the property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.

Multistate Adjustable Rate Rider (Monthly Treasury Average Index)— Single Family--Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                      Page 3 of 4                               Modified Form 3112
                                                                    Modified By GreenPoint Mortgage Funding H94686MU 06/05

March 2, 2006



G P M W D 0 2 0 2 8 0 6 0 2 2 1 1 7

However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Carlos H. Perez                 -Borrower

_____ (Seal)
Norma C. Perez                  -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

[Sign      Original
Only]

Multistate Adjustable Rate Rider (Monthly Treasury Average Index)— Single Family--Freddie Mac UNIFORM INSTRUMENT
GreenPoint Mortgage Funding                    Page 4 of 4                    Modified Form 3112
                                                        Modified By GreenPoint Mortgage Funding H94686MU 06/05
March 2, 2006



G P M W D 0 2 0 2 8 0 6 0 2 2 1 1 7

Loan Number: 0202806022

# OCCUPANCY RIDER TO MORTGAGE/
# DEED OF TRUST/SECURITY DEED

THE OCCUPANCY RIDER is made this 2nd day of **March, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to **GreenPoint Mortgage Funding, Inc.** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**551 Loumena Lane, San Jose, CA 95111**
**("Property Address")**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1. That the above-described property will be personally occupied by the Borrower as their principal residence within 60 days after the execution of the Security Instrument and Borrower shall continue to occupy the property as their principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld.

2. That if residency is not established as promised above as well as in the Security Instrument, the Lender may, without further notice, take any or all of the following actions:

   a. increase the interest rate on the Note by one-half of one percent (0.500%) per annum on a fixed-rate loan or increase the Margin on an Adjustable Rate Note by one-half of one percent (0.500%) per annum and to adjust the principal and interest payments to the amount required to pay the loan in full within the remaining term; and/or

   b. charge a non-owner occupancy rate adjustment fee of two percent (2.00%) of the original principal balance and/or

   c. require payment to reduce the unpaid principal balance of the loan to the lesser of (1) 70% of the purchase price of the property or (2) 70% of the appraised value at the time the loan was made. The reduction of the unpaid principal balance shall be due and payable within thirty (30) days following receipt of a written demand for payment, and if not paid within thirty (30) days will constitute a default under the terms and provisions of the Note and Security Instrument, and/or

---

G P M W D 0 2 0 2 8 0 6 0 2 2 1 1 7

    d.  declare a default under the terms of the Note and Security Instrument and begin foreclosure proceedings, which may result in the sale of the above-described property; and/or

    e.  refer what is believed to be fraudulent acts to the proper authorities for prosecution. It is a federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements or reports for the purpose of influencing in any way the action of the Lender in granting a loan on the above property under the provisions of TITLE 18, UNITED STATES CODE, SECTIONS 1010 AND 1014.

It is further understood and agreed that any forbearance by the Lender in exercising any right or remedy given here, or by applicable law, shall not be a waiver of such right or remedy.

Should any clause, section or part of this Occupancy Rider be held or declared to be void or illegal for any reason, all other clauses, sections or parts of this Occupancy Rider which can be effected without such illegal clause, section or part shall nevertheless continue in full force and effect.

It is further specifically agreed that the Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies set forth above, including but not limited to, reasonable attorney's fees.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Occupancy Rider.

_____ (Seal)
Carlos H. Perez                    -Borrower

_____ (Seal)
Norma C. Perez                     -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

Occupancy Rider to Mortgage/Deed of Trust/Security Deed
GreenPoint Mortgage Funding                    Page 2 of 2                    H74670MU 09/05 Rev. 01/06
March 2, 2006

G P M W D 0 2 0 2 8 0 6 0 2 2 1 1 7

# Exhibit "O"

RECORDING REQUESTED BY
FINANCIAL TITLE COMPANY

**Recording Requested By:**

**GreenPoint Mortgage Funding, Inc.**
*[Company Name]*

**And When Recorded Mail To:**

**GreenPoint Mortgage Funding, Inc.**
*[Company Name]*

*[Name of Natural Person]*

**981 Airway Court, Suite E**
*[Street Address]*

**Santa Rosa, CA, 95403-2049**
*[City, State Zip Code]*

43113307 JF140G   *[Space Above This Line For Recording Data]*



DOCUMENT:   18838196          Pages:   17

Fees  ..        57.00
Taxes  .
Copies..  _____
AMT PAID       57 00

BRENDA DAVIS                        RDE #  010
SANTA CLARA COUNTY RECORDER         3/10/2006
Recorded at the request of          8:00 AM
Financial Title Company

MIN 100013802028062208

# HOME EQUITY LINE OF CREDIT DEED OF TRUST
## Secondary Lien
### (Securing Future Advances)

Borrower has established a line of credit ("Home Equity Line of Credit") with Lender as evidenced by Borrower's Home Equity Line of Credit Agreement and Promissory Note dated the same date as this Security Instrument, and all renewals, extensions, modifications, replacements and substitutions thereof (collectively, the "Agreement"). Lender has agreed to make advances to Borrower under the terms of the Agreement. Such advances shall be of a revolving nature and may be made, repaid and remade from time to time. Borrower and Lender contemplate a series of advances to be secured by this Security Instrument. The total outstanding principal balance owing at any one time under the Agreement (not including charges and collection costs which may be owing from time to time) shall not exceed Sixty Six Thousand and 00/100ths (U.S. $66,000.00) plus interest thereon (the "Credit Limit"). That sum is referred to in the Agreement as the Credit Limit. The entire indebtedness under the Agreement, if not paid earlier, is due and payable on **March 15, 2021** or on such later date as may be permitted by Lender in writing, or at such earlier date in the event such indebtedness is accelerated in accordance with the terms of the Agreement and/or this Security Instrument.

**DEFINITIONS**

Words used in multiple sections of this Security Instrument are defined below and other words are defined in Sections 3, 10, 12, 17, 19, and 20. Certain rules regarding the usage of words used in this Security Instrument are also provided in Section 15.

**(A)**    "**Security Instrument**" means this Home Equity Line of Credit Deed of Trust, which is dated **March 2, 2006,** together with all Riders to this document.

**(B)**    "**Borrower**" is **Carlos H.L Perez and Norma C. Perez, Husband And Wife**
. Borrower is the trustor under this Security Instrument.

G P M W D 0 2 0 2 8 0 6 2 2 0 1 1 7

(C)    "Lender" is GreenPoint Mortgage Funding, Inc..
Lender is a **Corporation** organized and existing under the laws of the State of New York. Lender's address is **100 Wood Hollow Drive, Novato, CA 94945.**

(D)    "Trustee" is **Marin Conveyancing Corp..**

(E)    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F)    "Agreement" means the Home Equity Line of Credit Agreement and Promissory Note signed by Borrower and dated **March 2, 2006.** The Agreement states Lender has agreed to make advances to Borrower under the terms of the Agreement, such advances to be of a revolving nature. The total outstanding principal balance owing at any one time under the Agreement (not including charges and collection costs which may be owing from time to time under the Agreement) not to exceed the Credit Limit of **Sixty Six Thousand  and 00/100ths Dollars (U.S. $66,000.00)** plus interest. Borrower has promised to pay the total outstanding balance in Periodic Payments and to pay the entire debt in full not later than **March 15, 2021.**

(G)    "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)    "Account" means the debt evidenced by the Agreement, plus interest, any other charges due under the Agreement, and all sums due under this Security Instrument, plus interest.

(I)    "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

☐ Adjustable Rate Rider      ☐ Condominium Rider              ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider  ☐ Biweekly Payment Rider
☐ Home Improvement Rider     ☐ Revocable Trust Rider
☒ Other(s) *[specify]* **Occupancy Rider**

(J)    "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)    "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)    "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)    "Escrow Items" means those items that are described in Section 3.

(N)    "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of,



the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O)**    **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Agreement and the Account.

**(P)**    **"Periodic Payment"** means the amount due from Borrower to Lender each month for (i) principal and/or interest under the Agreement, and all late charges and other charges provided herein or authorized by the Agreement, plus (ii) any amounts under Section 3 of this Security Instrument.

**(Q)**    **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to the escrow account requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Agreement and the Account do not qualify as a "federally related mortgage loan" under RESPA.

**(R)**    **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Agreement and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (a) the prompt repayment of the Account evidenced by the Agreement, and all renewals, extensions and modifications of the Agreement, with interest thereon at the rate provided in the Agreement; (b) the payment of all other sums due under the Agreement, with interest thereon at the rate provided in the Agreement, (i) advanced to protect the security of this Security Instrument, (ii) incurred by Lender in connection with the enforcement of its rights under this Security Instrument and/or the Agreement, and/or (iii) required to be paid as set forth herein or in the Agreement; and (c) the performance of Borrower's covenants and agreements under this Security Instrument, the Agreement and any prior mortgage or deed of trust.

For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described real property located in the County                                      of Santa Clara                                      :
                        *[Type of Recording Jurisdiction]*              *[Name of Recording Jurisdiction]*
**As more particularly described in exhibit "A"attached hereto and made a part hereof.**

Assessor's Identification Number: **497-27-086**

which currently has the address of **551 Loumena Lane**

                                                              *[Street]*

**San Jose**                          , California **95111**                          ("Property Address").
              *[City]*                                  *[Zip Code]*

G  P  M  W  D  0  2  0  2  8  0  6  2  2  0  1  1  7

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest and Other Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Agreement and if allowable under Applicable Law, any prepayment charges, late charges and other charges due under the Agreement. Payments due under the Agreement and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Agreement or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Agreement and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

2.  **Application of Payments or Proceeds.** Payments are deemed received by Lender when received at the location designated in the Agreement or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14 or in such manner or location as required under Applicable Law. Except as otherwise described in this Section 2, and as permitted under Applicable Law, all payments accepted and applied by Lender shall be applied to the outstanding Account in the following order of priority: (i) any prepayment charges due under the Agreement and/or this Security Instrument if permitted by Applicable Law; (ii) amounts due under this Security Instrument to secure the amounts advanced under the Account and to protect Lender's security; (iii) any escrow payments under Section 3 of this Security Instrument, if Lender requires such payments; (iv) any late charges; (v) any other fees and charges other than finance charges; (vi) accrued and unpaid finance charges due under the Agreement; and (vii) any unpaid principal balance due under the Agreement.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. To the extent permitted by Applicable Law, voluntary prepayments shall be applied first to any prepayment charges and then as described in the Agreement.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Agreement shall not extend or postpone the due date, or change the amount of the Periodic Payments.

3.  **Funds for Escrow Items.** Subject to Applicable Law, Borrower shall pay to Lender on the days Periodic Payments are due under the Agreement, until the Account is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Agreement, Lender may require that Community Association Dues, Fees,



G P M W D 0 2 0 2 8 0 6 2 2 0 1 1 7

and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section 3. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender the Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 8. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 8 and pay such amount and Borrower shall then be obligated under Section 8 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA to mean the amount by which a current escrow balance falls short of the target balance at the time of escrow analysis, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA to mean the amount of the negative balance in the escrow account, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender. If under Section 21 the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

4. **Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument. Borrower shall pay when due, all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien other than a lien disclosed to Lender in Borrower's application or in any title report Lender obtained which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such



proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with the Agreement, the Account and this Security Instrument, if allowed under Applicable Law.

5.    **Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Agreement.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with the Agreement, the Account and this Security Instrument, either:  (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5, shall be added to the unpaid balance of the Account and interest shall accrue at the rate set forth in the Agreement, from the time it was added to the unpaid balance until it is paid in full.

Subject to Applicable Law, all insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Agreement, up to the amount of the outstanding Account balance.  Lender shall have the right to hold the policies and renewal certificates.  If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices.  If Borrower obtains any form of insurance coverage not otherwise required by Lender, for damage to, or destruction of the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Agreement and the Account, up to the amount of the outstanding Account balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender.  Lender may make proof of loss if not made promptly by Borrower.  Unless Lender and Borrower otherwise agree in writing, and subject to the rights of any holder of a mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds.  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds, and shall be the sole obligation of Borrower.  Subject to the rights of any holder of a mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument, if the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.  Such insurance proceeds shall be applied in the order provided for in Section 2.

If Lender believes that Borrower has abandoned the Property, Lender may file, negotiate and settle any available insurance claim and related matters.  If Borrower does not respond within 30 days to a notice from Lender that the insurance

G  P  M  W  D  0  2  0  2  8  0  6  2  2  0  1  1  7

carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Agreement, the Account or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Subject to the rights of any holder of a mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument, Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Agreement, the Account or this Security Instrument, whether or not then due.

6. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. If the Property is damaged, unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

7. **Borrower's Home Equity Line of Credit Application.** Borrower shall be in default if, during the home equity line of credit application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Agreement, the Account and this Security Instrument. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

8. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which has or may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Lender believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has or may attain priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument if allowed under Applicable Law. These amounts shall bear interest at the rate set forth in the Agreement from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

9. **Mortgage Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Agreement and the Account) for certain losses it may incur if Borrower does not repay the Account as agreed. Borrower is not a party to the Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of entering into the Agreement and establishing the Account, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** The Miscellaneous Proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or any part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument.

If the Property is damaged and if the restoration or repair is economically feasible and Lender's security is not lessened, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

If Lender believes that the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, then Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization, if applicable, of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization, if applicable, of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** When Borrower (as that term is defined above) includes more than one person, Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Agreement (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Agreement without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security

G P M W D 0 2 0 2 8 0 6 2 2 0 1 1 7

Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Account Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, as allowed under Applicable Law, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender shall have the authority to impose additional fees and charges to perform services requested by or on behalf of Borrower, or to otherwise administer and service the Agreement and the Account. The additional fees and charges may include administrative costs incurred by Lender and/or in reimbursement of payments made by Lender to third parties. Such fees and charges may include, without limitation, any and all costs or fees associated with the origination and/or servicing of such Agreement and the Account, document copy or preparation fees, transmittal, facsimile or delivery fees, reconveyance and release fees, property inspections and returned check or insufficient funds charged in connection with payments made by or on behalf of Borrower under the Agreement and all other such fees for ancillary services performed by Lender for Borrower or at Borrower's request or for services necessitated by or resulting from Borrower's default or malfeasance relating to this Security Instrument or the Agreement or incurred by Lender or assessed upon Borrower pursuant to the provisions of this Security Instrument or the Agreement. Such fees and charges shall be secured by this Security Instrument up to the amount of the Credit Limit and, unless Borrower and Lender agree to other terms of payment, shall bear interest from the date assessed by Lender at the rate stated in the Agreement, and in effect from time to time, and shall be payable, with interest, immediately following written demand from Lender to Borrower requesting payment thereof. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law. The absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.

If either the Agreement or the Account is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other charges collected or to be collected in connection with the Agreement and the Account exceed the permitted limits, then: (a) any such charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Agreement or by making a direct payment to Borrower, which Lender may accomplish by reducing the principal owed under the Agreement or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Agreement). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower may have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Agreement conflicts with



G P M W D 0 2 0 2 8 0 6 2 2 0 1 1 7

Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Agreement which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Agreement and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Agreement as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, as allowed under Applicable Law; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of the Agreement and the Account; Change of Loan Servicer; Notice of Grievance.** The Agreement and the Account, or a partial interest in the Agreement and the Account (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Agreement and this Security Instrument and performs other mortgage loan servicing obligations under the Agreement, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Agreement and the Account. If there is a change of the Loan Servicer, if required under Applicable Law, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Agreement and the Account are sold and thereafter the Agreement and the Account are serviced by a Loan Servicer other than the purchaser of the Agreement and the Account, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the purchaser of the Agreement and the Account unless otherwise provided by the purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take



corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 19. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

   **20. Hazardous Substances.** As used in this Section 20: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

   Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

   Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including, but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

   NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

   **21. Events of Default; Acceleration; Remedies.** The occurrence of any one or more of the following events shall, at the election of Lender, constitute an "Event of Default," and shall entitle Lender to terminate the Agreement and the Account and accelerate the indebtedness secured hereby: (a) any Borrower engages in fraud or material misrepresentation, whether by action or omission, in connection with any phase of the Agreement; (b) Borrower fails to meet the repayment terms set forth in the Agreement; or (c) Borrower's action or inaction adversely affects the Property or Lender's security interest, including, but not limited to, Borrower's actions or omissions that constitute "Events of Default" under the Agreement, or Borrower's failure to perform any material covenants or agreements contained in this Security Instrument.

   Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

   If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies



of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

22. **Reconveyance.** Upon request from Borrower and upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes and agreements evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

23. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

24. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

25. **Obligation to Advance.** Lender's obligation to advance funds to Borrower upon and subject to the terms stated in the Agreement after receipt of a Credit Line Check or other request for an advance made in accordance with the Agreement shall be obligatory.

26. **Request for Notice of Default and Sale.** In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any notice of default and a copy of any notice of sale under the deed of trust (or mortgage) recorded _____, in Book _____ page _____ records of Santa Clara County, (or filed for record with recorder's serial number _____, Santa Clara County) California, executed by _____

_____ as trustor (or mortgagor) in which

_____, is named as beneficiary (or mortgagee) and

_____ as trustee

be mailed to Name GreenPoint Mortgage Funding, Inc. at Address 100 Wood Hollow Drive, Novato, CA 94945.

**Notice:** A copy of any notice of default and any notice of sale will be sent only to the address contained in this recorded request. If your address changes, a new request must be recorded.

Signature _____

**REQUEST FOR NOTICE OF DEFAULT**
**AND FORECLOSURE UNDER SUPERIOR**
**MORTGAGES OR DEEDS OF TRUST**

G P M W D 0 2 0 2 8 0 6 2 2 0 1 1 7

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give notice to Lender, at Lender's address set forth on page two of this Security Instrument, of any default under the superior encumbrance and of any sale or other foreclosure action.

──────────── [Signatures on Following Page] ────────────

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____                    _____ (Seal)
                                                    Carlos H. Perez              -Borrower
Printed Name _____                                                   Printed Name
            *(Please Complete)*

NORMA C PEREZ                                        _____ (Seal)
                                                    Norma C. Perez               -Borrower
Printed Name _____                                                   Printed Name
            *(Please Complete)*

                                                    _____ (Seal)
                                                                                 -Borrower
                                                                                 Printed Name

                                                    _____ (Seal)
                                                                                 -Borrower
                                                                                 Printed Name

─────────────── [Space Below This Line For Acknowledgement_____



G P M W D 0 2 0 2 8 0 6 2 2 0 1 1 7

State of _California_                    §
                                         §
County of _Santa Clara_                  §

On _March 2, 2006_ before me, _L. Campos, Notary Public_, personally appeared

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

(Seal)

_L. Campos_
Notary Public                          _[Printed Name]_

My Commission Expires: _Dec. 18, 2008_



```
L. CAMPOS
COMM. # 1538298
NOTARY PUBLIC - CALIFORNIA
CONTRA COSTA
My Comm. Expires DEC. 18, 2008
MFR. 5 B E 1
```

G P M W D 0 2 0 2 8 0 6 2 2 0 1 1 7

43113307 -405 -JF1

### Legal Description

All that certain real property situate in the City of San Jose, County of Santa Clara, State of California, described as follows:

Lot 6, as shown on that certain Map of TRACT NO. 2287, which Map was filed for record in the office of the Recorder of the County of Santa Clara, State of California on February 18, 1960, in Book 117 of Maps, Page 3.

EXCEPTING THEREFROM the underground water or rights thereto, with no right of surface entry, as granted to Valley Title Company of Santa Clara County, a California corporation by Instrument recorded March 3, 1960 in Book 4715, Page 466, Official Records.

**497-27-086**

Loan Number: 0202806220

# OCCUPANCY RIDER TO MORTGAGE/
# DEED OF TRUST/SECURITY DEED

THE OCCUPANCY RIDER is made this 2nd day of **March, 2006**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to **GreenPoint Mortgage Funding, Inc.** (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**551 Loumena Lane, San Jose, CA 95111**
("Property Address")

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

1.  That the above-described property will be personally occupied by the Borrower as their principal residence within 60 days after the execution of the Security Instrument and Borrower shall continue to occupy the property as their principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld.
2.  That if residency is not established as promised above as well as in the Security Instrument, the Lender may, without further notice, take any or all of the following actions:
    a.  increase the interest rate on the Note by one-half of one percent (0.500%) per annum on a fixed-rate loan or increase the Margin on an Adjustable Rate Note by one-half of one percent (0.500%) per annum and to adjust the principal and interest payments to the amount required to pay the loan in full within the remaining term; and/or
    b.  charge a non-owner occupancy rate adjustment fee of two percent (2.00%) of the original principal balance and/or
    c.  require payment to reduce the unpaid principal balance of the loan to the lesser of (1) 70% of the purchase price of the property or (2) 70% of the appraised value at the time the loan was made. The reduction of the unpaid principal balance shall be due and payable within thirty (30) days following receipt of a written demand for payment, and if not paid within thirty (30) days will constitute a default under the terms and provisions of the Note and Security Instrument, and/or

---

Occupancy Rider to Mortgage/Deed of Trust/Security Deed
GreenPoint Mortgage Funding                     **Page 1 of 2**                     H74670MU 09/05 Rev. 01/06
March 2, 2006



G P M W D 0 2 0 2 8 0 6 2 2 0 1 1 7

d. declare a default under the terms of the Note and Security Instrument and begin foreclosure proceedings, which may result in the sale of the above-described property; and/or

e. refer what is believed to be fraudulent acts to the proper authorities for prosecution. It is a federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements or reports for the purpose of influencing in any way the action of the Lender in granting a loan on the above property under the provisions of TITLE 18, UNITED STATES CODE, SECTIONS 1010 AND 1014.

It is further understood and agreed that any forbearance by the Lender in exercising any right or remedy given here, or by applicable law, shall not be a waiver of such right or remedy.

Should any clause, section or part of this Occupancy Rider be held or declared to be void or illegal for any reason, all other clauses, sections or parts of this Occupancy Rider which can be effected without such illegal clause, section or part shall nevertheless continue in full force and effect.

It is further specifically agreed that the Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies set forth above, including but not limited to, reasonable attorney's fees.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Occupancy Rider.



| | (Seal) | | (Seal) |
|---|---|---|---|
| Carlos H. Perez | -Borrower | Norma C. Perez | -Borrower |
| | (Seal) | | (Seal) |
| | -Borrower | | -Borrower |

Occupancy Rider to Mortgage/Deed of Trust/Security Deed
GreenPoint Mortgage Funding                      Page 2 of 2                      H74670MU 09/05 Rev. 01/06
March 2, 2006

G P M W D 0 2 0 2 8 0 6 2 2 0 1 1 7

# Exhibit "P"

# TRUTH IN LENDING DISCLOSURE STATEMENT
## (RESPA Transactions)

DATE:      **March 2, 2006**
CREDITOR:  **GreenPoint Mortgage Funding, Inc.**                        **Loan Number: 0202806022**
PROPERTY: **551 Loumena Lane, San Jose, CA 95111**

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br>The total cost of your purchase on credit, including your downpayment of<br>$ N/A |
|---|---|---|---|---|
| 7.408 % | $ 887,961.26 | $ 520,853.00 | $ 1,408,814.26 | $ N/A |

Your Monthly payment schedule will be:

| Number of Payments | Amount of Payments | When payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 1 | 1,822.24 | 05/01/2006 | | | | | | |
| 11 | 1,822.24 | 06/01/2006 | | | | | | |
| 12 | 1,958.91 | 05/01/2007 | | | | | | |
| 12 | 2,105.83 | 05/01/2008 | | | | | | |
| 3 | 2,263.77 | 05/01/2009 | | | | | | |
| 320 | 4,147.60 | 08/01/2009 | | | | | | |
| 1 | 4,147.19 | 04/01/2036 | | | | | | |

**Construction Loan:** ☐ If checked, this loan provides for interest-only payments during the construction period. Beginning you will make periodic interest-only payments during the construction period, followed by payments of principal and interest as scheduled above.

**Variable Rate:** ☒ If checked, this loan contains a variable rate feature. ☒ Disclosures about the variable rate feature were provided to you earlier. ☐ Disclosures about the variable rate feature are provided in the attached Variable Rate Disclosure Addendum.

**Assumption:** Someone buying your property ☐ cannot, unless otherwise provided by federal law, ☒ may, subject to conditions, be allowed to assume the remainder of the loan on the original terms.

**Security:** You are giving a security interest in: **551 Loumena Lane, San Jose, CA 95111**
☐ the property being purchased ☒ your property.

**Late Charge:** If a payment is not received by the end of **10** days after the date it is due, you will be charged **6.000** % of the overdue ☒ payment ☐ payment of principal and interest, but not less than U.S. **$ 5.00** and not more than U.S. **$ 109.33**.

**Prepayment:** If you pay this loan early you ☒ may ☐ will not have to pay a penalty. ☐ If you pay off an FHA insured loan, on a date other than the regular installment date, you may be assessed interest charges until the end of the month. You ☐ may be or ☒ will not be entitled to a refund of part of the finance charge.

**Deposit:** ☐ If checked, the annual percentage rate does not take into account your required deposit.

**Demand:** ☐ If checked, this loan has a demand feature.

See your contract documents for any additional information about non-payment, default, any required payment in full before the scheduled date, and any prepayment refunds.

3/2/2006 3:33:23 PM

Truth In Lending Disclosure Statement (RESPA Transactions) (Multistate)
GreenPoint Mortgage Funding                    **Page 1 of 2**                   GF01001MU 06/03

G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 9

**Property Insurance:**  Property insurance is required on this loan. Flood insurance may be required if the property is located in an area designated as an area having special flood hazards. You may obtain property insurance and, if required, flood insurance from anyone you want that is acceptable to Creditor.

**Credit Insurance**  Credit life insurance and/or credit disability insurance:

☒ is not required to obtain credit from Creditor and will not be provided by Creditor.

☐ is not required to obtain credit from Creditor, but will be provided by Creditor if you request the insurance and agree to pay the additional cost by signing below next to the coverage you want. No such insurance will be in force until the terms of your insurance contract have been fulfilled.

☐ is required to obtain credit from Creditor, but will not be provided by Creditor.

☐ is required to obtain credit from Creditor and will be provided by Creditor, as shown below.

| Type | Premium | Term | Signatures(s) |
|---|---|---|---|
| Single/Joint Credit Life | $ | mos. | I/We want credit life insurance at the stated premium _____ |
| Single/Joint Credit Disability | $ | mos. | I/We want credit disability insurance at the stated premium _____ |
| Single Credit Life and Disability | $ | mos. | I/We want credit life and disability insurance at the stated premium _____ |

**Filing Fee: $  45.00**                    (e)

"e" means estimate

☒ all dates and numerical disclosures except the late payment disclosures are estimates.

The undersigned hereby acknowledge receipt of a completed copy of this Disclosure, a Good Faith Estimate of Settlement Charges, and if this loan has a Variable Rate feature, a copy of an Adjustable/Variable Rate Loan Program Disclosure along with a copy of The Consumer Handbook on Adjustable Rate Mortgages (Charm Booklet) on or before the date an application form was furnished or on or before the payment of a non-refundable fee, whichever is earlier, unless the application reached Creditor by telephone or by way of an intermediary agent or broker. In that event the disclosure was placed in the mail or delivered not later than three (3) business days after the Creditor received the application. The undersigned further acknowledge receipt of a copy of this Disclosure for keeping prior to consummation.

_____
**Carlos H. Perez**                    (Borrower)

_____
**Norma C. Perez**                    (Borrower)

_____
(Borrower)

_____
(Borrower)

**NOTE:  Payments shown above do not include reserve deposits for taxes, property or flood insurance.**




GPMWD020280602214 9

# PREPAID FINANCE CHARGES
# AND AMOUNT FINANCED

**Creditor:**
GreenPoint Mortgage Funding, Inc.
100 Wood Hollow Drive
Novato, CA 94945

**Borrower(s):**
Carlos H. Perez and Norma C. Perez

**Property Address:**
551 Loumena Lane
San Jose, CA 95111

**Mailing Address:**
551 Loumena Lane
San Jose, CA 95111 USA

**Loan Number:** 0202806022

**Sales Price:** $ 0.00

**Date of Documents:** March 02, 2006

**Loan Amount:** $ 528,000.00

**Estimated Settlement Date:** April 01, 2006
**First Payment Date:** May 01, 2006

**Interest Rate:** 1.500

**LOAN AMOUNT:**                                          528,000.00

**LESS PREPAID FINANCE CHARGES:**                          7,147.00

| HUD-1 Item No. | Service/Provider | Estimated Charges |
|---|---|---|
| 0801 | Origination Fee to Broker * | 2,640.00 |
| 0806 | Redraw Fee to GPM* | 250.00 |
| 0811 | Tax Service Fee* | 79.00 |
| 0814 | Process/Admin Fee to Broker* | 760.00 |
| 0815 | Flood Certification Fee* | 11.00 |
| 0816 | Underwriting Fee to GPM* | 250.00 |
| 0901 | Prepaid Interest* | 2,667.00 |
| 1101 | Settlement/Closing Fee | 300.00 |
| 1115 | Payoff/Recnvy/Release | 90.00 |
| 1302 | Courier Fee to Settlemnt Agent | 75.00 |
| 1303 | Wire Fee to Settlement Agent | 25.00 |

**EQUALS AMOUNT FINANCED:**                                520,853.00

FOR INTERNAL AUDITING PURPOSES ONLY.

**Index (if ARM):** 3.888

**Fully Indexed Rate:** 7.388

Prepaid Finance Charges and Amount Financed (Multistate)

— THE COMPLIANCE SOURCE, INC. —

www.compliancesource.com

(page 1 of 1 pages)
02008MU 08/99
©1999, All Rights Reserved



G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 9

# TRUTH IN LENDING DISCLOSURE STATEMENT
## (RESPA Transactions)

DATE:        **March 2, 2006**
CREDITOR:  **GreenPoint Mortgage Funding, Inc.**                    **Loan Number: 0202806022**
PROPERTY: **551 Loumena Lane, San Jose, CA 95111**

| ANNUAL PERCENTAGE RATE  The cost of your credit as a yearly rate. | FINANCE CHARGE  The dollar amount the credit will cost you. | Amount Financed  The amount of credit provided to you or on your behalf. | Total of Payments  The amount you will have paid after you have made all payments as scheduled. | Total Sale Price  The total cost of your purchase on credit, including your downpayment of $ N/A |
|---|---|---|---|---|
| 7.408 % | $ 887,961.26 | $ 520,853.00 | $ 1,408,814.26 | $ N/A |

Your Monthly payment schedule will be:

| Number of Payments | Amount of Payments | When payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due | Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| 1 | 1,822.24 | 05/01/2006 | | | | | | |
| 11 | 1,822.24 | 06/01/2006 | | | | | | |
| 12 | 1,958.91 | 05/01/2007 | | | | | | |
| 12 | 2,105.83 | 05/01/2008 | | | | | | |
| 3 | 2,263.77 | 05/01/2009 | | | | | | |
| 320 | 4,147.60 | 08/01/2009 | | | | | | |
| 1 | 4,147.19 | 04/01/2036 | | | | | | |

**Construction Loan:** ☐ If checked, this loan provides for interest-only payments during the construction period. Beginning you will make periodic interest-only payments during the construction period, followed by payments of principal and interest as scheduled above.

**Variable Rate:** ☒ If checked, this loan contains a variable rate feature. ☒ Disclosures about the variable rate feature were provided to you earlier. ☐ Disclosures about the variable rate feature are provided in the attached Variable Rate Disclosure Addendum.

**Assumption:** Someone buying your property ☐ cannot, unless otherwise provided by federal law, ☒ may, subject to conditions, be allowed to assume the remainder of the loan on the original terms.

**Security:** You are giving a security interest in: **551 Loumena Lane, San Jose, CA 95111** ☐ the property being purchased ☒ your property.

**Late Charge:** If a payment is not received by the end of **10** days after the date it is due, you will be charged **6.000** % of the overdue ☒ payment ☐ payment of principal and interest, but not less than U.S. $ **5.00** and not more than U.S. $ **109.33**.

**Prepayment:** If you pay this loan early you ☒ may ☐ will not have to pay a penalty. ☐ If you pay off an FHA insured loan, on a date other than the regular installment date, you may be assessed interest charges until the end of the month. You ☐ may be or ☒ will not be entitled to a refund of part of the finance charge.

**Deposit:** ☐ If checked, the annual percentage rate does not take into account your required deposit.

**Demand:** ☐ If checked, this loan has a demand feature

See your contract documents for any additional information about non-payment, default, any required payment in full before the scheduled date, and any prepayment refunds.

3/2/2006 3:33:23 PM

Truth In Lending Disclosure Statement (RESPA Transactions) (Multistate)
GreenPoint Mortgage Funding                                  Page 1 of 2                                  GP02001MU 06/03

G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 9

**Property Insurance:** Property insurance is required on this loan. Flood insurance may be required if the property is located in an area designated as an area having special flood hazards. You may obtain property insurance and, if required, flood insurance from anyone you want that is acceptable to Creditor.

**Credit Insurance** Credit life insurance and/or credit disability insurance:

☒ is not required to obtain credit from Creditor and will not be provided by Creditor.

☐ is not required to obtain credit from Creditor, but will be provided by Creditor if you request the insurance and agree to pay the additional cost by signing below next to the coverage you want. No such insurance will be in force until the terms of your insurance contract have been fulfilled.

☐ is required to obtain credit from Creditor, but will not be provided by Creditor.

☐ is required to obtain credit from Creditor and will be provided by Creditor, as shown below.

| Type | Premium | Term | Signatures(s) |
|---|---|---|---|
| Single/Joint Credit Life | $ | mos. | I/We want credit life insurance at the stated premium _____ |
| Single/Joint Credit Disability | $ | mos. | I/We want credit disability insurance at the stated premium _____ |
| Single Credit Life and Disability | $ | mos. | I/We want credit life and disability insurance at the stated premium _____ |

**Filing Fee: $ 45.00**                    (e)

"e" means estimate

☐ all dates and numerical disclosures except the late payment disclosures are estimates.

The undersigned hereby acknowledge receipt of a completed copy of this Disclosure, a Good Faith Estimate of Settlement Charges, and if this loan has a Variable Rate feature, a copy of an Adjustable/Variable Rate Loan Program Disclosure along with a copy of The Consumer Handbook on Adjustable Rate Mortgages (Charm Booklet) on or before the date an application form was furnished or on or before the payment of a non-refundable fee, whichever is earlier, unless the application reached Creditor by telephone or by way of an intermediary agent or broker. In that event the disclosure was placed in the mail or delivered not later than three (3) business days after the Creditor received the application. The undersigned further acknowledge receipt of a copy of this Disclosure for keeping prior to consummation.

_____
**Carlos H. Perez**                    (Borrower)

_____
**Norma C. Perez**                    (Borrower)

_____
(Borrower)

_____
(Borrower)

**NOTE: Payments shown above do not include reserve deposits for taxes, property or flood insurance.**




G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 9

# PREPAID FINANCE CHARGES
# AND AMOUNT FINANCED

**Creditor:**
GreenPoint Mortgage Funding, Inc.
100 Wood Hollow Drive
Novato, CA 94945

**Property Address:**
551 Loumena Lane
San Jose, CA 95111

**Loan Number:** 0202806022

**Date of Documents:** March 02, 2006

**Estimated Settlement Date:** April 01, 2006
**First Payment Date:** May 01, 2006

**Borrower(s):**
Carlos H. Perez and Norma C. Perez

**Mailing Address:**
551 Loumena Lane
San Jose, CA 95111 USA

**Sales Price:** $ 0.00

**Loan Amount:** $ 528,000.00

**Interest Rate:** 1.500

**LOAN AMOUNT:**                                     528,000.00

**LESS PREPAID FINANCE CHARGES:**                      7,147.00

| HUD-1 Item No.      Service/Provider | Estimated Charges |
|---|---|
| 0801 Origination Fee to Broker * | 2,640.00 |
| 0806 Redraw Fee to GPM* | 250.00 |
| 0811 Tax Service Fee* | 79.00 |
| 0814 Process/Admin Fee to Broker* | 760.00 |
| 0815 Flood Certification Fee* | 11.00 |
| 0816 Underwriting Fee to GPM* | 250.00 |
| 0901 Prepaid Interest* | 2,667.00 |
| 1101 Settlement/Closing Fee | 300.00 |
| 1115 Payoff/Recnvy/Release | 90.00 |
| 1302 Courier Fee to Settlemnt Agent | 75.00 |
| 1303 Wire Fee to Settlement Agent | 25.00 |

**EQUALS AMOUNT FINANCED:**                           520,853.00

FOR INTERNAL AUDITING PURPOSES ONLY.

**Index (if ARM):** 3.888                **Fully Indexed Rate:** 7.388

Prepaid Finance Charges and Amount Financed (Multistate)

—— THE COMPLIANCE SOURCE, INC. ——

www.compliancesource.com

(page 1 of 1 pages)
02008MU 08/99
©1999, All Rights Reserved



G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 9

# Exhibit "Q"

**Loan Number: 0202806022**

# NOTICE OF RIGHT TO CANCEL

**Your Right to Cancel.** You are entering into a transaction that will result in a mortgage, lien or security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three (3) business days from whichever of the following events occurs last:

(1)    the date of the transaction, which is; _____; or
(2)    the date you received your Truth in Lending disclosures; or
(3)    the date you received this Notice of Right to Cancel.

If you cancel the transaction, the mortgage, lien or security interest is also canceled. Within twenty (20) calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on/in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within twenty (20) calendar days of your offer, you may keep it without further obligation.

**How To Cancel.** If you decide to cancel this transaction, you may do so by notifying us in writing, at:
**GreenPoint Mortgage Funding, Inc.**
**Attn: Rescission Processing**
**100 Wood Hollow Drive**
**Novato, CA 94945**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one (1) copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of, _____,
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I Wish To Cancel.**

_____         Date: _____
(Consumer)

**Receipt of Notice.** I hereby acknowledge that the transaction identified on the face of this Notice was consummated and that I have received one (1) copy of the Federal Truth in Lending Disclosure and two (2) copies of this Notice.

**Do not sign unless the dates in the boxes are completed.**

_____
**Carlos H.L Perez**                              (Consumer)

---



G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 6

**Loan Number: 0202806022**

# NOTICE OF RIGHT TO CANCEL

**Your Right to Cancel.** You are entering into a transaction that will result in a mortgage, lien or security interest on/in your home. You have a legal right under federal law to cancel this transaction, without cost, within three (3) business days from whichever of the following events occurs last:

(1)   the date of the transaction, which is; [                    ]; or
(2)   the date you received your Truth in Lending disclosures; or
(3)   the date you received this Notice of Right to Cancel.

If you cancel the transaction, the mortgage, lien or security interest is also canceled. Within twenty (20) calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on/in your home has been canceled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within twenty (20) calendar days of your offer, you may keep it without further obligation.

**How To Cancel.** If you decide to cancel this transaction, you may do so by notifying us in writing, at:
**GreenPoint Mortgage Funding, Inc.**
**Attn: Rescission Processing**
**100 Wood Hollow Drive**
**Novato, CA 94945**

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one (1) copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of, [                    ],
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I Wish To Cancel.**

_____         Date: _____
(Consumer)

**Receipt of Notice.** I hereby acknowledge that the transaction identified on the face of this Notice was consummated and that I have received one (1) copy of the Federal Truth in Lending Disclosure and two (2) copies of this Notice.

**Do not sign unless the dates in the boxes are completed.**

_____
**Norma C. Perez**                          (Consumer)

---

Notice of Right to Cancel (H8) (Multistate)
GreenPoint Mortgage Funding                        Page 1 of 1                        H802201MU 12/97 Rev. 05/04



G P M W D 0 2 0 2 8 0 6 0 2 2 1 4 6

# Exhibit "R"

Loan Number: 0202806220

# NOTICE OF RIGHT TO CANCEL
# (Open-End Credit - When Opening an Account)

**1.  Your Right to Cancel.** We have agreed to establish an open-end credit account for you, and you have agreed to give us a mortgage, lien or security interest on/in your home as security for the account. You have a legal right under federal law to cancel the account, without cost, within three (3) business days from whichever of the following events occurs last:

    (1)    the date of the transaction, which is; | **February 09, 2006** |;.or
    (2)    the date you received your Truth-in-Lending disclosures; or
    (3)    the date you received this notice of your right to cancel the account.

    If you cancel the account, the mortgage, lien or security interest on/in your home is also cancelled. Within twenty (20) days of receiving your notice, we must take the necessary steps to reflect the fact that the mortgage, lien or security interest on/in your home has been cancelled. We must return to you any money or property you have given to us or to anyone else in connection with the account.

    You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address shown below. If we do not take possession of the money or property within twenty (20) days of your offer, you may keep it without further obligation.

**2.  How To Cancel.** If you decide to cancel the account you may do so by notifying us in writing, at:
**GreenPoint Mortgage Funding, Inc.**
**Attn: Rescission Processing**
**100 Wood Hollow Drive**
**Novato, CA 94945**
    You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one (1) copy of this notice no matter how you notify us because it contains important information about your rights.

    If you cancel by mail or telegram, you must send the notice no later than midnight of | **February 13, 2006** | , (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I Wish To Cancel.**

_____    Date: _____
           (Consumer)

**3.  Receipt of Notice.** The undersigned hereby represents and warrants that I have an ownership interest in the property. I hereby acknowledge that the transaction identified on the face of this Notice was consummated and that I have received one (1) copy of the federal Truth in Lending disclosure and two (2) copies of this Notice on the date my signature on the Security Instrument was acknowledged.

**Do not sign unless the dates in the boxes in Paragraphs 1 and 2 are completed.**

_____
    **Carlos H. Perez**           (Consumer)

Loan Number: 0202806220

# NOTICE OF RIGHT TO CANCEL
# (Open-End Credit - When Opening an Account)

**1.   Your Right to Cancel.** We have agreed to establish an open-end credit account for you, and you have agreed to give us a mortgage, lien or security interest on/in your home as security for the account. You have a legal right under federal law to cancel the account, without cost, within three (3) business days from whichever of the following events occurs last:

    (1)   the date of the transaction, which is;   | **February 09, 2006**            |;.or
    (2)   the date you received your Truth-in-Lending disclosures; or
    (3)   the date you received this notice of your right to cancel the account.

    If you cancel the account, the mortgage, lien or security interest on/in your home is also cancelled. Within twenty (20) days of receiving your notice, we must take the necessary steps to reflect the fact that the mortgage, lien or security interest on/in your home has been cancelled. We must return to you any money or property you have given to us or to anyone else in connection with the account.

    You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address shown below. If we do not take possession of the money or property within twenty (20) days of your offer, you may keep it without further obligation.

**2.   How To Cancel.** If you decide to cancel the account you may do so by notifying us in writing, at:
**GreenPoint Mortgage Funding, Inc.**
**Attn: Rescission Processing**
**100 Wood Hollow Drive**
**Novato, CA 94945**
    You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one (1) copy of this notice no matter how you notify us because it contains important information about your rights.

    If you cancel by mail or telegram, you must send the notice no later than midnight of | **February 13, 2006**            | , (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I Wish To Cancel.**

_____          Date: _____
              (Consumer)

**3.   Receipt of Notice.** The undersigned hereby represents and warrants that I have an ownership interest in the property. I hereby acknowledge that the transaction identified on the face of this Notice was consummated and that I have received one (1) copy of the federal Truth in Lending disclosure and two (2) copies of this Notice on the date my signature on the Security Instrument was acknowledged.

**Do not sign unless the dates in the boxes in Paragraphs 1 and 2 are completed.**

_____
  Norma C. Perez                 (Consumer)



G P M W D 0 2 0 2 8 0 6 2 2 0 1 4 6

# Exhibit "S"

# CONSUMER LAW CENTER, INC.

Fred W. Schwinn
fred.schwinn@sjconsumerlaw.com

12 South First Street, Suite 1014
San Jose, CA  95113-2418

(408) 294-6100
Fax (408) 294-6190

March 24, 2008

GMAC Mortgage, LLC
c/o Corporation Service Company, Agent for Service
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA  95833-3503

**CERTIFIED MAIL**
**7007 0710 0001 0498 7032**

GMAC Mortgage, LLC
100 Witmer Road
Horsham, PA  19044-2211

**CERTIFIED MAIL**
**7007 0710 0000 0498 7025**

GMAC Mortgage, LLC
P.O. Box 780
Waterloo, IA  50704-0780

**CERTIFIED MAIL**
**7007 0710 0000 0498 6752**

Mortgage Electronic Registration System, Inc.
P.O. Box 2026
Flint, MI  48501-2026

**CERTIFIED MAIL**
**7007 0710 0001 0498 6745**

Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, CA  91504-3120

**CERTIFIED MAIL**
**7007 0710 0001 0498 6738**

Greenpoint Mortgage Funding, Inc.
c/o Corporation Service Company, Agent for Service
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA  95833-3503

**CERTIFIED MAIL**
**7007 0710 0001 0498 6721**

Greenpoint Mortgage Funding, Inc.
100 Wood Hollow Drive
Novato, CA  94945-1434

**CERTIFIED MAIL**
**7007 0710 0001 0498 6691**

Re:     Carlos H.L. Perez
        551 Loumena Lane
        San Jose, California  95111-2246
        GreenPoint Loan No. 020806022
        GMAC Loan No. 0307677203

Dear Sir/Madam:

This office represents Carlos H.L. Perez concerning the above referenced loan transaction which he and his wife entered into with Greenpoint Funding, Inc., on or about March 2, 2006.  We have been

- 1 -

authorized by our client to rescind this transaction and hereby exercise that right pursuant to the Federal Truth in Lending Act (TILA), 15 U.S.C. § 1635(i)(1)(B) and Regulation Z, 12 C.F.R. § 226.23(h)(1)(ii).

Greenpoint Funding, Inc., failed the provide the TILA disclosures to our client or the TILA disclosures provided to our client failed to meet the requirements of the Federal Truth in Lending Act and Regulation Z in the following respects:

(a)   Our client was not provided the disclosures that are required by the Federal Truth in Lending Act, 15 U.S.C. § 1635(a) and Regulation Z, 12 C.F.R. § 226.23(b)(1)(v), in that our client was not provided with two properly completed copies of the Notice of Right to Cancel disclosure in a credit transaction in which a security interest was retained or acquired in our client's principal dwelling.

It appears that GMAC Mortgage, LLC, is a successor in interest to the Deed of Trust which secures the subject consumer transaction.  As a successor in interest of the Deed of Trust once owned by Greenpoint Funding, Inc., we hereby demand that GMAC Mortgage, LLC, take any action necessary to reflect the termination of the security interest in our client's principal dwelling.  As a result of the above described violations of the Truth in Lending Act and Regulation Z, the security interest held by Greenpoint Funding, Inc., and/or GMAC Mortgage, LLC, is void upon our client's rescission.  See 15 U.S.C. § 1635 and 12 C.F.R. § 226.23.  Pursuant to the TILA and Regulation Z, you have twenty days after receipt of this notice of rescission to return to our client all monies paid and to take action necessary or appropriate to reflect termination of the security interest on our client's principal dwelling.

Please be advised that if you do not cancel the security interest and return all consideration paid by our client you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

Very Truly Yours,

Fred W. Schwinn

cc:    Carlos H.L. Perez



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

FLINT MI 48501

| | | 0012 |
|---|---|---|
| Postage | $0.41 | |
| Certified Fee | $2.65 | 09 |
| Return Receipt Fee (Endorsement Required) | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $5.21 | 03/24/2008 |

7007 0710 0001 0498 6745

Sent To MORTGAGE ELECTRONIC Reg Sys
Street, Apt. No.; or PO Box No. BOX 2026
City, State, ZIP+4 FLINT, MI 48501-2026

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

SACRAMENTO CA 95833

| | | 0012 |
|---|---|---|
| Postage | $0.41 | |
| Certified Fee | $2.65 | 09 |
| Return Receipt Fee (Endorsement Required) | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $5.21 | 03/24/2008 |

7007 0710 0001 0498 7032

Sent To GMAC MORTGAGE, LLC
Street, Apt. No.; or PO Box No. 100 GATEWAY OAKS DR #100
City, State, ZIP+4 SACRAMENTO, CA 95833-3503

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

BURBANK CA 91504

| | | 0012 |
|---|---|---|
| Postage | $0.41 | |
| Certified Fee | $2.65 | 09 |
| Return Receipt Fee (Endorsement Required) | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $5.21 | 03/24/2008 |

7007 0710 0001 0498 6738

Sent To EXECUTIVE TRUSTEE SERVICE LLC
Street, Apt. No.; or PO Box No. 2255 NORTH ONTARIO St #400
City, State, ZIP+4 BURBANK, CA 91504-3120

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

HORSHAM PA 19044

| | | 0012 |
|---|---|---|
| Postage | $0.41 | |
| Certified Fee | $2.65 | 09 |
| Return Receipt Fee (Endorsement Required) | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $5.21 | 03/24/2008 |

7007 0710 0001 0498 7025

Sent To GMAC MORTGAGE, LLC
Street, Apt. No.; or PO Box No. WITMER ROAD
City, State, ZIP+4 HORSHAM, PA 19044-2211

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

SACRAMENTO CA 95833

| | | 0012 |
|---|---|---|
| Postage | $0.41 | |
| Certified Fee | $2.65 | 09 |
| Return Receipt Fee (Endorsement Required) | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $5.21 | 03/24/2008 |

7007 0710 0001 0498 6721

Sent To GREENPOINT MORTGAGE FUNDING
Street, Apt. No.; or PO Box No. 100 GATEWAY OAKS DR #100
City, State, ZIP+4 SACRAMENTO, CA 95833-3503

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

WATERLOO IA 50704

| | | 0012 |
|---|---|---|
| Postage | $0.41 | |
| Certified Fee | $2.65 | 09 |
| Return Receipt Fee (Endorsement Required) | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $5.21 | 03/24/2008 |

7007 0710 0001 0498 6752

Sent To GMAC MORTGAGE, LLC
Street, Apt. No.; or PO Box No. BOX 780
City, State, ZIP+4 WATERLOO, IA 50704-0780

PS Form 3800, August 2006          See Reverse for Instructions



**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $  $2.65 |
| Certified Fee | $1.15 |
| Return Receipt Fee (Endorsement Required) | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $  $5.21 |

Postmark Here
03/24/2008

Sent To GREEN POINT MORTGAGE Fund
Street, Apt. No.; or PO Box No. 100 WOOD HOLLOW DR
City, State, ZIP+4 NOVATO, CA 94945-1434

PS Form 3800, August 2006        See Reverse for Instructions

7007 0710 0001 0498 6991

# Exhibit "T"

# CONSUMER LAW CENTER, INC.

Fred W. Schwinn
fred.schwinn@sjconsumerlaw.com

12 South First Street, Suite 1014
San Jose, CA  95113-2418

(408) 294-6100
Fax (408) 294-6190

March 24, 2008

GMAC Mortgage, LLC
c/o Corporation Service Company, Agent for Service
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA  95833-3503

**CERTIFIED MAIL**
**7008 0150 0001 3205 7281**

GMAC Mortgage, LLC
100 Witmer Road
Horsham, PA  19044-2211

**CERTIFIED MAIL**
**7008 0150 0001 3205 7298**

GMAC Mortgage, LLC
P.O. Box 780
Waterloo, IA  50704-0780

**CERTIFIED MAIL**
**7008 0150 0001 3205 7304**

Mortgage Electronic Registration System, Inc.
P.O. Box 2026
Flint, MI  48501-2026

**CERTIFIED MAIL**
**7008 0150 0001 3205 7359**

Greenpoint Mortgage Funding, Inc.
c/o Corporation Service Company, Agent for Service
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA  95833-3503

**CERTIFIED MAIL**
**7008 0150 0001 3205 7335**

Greenpoint Mortgage Funding, Inc.
100 Wood Hollow Drive
Novato, CA  94945-1434

**CERTIFIED MAIL**
**7008 0150 0001 3205 7328**

Re:    Carlos H.L. Perez
       551 Loumena Lane
       San Jose, California  95111-2246
       GreenPoint Loan No. 020806220
       GMAC Loan No. 8307042014

Dear Sir/Madam:

This office represents Carlos H.L. Perez concerning the above referenced loan transaction which he and his wife entered into with Greenpoint Funding, Inc., on or about March 2, 2006.  We have been authorized by our client to rescind this transaction and hereby exercise that right pursuant to the Federal Truth in Lending Act (TILA), 15 U.S.C. § 1635 and Regulation Z, 12 C.F.R. § 226.15.

- 1 -

Greenpoint Funding, Inc., failed the provide the TILA disclosures to our client or the TILA disclosures provided to our client failed to meet the requirements of the Federal Truth in Lending Act and Regulation Z in the following respects:

(a)  Our client was not provided the disclosures that are required by the Federal Truth in Lending Act, 15 U.S.C. § 1635(a) and Regulation Z, 12 C.F.R. § 226.15(b)(5), in that our client was not provided with two properly completed copies of the Notice of Right to Cancel disclosure in a credit transaction in which a security interest was retained or acquired in our client's principal dwelling.

It appears that GMAC Mortgage, LLC, is a successor in interest to the Deed of Trust which secures the subject consumer transaction.  As a successor in interest of the Deed of Trust once owned by Greenpoint Funding, Inc., we hereby demand that GMAC Mortgage, LLC, take any action necessary to reflect the termination of the security interest in our client's principal dwelling.  As a result of the above described violations of the Truth in Lending Act and Regulation Z, the security interest held by Greenpoint Funding, Inc., and/or GMAC Mortgage, LLC, is void upon our client's rescission.  See 15 U.S.C. § 1635 and 12 C.F.R. § 226.15.  Pursuant to the TILA and Regulation Z, you have twenty days after receipt of this notice of rescission to return to our client all monies paid and to take action necessary or appropriate to reflect termination of the security interest on our client's principal dwelling.

Please be advised that if you do not cancel the security interest and return all consideration paid by our client you could be held responsible for actual damages, statutory damages, attorney fees and costs pursuant to 15 U.S.C. § 1640(a).

Finally, please be advised that our client reserve all rights to raise additional or alternative grounds for rescission as may be subsequently identified under state or federal law.

Very Truly Yours,

Fred W. Schwinn

cc:    Carlos H.L. Perez



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.41 | 0012 |
| Certified Fee | | $2.65 | |
| Return Receipt Fee (Endorsement Required) | | $2.15 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.21 | 03/24/2008 |

Postmark Here

Sent To MORTGAGE ELECTRONIC REG
Street, Apt. No.; or PO Box No. BOX 2026
City, State, ZIP+4 FLINT, MI 48501-2026

PS Form 3800, August 2006        See Reverse for Instructions

7008 0150 0001 3205 7359

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.41 | 0012 |
| Certified Fee | | $2.65 | |
| Return Receipt Fee (Endorsement Required) | | $2.15 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.21 | 03/24/2008 |

Postmark Here

Sent To GMAC MORTGAGE LLC
Street, Apt. No.; or PO Box No. 500 GATEWAY OAKS DR # 100
City, State, ZIP+4 SACRAMENTO, CA 95833-3503

PS Form 3800, August 2006        See Reverse for Instructions

7008 0150 0001 3205 7281

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.41 | 0012 |
| Certified Fee | | $2.65 | |
| Return Receipt Fee (Endorsement Required) | | $2.15 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.21 | 03/24/2008 |

Postmark Here

Sent To GREENPOINT MORTGAGE Funding
Street, Apt. No.; or PO Box No. 500 GATEWAY OAKS DR # 100
City, State, ZIP+4 SACRAMENTO, CA 95833-3503

PS Form 3800, August 2006        See Reverse for Instructions

7008 0150 0001 3205 7335

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.41 | 0012 |
| Certified Fee | | $2.65 | |
| Return Receipt Fee (Endorsement Required) | | $2.15 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.21 | 03/24/2008 |

Postmark Here

Sent To GMAC MORTGAGE LLC
Street, Apt. No.; or PO Box No. WITMER ROAD
City, State, ZIP+4 HORSHAM, PA 19044-2211

PS Form 3800, August 2006        See Reverse for Instructions

7008 0150 0001 3205 7298

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.41 | 0012 |
| Certified Fee | | $2.65 | |
| Return Receipt Fee (Endorsement Required) | | $2.15 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.21 | 03/24/2008 |

Postmark Here

Sent To GREENPOINT MORTGAGE
Street, Apt. No.; or PO Box No. WOOD HOLLOW DR
City, State, ZIP+4 NOVATO, CA 94945-1434

PS Form 3800, August 2006        See Reverse for Instructions

7008 0150 0001 3205 7328

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.41 | 0012 |
| Certified Fee | | $2.65 | |
| Return Receipt Fee (Endorsement Required) | | $2.15 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.21 | 03/24/2008 |

Postmark Here

Sent To GMAC MORTGAGE, LLC
Street, Apt. No.; or PO Box No. BOX 780
City, State, ZIP+4 WATERLOO, IA 50704-0780

PS Form 3800, August 2006        See Reverse for Instructions

7008 0150 0001 3205 7304

# Exhibit "U"

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *Dickey De George*  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)   MAR 2 6 2008

C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

GMAC MORTGAGE, LLC
c/o Corp. Service Company
AGENT FOR SERVICE
2730 GATEWAY OAKS DR
SUITE 100
SACRAMENTO, CA 95833-35...

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7007 0710 0001 0498 7032

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X *C Moody*  ☒ Agent  ☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery  3-27

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

GMAC MORTGAGE, LLC
100 WITMER ROAD
HORSHAM, PA
19044-2211

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7007 0710 0001 0498 7025

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ROB SMEDLEY  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery   MAR 2 8 2008

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

GMAC MORTGAGE, LLC
P.O. BOX 780
WATERLOO, IA
50704-0780

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.
4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)

7007 0710 0001 0498 6752

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X *Blaine K. Grant* ☐ Agent ☐ Addressee<br>B. Received by (*Printed Name*)  C. Date of Delivery MAR 3 1 2008 |
| 1. Article Addressed to:<br><br>MORTGAGE ELECTRONIC<br>REGISTRATION SYS., INC<br>P.O. BOX 2026<br>FLINT, MI<br>48501-2026 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No |
| | 3. Service Type<br>☑ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (*Extra Fee*)  ☐ Yes |
| 2. Article Number<br>(*Transfer from service label*) | 7007 0710 0001 0498 6745 |

PS Form 3811, February 2004          Domestic Return Receipt          102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

GREENPOINT MORTGAGE
          FUNDING, INC
C/O CORP. SERVICE COMPANY
    Agent FOR SERVICE
2730 GATEWAY OAKS DR. #100
SACRAMENTO, CA 95833-
                        3505

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X Becky DeGeorge    ☐ Agent
                    ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
Becky DeGeorge    MAR 2 6 2008

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7007 0710 0001 0498 6721

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

GREENPOINT MORTGAGE
          FUNDING, INC
100 WOOD HOLLOW DR
NOVATO, CA
         94945-1434

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature]    ☐ Agent
                 ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery
Nil Knight    3/26/08

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7007 0710 0001 0498 6691

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

# Exhibit "V"

## Receipt 1

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  Becky DeGeorge
☐ Agent
☐ Addressee

B. Received by (Printed Name)   Becky DeGeorge
C. Date of Delivery   MAR 2 6 2008

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

GMAC MORTGAGE, LLC
c/o Corp. SERVICE COMPANY
2730 GATEWAY OAKS DR
Suite 100
SACRAMENTO, CA
95833-3503

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7008 0150 0001 3205 7281

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

## Receipt 2

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  G. Neelo
☐ Agent
☐ Addressee

B. Received by (Printed Name)
C. Date of Delivery   3-27

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

GMAC MORTGAGE LLC
100 WITMER ROAD
HORSHAM, PA
19044-2211

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7008 0150 0001 3205 7298

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

## Receipt 3

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  ACE SMEDLEY
☐ Agent
☐ Addressee

B. Received by (Printed Name)
C. Date of Delivery   MAR 2 8 2008

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

1. Article Addressed to:

GMAC MORTGAGE, LLC
P.O. BOX 780
WATERLOO, IA
50704-0780

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7008 0150 0001 3205 7304

PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Elaine K. Grant_  ☐ Agent
☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
MAR 3 1 2008

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

MORTGAGE ELECTRONIC
   REGISTRATION SYS. INC
P.O. BOX 2026
FLINT, MI 48501-2026

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
7008 0150 0001 3205 7359

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
MAR 2 6 2000
X _Becky DeGeorge_  ☐ Agent
☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
_Becky DeGeorge_

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

GREEN POINT MORTGAGE
   FUNDING, INC.
C/O CORP SERVICE COMPANY
   AGENT FOR SERVICE
2730 GATEWAY OAKS DR
   Suite 100
SACRAMENTO, CA 95833-
   3.503

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
7008 0150 0001 3205 7335

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent
☐ Addressee

B. Received by ( Printed Name )   C. Date of Delivery
_Kirk Knight_   3/26/08

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

1. Article Addressed to:

GREENPOINT MORTGAGE
   FUNDING, INC
100 WOOD HOLLOW DRIVE
NOVATO, CA.
   94945-1434

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
7008 0150 0001 3205 7328

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540